ROPES & GRAY LLP
Mark I. Bane
Meredith S. Tinkham (*pro hac vice* pending)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

-and-

James A. Wright III
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

*Proposed Counsel to the Debtor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Doral Financial Corporation,[1] | : | Case No. 15-_____ ( ) |
| | : | |
| Debtor. | : | |

-------------------------------------------------------x

## DECLARATION OF CAROL FLATON
## IN SUPPORT OF FIRST DAY MOTIONS

I, Carol Flaton, hereby certify and declare as follows:

1.      I am the Chief Restructuring Officer ("CRO") of Doral Financial Corporation ("DFC" or the "Debtor"). DFC is the above-referenced debtor and debtor-in-possession in this chapter 11 case (the "Chapter 11 Case") currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

---

[1] The last four digits of the taxpayer identification number of the Debtor are 2162.

2.     In my capacity as CRO, I have become, and am, generally familiar with the Debtor's go forward operations, business affairs, and books and records, as well as the Debtor's restructuring efforts.

3.     In addition to being the Debtor's CRO, I am a managing director of Zolfo Cooper. I have over 27 years of professional experience in banking and finance, and my career has included positions in lending, capital markets, risk management and as a financial advisor to debtors and creditors in connection with restructurings, debt exchanges, refinancings, and capital raises. Prior to my role as managing director of Zolfo Cooper, I was a managing director in the U.S. restructuring practice of Lazard Frères from 2008 to 2013 and a restructuring banker at Citigroup from 2006 to 2008 and Credit Suisse from 1995-2006.

4.     On March 11, 2015, (the "Petition Date") the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. To minimize the adverse effects of filing for chapter 11 protection and to enhance the prospect of a successful chapter 11 case, the Debtor is filing a limited number of motions requesting various types of "first day" relief (collectively, the "First Day Motions"). I am familiar with the contents of each First Day Motion. The facts and descriptions of the relief requested in the First Day Motions are true and correct to the best of my information and belief. I believe the relief sought in each First Day Motion is necessary to enable the Debtor to transition into chapter 11 with minimal disruption. I further believe the relief sought in each First Day Motion is critical to the Debtor's ability to implement a timely and efficient chapter 11 process, is in the best interests of the Debtor's creditors, and will preserve and maximize the value of the Debtor's estate.

5.     I submit this declaration (the "Declaration") in support of the First Day Motions. Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by members of the Debtor's management or its professionals, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized by the Debtor to submit this Declaration.

## I.     OVERVIEW OF THE DEBTOR'S BUSINESS

### A.     The Debtor's Business Operations

6.     DFC maintains offices in New York City, Coral Gables, Florida and San Juan, Puerto Rico and is organized under the laws of the Commonwealth of Puerto Rico ("Puerto Rico" or the "Commonwealth"). DFC has three wholly-owned subsidiaries: (i) Doral Properties, Inc. ("Doral Properties"), (ii) Doral Insurance Agency, LLC ("Doral Insurance"), and (iii) Doral Recovery, Inc. ("Doral Recovery I").[2]

7.     Prior to February 27, 2015, Doral Bank Puerto Rico ("Doral Bank"), a state non-member bank chartered by the Puerto Rico Office of the Commissioner of Financial Institutions ("OCIF"), was also a wholly-owned subsidiary of DFC. On February 27, OCIF appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver for Doral Bank.[3] Doral Bank had several subsidiaries, including (i) Doral Mortgage, LLC ("Doral Mortgage"), which engaged in mortgage lending in Puerto Rico,

---

[2] Doral Recovery I has no liabilities or assets other than a potential net operating loss tax attribute.

[3] Doral Financial Corporation form 8-K, dated as of February 26, 2015, available at http://www.sec.gov/Archives/edgar/data/840889/000119312515070394/d883548d8k.htm.

(ii) Doral Money, Inc. ("Doral Money"), which engaged in commercial lending in the United States, (iii) Doral Recovery II, LLC ("Doral Recovery II"), which held commercial loans and residential mortgage loans previously held by Doral Bank, (iv) Abbey Depositor, Inc., a Delaware corporation organized for the purpose of selling certain performing mortgage loans, and (v) Doral Investment International, LLC.

8.      Prior to Doral Bank being placed into receivership on February 27, DFC conducted the bulk of its operations through Doral Bank, which served customers through 26 branches located in New York, Florida, and Puerto Rico. Doral Bank's principal business consisted of residential mortgages and consumer lending, commercial lending, institutional securities, retail banking, and online banking.

### B.      DFC's Assets

9.      DFC is a holding company whose primary operating asset, prior to Doral Bank being placed into receivership, was equity in Doral Bank. An overview of DFC's remaining assets is discussed below:

10.      *Deposit Accounts*. As of the Petition Date, the Debtor has approximately $20.5 million in deposit accounts with Citibank, N.A. The Debtor has substantially smaller amounts in other deposit accounts with Banco Popular and Doral Bank.

11.      *Loan, I/O Strip, and REO Assets*. The Debtor owns approximately 129 legacy loans with a book value of approximately $10.3 million and approximately 61 real estate owned, or "REO," properties in Puerto Rico, acquired through foreclosures of loans with a collective book value of approximately $6.0 million. The loans primarily consist of loans collateralized by real estate in Puerto Rico, many of which are currently non-performing. DFC also owns interest only strips "I/O strips" on pools of fixed rate mortgages. The I/O strips had a collective book value of approximately $8.2 million as of

January 31, 2015 (the last date such information is available). Finally, DFC expects to liquidate these assets, subject to approval of this Court, through sales in the immediate future.

12.     *Doral Insurance*. DFC owns 100% of the equity in Doral Insurance, a non-debtor. Doral Insurance is an insurance general agent located in Puerto Rico, which acts as an insurance agent primarily for customers of Doral Bank. Among other things, Doral Insurance assists mortgage borrowers by connecting them with third party insurers for insurance policies required under the mortgage loan, such as basic homeowners insurance.

13.     Doral Insurance's customer base consists of customers of Doral Bank. Following Doral Bank being placed into receivership, the Debtor expects that the customer base of Doral Insurance may begin to decline dramatically. The value of Doral Insurance as an asset of DFC is rapidly diminishing, and DFC is aware of the necessity of disposing of Doral Insurance in an expeditious and value-preserving manner.

14.     In the lead up to this case, DFC received inquiries from parties interested in acquiring certain of Doral Insurance's assets and operations. That process culminated in the Asset Purchase and Sale Agreement (the "Sale Agreement"), dated as of February 26, 2015, by and between Doral Insurance and Anglo-Puerto Rican Insurance Corporation ("Purchaser"), pursuant to which Doral Insurance agreed to sell its agency policy portfolio (the "Business") to the Purchaser for $10.75 million, subject to certain price adjustments, as set forth in the Sale Agreement. The Sale Agreement is expressly

subject to approval of this Court, and DFC expects to present a motion shortly seeking Court approval of the transaction and approval of the dissolution of Doral Insurance.[4]

15. *Holdback Funds*. DFC has contractual interests in approximately $6.7 million in holdback funds under several sale contracts, which funds are subject to various rights of the buyers. Prepetition, DFC sold certain loan assets and REO properties to third party buyers (the "<u>Conditionally Sold Loan Assets</u>"). The agreements provide for funds to be held back and then released over time to DFC, in conjunction with the buyers completing diligence on the various assets sold and resolving issues (such as title issues) raised therein. In addition to the $6.7 million noted above, DFC has already received approximately $10.1 million in released funds under the sale contracts. The Debtor intends to explore agreements with the buyers to promptly resolve the remaining funds in escrow and the parties' respective rights thereto.

16. *Collateral Pledged to Fannie Mae*. DFC has, in the past, sold certain loans to the Federal National Mortgage Association ("<u>Fannie Mae</u>") under a series of Master Agreements. In the transactions, DFC agreed to certain repurchase provisions under which Fannie Mae has the right to compel DFC to repurchase particular loans if certain defined defaults by the borrowers under the loans later occurred. DFC's repurchase obligations to Fannie Mae are secured by a pledge of treasury securities (which recently matured into cash) by DFC, held by a third party under a tri-party agreement. Currently, DFC has $44 million in collateral pledged to support DFC's repurchase obligations. DFC believes, however, that its repurchase liability exposure to Fannie Mae is substantially less than $44 million. In the lead up to this Chapter 11 Case, DFC entered into

---

[4] Doral Financial Corporation form 8-K, dated as of February 26, 2015, available at http://www.sec.gov/Archives/edgar/data/840889/000119312515070394/d883548d8k.htm.

negotiations with Fannie Mae regarding the projected excess collateral and has reached a tentative agreement with Fannie Mae. DFC intends to submit a motion to the Court to approve a settlement with Fannie Mae on this basis that would crystallize DFC's repurchase liability and return a significant portion of the collateral to DFC.

17. *Doral Properties*. DFC owns 100% of the equity in Doral Properties, a non-debtor. Doral Properties' primary asset is an office building located at 1451 Franklin D. Roosevelt Avenue in San Juan, Puerto Rico ("1451 FDR Ave"). Doral Properties also holds certain leases to affiliated entities for use of space in 1451 FDR Ave. As discussed below, Doral Properties is obligated on substantial secured bond indebtedness, which may exceed the value of Doral Properties' assets, which is not yet known. Doral Properties' bond debt is guaranteed, on an unsecured basis, by the Debtor. The Debtor and Doral Properties intend to negotiate with the creditors of Doral Properties regarding an out of court liquidation of the Doral Properties' assets.

18. *Plaintiff Claims*. DFC is currently pursuing certain causes of action, as plaintiff or counter-claimant, in various ongoing litigation matters. DFC intends to pursue these claims as appropriate to generate value for DFC's estate.

### C. DFC's Capital Structure

19. DFC's borrowed debt capital structure consists of two sets of long-term debt obligations: the DFC Notes issued by DFC and the AFICA Bonds issued by Doral Properties, for which DFC is a guarantor (each as defined below).

#### i. DFC Notes

20. In separate issuances in 2001 and 2002, the Puerto Rico Conservation Trust Fund, a charitable trust organized under the laws of Puerto Rico, issued four sets of publicly-held secured notes totaling $200 million in the aggregate (the "Trust Notes").

The Trust Notes vary in interest rate from 6.10% and 6.5% and are payable solely from and secured by a pledge of $200 million in original principal amount of senior notes issued by DFC in 2001 and 2002 (the "<u>DFC Notes</u>"). The DFC Notes were issued pursuant to the Senior Debt Securities Indenture, dated as of May 14, 1999, between DFC and Bankers Trust Company, as Trustee. The DFC Notes vary in interest rate from 7.10% to 7.65% and are unsecured obligations of DFC. Approximately $170,000,000 in principal, plus unpaid interests, remains outstanding on the DFC Notes.

ii.     **AFICA Bonds**

21.     In 1999 and 2002, Doral Properties, a non-debtor, arranged financing through the issuance of tax-preferred bonds by the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("<u>AFICA</u>").[5] In 1999, AFICA issued $44,765,000 million in bonds (the "<u>1999 AFICA Bonds</u>"). AFICA then lent the proceeds from the issuance of the 1999 AFICA Bonds to Doral Properties to finance the acquisition, development, and construction of 1451 FDR Ave pursuant to a Loan and Guaranty Agreement, dated as of November 3, 1999, among AFICA, Doral Properties, and DFC. Under the Loan and Guaranty Agreement, DFC guaranteed Doral Properties' obligations to AFICA.

22.     The 1999 AFICA Bonds are secured by a lien on 1451 FDR Ave, pursuant to a Pledge and Security Agreement between AFICA and Doral Properties, dated as of November 3, 1999 (the "<u>Pledge Agreement</u>"). DFC's guarantee is an unsecured obligation. Approximately $30.8 million in principal, plus unpaid interest, remains outstanding on the 1999 AFICA Bonds.

---

[5] AFICA's name in Spanish is **A**utoridad de Puerto Rico para el **F**inanciamiento de Facilidades **I**ndustriales, Turisticas, Educativas, Medicas y de **C**ontrol **A**mbiental.

23.     In 2002, AFICA issued $7.6 million in bonds (the "<u>2002 AFICA Bonds</u> and, together with the 1999 AFICA Bonds, the "<u>AFICA Bonds</u>"). AFICA then lent the proceeds of the 2002 AFICA Bonds to Doral Properties to finance improvements to 1451 FDR Ave pursuant to the Loan and Guaranty Agreement, dated as of November 1, 2002, among AFICA, Doral Properties, and DFC. Under the Loan and Guaranty Agreement, DFC guaranteed Doral Properties' obligations to AFICA.

24.     The 2002 AFICA Bonds are not subject to the Pledge Agreement and are unsecured. DFC's guarantee is also an unsecured obligation. Approximately $6.5 million in principal, plus unpaid interest, remains outstanding on the 2002 AFICA Bonds.

## II.     EVENTS LEADING UP TO THE CHAPTER 11 CASE

25.     The information in this section II is based on information provided to me by the Debtor's management and not based on my personal knowledge.

### A.     History of DFC

26.     In the early to mid 2000s, members of the former management team controlled and operated DFC and its then subsidiaries (collectively, the "<u>Doral Group</u>"). During these years, Doral Bank had significant banking operations and was a large mortgage lender in Puerto Rico. The Doral Group engaged in numerous derivative transactions at this time that resulted in illusory, non-cash earnings. This led to accounting errors and ultimately, among other things, misstated earnings and overpayments of taxes by the Doral Group.

27.     The Doral Group began a process of changing its financial reporting and accounting and restating its earnings. The restatement resulted in, among other things, a $4.5 billion market capitalization collapse and subsequent class action suits and fines from the U.S. Securities and Exchange Commission. Ultimately, the restatement resulted

in the unwinding of multiple true sale transactions, subsequently requiring that billions of dollars of residential and commercial assets and related liabilities be brought back onto the Doral Group's balance sheet. It also led to the creation of a deferred tax asset ("DTA"), as taxes were reported and paid on fictitious earnings during this period. The DTA was the source of a lengthy tax dispute with the Commonwealth of Puerto Rico which ultimately led to the undercapitalization and failure of Doral Bank (discussed below).

28.     DFC's current management joined in mid-2006 and began a comprehensive reorganization of the Doral Group to improve the bank's business and to address the internal control problems and the balance sheet. The vast majority of the Doral Group's assets were asset-backed loans in Puerto Rico that were already booked when the management change occurred.

29.     To help recapitalize the Doral Group, DFC raised $610 million in new equity investments in 2007.[6] From 2007 to 2014, DFC sought to position the Doral Group for an expected recovery in Puerto Rico's economy and growth on the mainland. DFC worked to strengthen Puerto Rico operations by better managing the existing credit exposure. The company, under the new management team, also closed branches, streamlined operations, and consolidated back offices, to reduce costs at Doral Bank. DFC also formed Doral Recovery to manage its non-performing assets.

30.     Doral Bank recognized significant losses to its portfolio as it deleveraged its Puerto Rico operations. As of December 31, 2006, Doral Bank had approximately $11.8 billion in Puerto Rico assets and minimal assets in the continental U.S. As of

---

[6] Doral Financial Corporation form 10-K for the year ended December 31, 2007, available at http://www.sec.gov/Archives/edgar/data/840889/000095014408002124/g12281e10vk.htm.

March 31, 2014, to reduce risk and improve earnings, Doral Bank deleveraged its Puerto Rico based assets down to approximately $ 5.6 billion, while also expanding its continental U.S. segment with approximately $2.2 billion in new lower risk and higher earning assets.

31.     More recently, DFC has engaged in several transactions to resolve non-performing assets and increase capital at Doral Bank. In 2014, DFC retained Houlihan Lokey to help DFC and Doral Bank restructure their operations and raise capital through asset sales. This resulted in several asset sales by DFC and Doral Bank in 2014, which raised needed capital. DFC also intended to initiate an exchange offer to recapitalize DFC around a smaller, but profitable and regulatory-compliant, banking operation. However, the exchange never came to fruition.

### B.     Profitable Expansion Into New York and Florida

32.     Over the past five years, to diversify and grow its business and in response to the economic situation in Puerto Rico, DFC sought to develop Doral Bank's business outside of Puerto Rico. DFC succeeded in expanding Doral Bank's business in the continental U.S., opening branches in New York and Florida. Doral Bank also began commercial and construction lending in the New York City metropolitan area through its indirect subsidiary, Doral Money.

33.     As a result of DFC's efforts, as of February 2015, Doral Bank had eight branches in New York and Florida. As of December 2013, the bank's continental U.S. segment had grown to total loans of approximately $2.7 billion. DFC's most recently filed form 10-K for the year ended December 31, 2013 reflected that, given the

continuing recession in Puerto Rico, the continental U.S. was DFC's principal source of growth and future focus.

### C.     Decline of Puerto Rico's Economy

34.     Despite DFC's successful efforts to diversify, the majority of Doral Bank's assets remained intrinsically tied to Puerto Rico and its economy's success or failure. The global economic crisis in 2007-2008 exacerbated the recession in Puerto Rico. The general expectation was that the economy of Puerto Rico would recover consistently with a recovery in the continental U.S. Instead, unlike the rest of the United States, Puerto Rico's economy failed to recover and remains in recession with substantial financial challenges.[7]

35.     The Doral Group, like all major Puerto Rican financial institutions, was challenged by the ongoing recession in Puerto Rico. Puerto Rico's continuing recession has significantly impacted all elements of the island's economy. Residential housing prices have dropped dramatically, falling as much as 45 percent since their peak in 2007.[8] The drop in residential housing prices, combined with the economic hardships of borrowers, resulted in an increase in non-performing loans as well as loan defaults and foreclosures for all Puerto Rico lenders, including Doral Bank. DFC also faced significant competition in Puerto Rico from local commercial banks and credit unions, as well as banking affiliates of banks headquartered in the continental U.S. and Canada.

### D.     Tax Disputes with the Commonwealth

36.     As discussed above, and relayed to me by members of DFC's management and also filed in various public filings, the Doral Group reported large, but illusory, gains

---

[7] http://www.nytimes.com/aponline/2015/03/08/world/americas/ap-cb-puerto-rico-tax-evasion.html

[8] http://www.nytimes.com/2014/09/07/realestate/puerto-rico-luring-buyers-with-tax-breaks.html

in the early to mid-2000's. Largely as a result of apparent gains in these transactions, the Doral Group reported large profits in the early to mid 2000s, on which it paid substantial amounts in taxes to the Commonwealth's taxing authority (the "Hacienda").

37.     Over time, it became evident that the Doral Group had overpaid taxes to the Hacienda. To address these overpayments, DFC and the Hacienda engaged in lengthy negotiations, which eventually resulted in several closing agreements with the Hacienda settling these disputes over time.

38.     One closing agreement, entered into on September 26, 2006 (as amended by subsequent closing agreements (excluding the 2012 Closing Agreement, as defined below), the "2006 Closing Agreement"), recognized available tax deductions of approximately $889.7 million (as of that date).

39.     On March 26, 2012, the Hacienda and DFC, Doral Bank, Doral Mortgage, Doral Insurance, and Doral Properties entered into a new closing agreement (the "2012 Closing Agreement"). Under the 2012 Closing Agreement, which replaced the 2006 Closing Agreement from January 1, 2011 forward, the Hacienda and DFC agreed to replace the remaining tax deductions in the 2006 Closing Agreement with a determination that the Doral Group had a tax overpayment in the amount of approximately $229.9 million, which represented a negotiated resolution.

40.     Later, on December 30, 2013, DFC, Doral Bank, Doral Mortgage, Doral Insurance, Doral Properties, Doral Recovery I and Doral Recovery II executed a another closing agreement with the Hacienda (the "2013 Closing Agreement" and, together with the 2012 Closing Agreement, the "2012 & 2013 Closing Agreements"), to address a

separate overpayment of taxes. Pursuant to the 2013 Closing Agreement, the parties agreed that the Doral Group had overpaid approximately $56 million in taxes for 2012.

41.    The 2012 & 2013 Closing Agreements provided for the tax overpayments to be treated as a prepayment of income tax by the Doral Group that could be apportioned among and used by any member of the Doral Group to offset taxes due in future years. Critically, the Closing Agreements also provided that if there was no tax liability to offset the debts due, an agreed portion of the overpayments could be claimed as partial or full refunds in future tax years.

42.    By letter dated April 30, 2012, the Hacienda confirmed that, pursuant to the 2012 Closing Agreement, the agreed overpayment would be treated as a prepayment of tax or refunded over a period of 5 years upon a proper claim by the Doral Group. In light of the closing agreements and the Hacienda's assurance it would abide by the closing agreements, DFC believed it had significant value to be derived from the 2012 & 2013 Closing Agreements and operated for some time with that understanding. On May 9, 2014, DFC sent a letter to the Secretary of the Hacienda (the "May 9 Letter") requesting that the Commonwealth of Puerto Rico pay all amounts due to DFC under the 2012 Closing Agreement. DFC also stated in the May 9 Letter that it intended to exercise all legal remedies available to it to enforce collection and protect the interests of DFC and its stakeholders, including shareholders, depositors, and employees.[9]

43.    Notwithstanding this acknowledgment, however, after a change in the government of Puerto Rico, the Hacienda refused to abide by the terms of the 2012 Closing Agreement and did not issue refunds for the prepaid taxes. On May 14, 2014, the

---

[9] Doral Financial Corporation form 8-K, dated as of May 9, 2014, available at
http://www.sec.gov/Archives/edgar/data/840889/000119312514193660/d724294d8k.htm.

Hacienda issued a decision finding that Doral Bank was not entitled to the refunds, despite the Closing Agreements and the Hacienda's previous acknowledgments.[10]

44.     Subsequently, DFC sought to judicially enforce the 2012 Closing Agreement and filed a complaint for declaratory judgment in the Court of First Instance of Puerto Rico (the "Court of First Instance"). On October 10, 2014, the Court of First Instance ruled in DFC's favor, finding the 2012 Closing Agreement to be a valid and binding obligation enforceable against the Commonwealth.[11] On December 31, 2014, the Commonwealth appealed the ruling to the Court of Appeals of Puerto Rico, and on February 25, 2015, the Court of Appeals overturned the ruling of the Court of First Instance.

45.     DFC filed an appeal to the Supreme Court of Puerto Rico early in the morning on Friday, February 27, 2015. Later that day – the same day Doral Bank was placed into receivership – the Supreme Court of Puerto Rico denied DFC's petition for Certiorari.[12] As a result, the Court of Appeals decision is final and the 2012 Closing Agreement is now void.

46.     DFC is exploring its rights in the aftermath of the judicial disallowance of the 2012 Closing Agreement.

---

[10] *See Request for Declaratory Judgment*; Doral Financial Corporation; Doral Bank; Doral Mortgage, LLC; Doral Insurance Agency, Inc.; Doral Properties, Inc. v. Commonwealth of Puerto Rico; Department of the Treasury; and the Hon. Melba Acosta Febo, Civil Case Number: K AC2014-0533, Division: 503.

[11] Doral Financial Corporation; Doral Bank; Doral Mortgage, LLC; Doral Insurance Agency, Inc.; Doral Properties, Inc. v. Commonwealth of Puerto Rico; Department of the Treasury; and the Hon. Melba Acosta Febo, Civil Case Number: K AC2014-0533, Division: 503, In re Declaratory Judgment; Violation of Constitutional Rights; Breach of Contracts.

[12] Doral Financial Corporation form 8-K, dated as of February 27, 2015, available at http://www.sec.gov/Archives/edgar/data/840889/000119312515071890/d884430d8k.htm.

### E. Disputes with the OCIF and FDIC

47.     DFC and Doral Bank were highly regulated institutions. As a bank holding company, DFC was subject to regulation by the Board of Governors of the Federal Reserve System and oversight by the Federal Reserve Bank of New York, and Doral Bank was subject to regulation and oversight by the FDIC and the OCIF. Under the FDIC's existing risk-based capital guidelines for bank holding companies, Doral Bank was required to maintain a certain ratio of qualifying total capital to risk-weighted assets, with at least half of its total capital to be comprised of certain kinds of assets (such capital, "Tier 1 Capital"). The Consent Order, entered into between Doral Bank and the FDIC on August 8, 2012, also set forth certain operating restrictions and requirements for Doral Bank (the "Consent Order").[13]

48.     As described above, due to the continued recession in Puerto Rico, Doral Bank experienced difficulty in maintaining sufficient capital to satisfy the FDIC's requirements. To increase Doral Bank's Tier 1 capital, DFC's Board of Directors undertook in 2012 to contribute the approximately $286 million in refunds due under the Closing Agreements to Doral Bank (the "Refund Undertaking"), in exchange for a commitment by the FDIC that Refund Undertaking would constitute Tier 1 Capital for Doral Bank.

49.     On May 8, 2014, the FDIC sent a letter to Doral Bank announcing for the first time that the FDIC would not accept the Refund Undertaking as Tier 1 Capital. On June 30, 2014, Doral Bank requested an administrative review of the FDIC's determination, arguing that the Refund Undertaking should qualify as Tier 1 Capital. The

---

[13] Exhibit 99.3 to Doral Financial Corporation form 8-K, dated as of August 8, 2012, available at http://www.sec.gov/Archives/edgar/data/840889/000119312512345315/d393425d8k.htm.

FDIC refused to permit the appeal, without addressing DFC's arguments as to why the Refund Undertaking should qualify as Tier 1 Capital. On August 27, 2014, Doral Bank requested reconsideration of the FDIC's determination. The FDIC denied this request on November 5, 2014, again without any discussion of the substantive points raised by DFC.

50.     Despite DFC's best efforts, Doral Bank was unable to raise sufficient Tier 1 Capital to satisfy the FDIC's capital requirements. On September 26, 2014, the FDIC sent a letter to Doral Bank indicating that the bank was "significantly undercapitalized" and directing Doral Bank to file a written capital restoration plan and contingency plan with the FDIC. On October 28, 2014, Doral Bank submitted a capital restoration plan and contingency plan to the FDIC. The capital restoration plan included treating the Refund Undertaking as Tier 1 Capital.

51.     On December 8, 2014, Doral Bank received a letter from the FDIC stating that the FDIC required more specificity in the bank's contingency plan and directing Doral Bank to resubmit a capital plan. Just two days later, on December 10, 2014, the Bank submitted to the FDIC an updated capital plan designed to allow DFC and Doral Bank to maximize the value of their assets on behalf of their stakeholders, including pursuing claims against the Commonwealth under the Closing Agreements, and to minimize the risk of loss.[14] On January 9, 2015, Doral Bank received a letter from the FDIC rejecting the updated plan.[15]

52.     On January 26, 2015, the Board of Directors of Doral Bank received a letter from the FDIC notifying the Board that the FDIC had issued a Prompt Corrective Action Directive to Doral Bank (the "Directive"). The Directive directed Doral Bank to

---

[14] *See* Doral Financial Corporation 8-K dated December 8, 2014.

[15] *See* Doral Financial Corporation 8-K dated January 9, 2015.

promptly (i) increase the amount of its Tier 1 Capital to a level sufficient to restore Doral Bank to an "adequately capitalized" level under Section 38(b)(1)(B) of the Federal Deposit Insurance Act of 1950 and/or (ii) accept an offer to combine with another insured depositary institution. The Directive also directed Doral Bank to, within 30 days of the date of the Directive, submit to the FDIC an acceptable revised written capital restoration plan.

53.     On February 24, 2015, Doral Bank received a Joint Report of Examination ("ROE") from the FDIC and OCIF as well as a Prompt Corrective Action Letter ("PCA") pursuant to which the FDIC notified Doral Bank that, based on the adjustments in the ROE, it deemed Doral Bank to be "critically undercapitalized" and subject to operating restrictions.

54.     As noted above, on Friday, February 27, 2015, OCIF appointed the FDIC as receiver for Doral Bank.

55.     Throughout 2014 and early 2015, DFC has focused on three objectives related to the tax dispute: (a) help Doral Bank remain in regulatory compliance to maintain its operations for as long as necessary to prosecute the claims against the Hacienda, (b) obtain a final judgment regarding enforcement of the 2012 Closing Agreement against the Hacienda, and (c) use the validity of the payment obligations under the 2012 Closing Agreement to restructure the company to maximize recovery for all stakeholders.

56.     To remain in compliance with the Consent Order and its mandate to increase Doral Bank's Tier 1 Capital, on August 15 and October 28, 2014, DFC transferred to Doral Bank approximately $60 million in the aggregate. DFC made these

transfers to avoid Doral Bank being placed into receivership while DFC pursued negotiation, and then litigation, with the Hacienda regarding the 2012 Closing Agreement. As discussed above, in October 2014 the Court of First Instance ruled in favor of DFC regarding the validity of the 2012 Closing Agreement, and the Court of Appeals did not reverse that decision until February 2015. DFC believed success regarding the 2012 Closing Agreement would enable DFC to avoid Doral Bank being placed into receivership and thereby preserve substantial value for DFC's creditors and equity holders.

57.     Despite the significant efforts of DFC and its management and the Doral Bank's business growth in the continental U.S., (a) the ongoing economic recession in Puerto Rico, (b) the disputes regarding the 2012 Closing Agreement and the court decision voiding that agreement, and (c) Doral Bank being placed into receivership, has led to the filing of this chapter 11 case.

**III.     PLAN FOR CHAPTER 11 CASE**

58.     DFC initiated this chapter 11 case in response to Doral Bank being placed into receivership. As discussed above, DFC is already in the process of liquidating certain of its assets, which DFC expects to convert to cash through sales and other transactions under the jurisdiction of this Court. In light of the Supreme Court of Puerto Rico's denial of DFC's petition for Certiorari regarding the 2012 Closing Agreement, DFC also intends to pursue litigation or transactions to realize value on its tax rights with the Hacienda, including DFC's rights under the 2006 Closing Agreement and the 2013 Closing Agreement. The Debtor expects to distribute the proceeds to creditors through a chapter 11 plan of liquidation negotiated with the major creditor constituencies.

## IV.  FIRST DAY MOTIONS

59.     The Debtor intends to file a number of First Day Motions seeking targeted relief to allow the Debtor to minimize the adverse effects of the commencement of this chapter 11 case on their ongoing business operations. I believe Court approval of the relief requested in the First Day Motions is essential to providing the Debtor with the opportunity to successfully meet its creditor obligations in a manner that benefits all of the Debtor's constituents. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

**A.      Motion for an Order (I) Authorizing, But Not Directing, Payment of Prepetition Wages, Salaries, Business Expenses, and Related Items, and (II) Directing All Financial Institutions to Honor Checks for Payment of Such Obligations (the "Wages Motion")**

60.     By the Wages Motion, the Debtor seeks authorization to pay all prepetition wages, salaries, and other accrued compensation, as well as all reimbursable prepetition business expenses, to employees, and to pay all payments for which prepetition payroll deductions, withholdings, or matching employer contributions were made, and all prepetition processing costs and administrative expenses related to the foregoing. Additionally, the Debtor seeks a direction to Financial Institutions (as defined in the Wages Motion) to continue to honor checks for payment on account of such obligations.

61.     As of the Petition Date, the Debtor has a staff of twelve (12) employees (the "Employees"). The Debtor has retained these Employees to help facilitate transition to operations under the Bankruptcy Code and to complete several complicated transactions necessary to wind down and monetize assets. The Debtor needs these Employees' specialized skills, institutional knowledge, and understanding of the Debtor's

business to wind down its estate efficiently and effectively. The Debtor expects to adjust its workforce as necessary during the case.

62.     The Employees are paid weekly, and the average weekly payroll per Employee is $6,375.64. The Debtor's last payroll was Friday, March 6, 2015. The Debtor therefore owes the Employees compensation for wages and salaries accrued from March 6, 2015 until the Petition Date ("Prepetition Employee Obligations"). The Debtor seeks authorization to pay such Prepetition Employee Obligations and to continue to pay all Prepetition Employee Obligations as they become due in the ordinary course of business.

63.     The Debtor uses ADP, a payroll service, to, among other things, process payroll checks and remit appropriate withholding taxes for the Employees (collectively, the "Payroll Services"). The Debtor pays a *de minimis* amount to ADP per month for payroll administration and other payroll-related services. The Debtor requests authority to pay any prepetition amounts that may be due on account of the Payroll Services, and continue to use the Payroll Services postpetition in the ordinary course of business.

64.     In the ordinary course of business, the Debtor reimburses Employees for certain expenses incurred in the scope of their employment on the Debtor's behalf (the "Reimbursable Expenses"). The Reimbursable Expenses are ordinary business expenses, and not compensation. As of the Petition Date, the Debtor estimates that there is no amount unpaid for Reimbursable Expenses. To the extent prepetition Reimbursable Expenses exist, the Debtor seeks authorization, by the Wages Motion, to continue to pay all Reimbursable Expenses as they become due in the ordinary course of business.

65.     The Debtor accrues in the ordinary course of business state, local, and federal employment and withholding taxes as wages are earned by the Employees

("Withholding Obligations"), including Social Security taxes, federal, state, and local income taxes, wage garnishments, and other court-ordered deductions. The Debtor seeks the authority to continue to timely pay the Withholding Obligations as they become due in the ordinary course of business.

66.     The Debtor also seeks an order authorizing and directing all Financial Institutions to receive, process, honor, and pay any and all checks, drafts, and other forms of payment drawn on the Debtor's bank accounts related to the Prepetition Employee Obligations, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable bank accounts to cover such payments.

67.     I believe that the relief sought in the Wages Motion is necessary because the failure to pay Prepetition Employee Obligations and to continue to pay wages and salaries to the Employees could have a material adverse impact on the winding down of the Debtor's operations. The Employees are necessary to wind down the Debtor's estate efficiently and effectively, on account of their specialized skills, institutional knowledge, and understanding of the Debtor's business.

**B.      Motion for an Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates (the "Case Management Motion")**

68.     By the Case Management Motion, the Debtor seeks an order establishing case management and administrative procedures for its chapter 11 case. Specifically, the Debtor seeks approval of, among other things, a Master Service List (as defined in the Case Management Motion), service and noticing procedures, omnibus hearing dates, and procedures governing motion practice, requests for emergency hearings, hearing agendas, and adversary proceedings.

69. Approval of the procedures set forth in the Case Management Motion will significantly reduce the administrative and economic burden placed on this Court, the Debtor, creditors, and parties-in-interest with respect to hearings and the filing and serving of documents in these cases.

70. In addition, the costs and burdens associated with the possibility of numerous, fragmented hearings, plus the costs associated with copying and mailing or otherwise serving all filings to parties without the limitation proposed in the Case Management Motion, will impose an administrative and economic burden on the Debtor's estate, this Court, and the parties-in-interest. Indeed, mass mailings could be costly to the Debtor's estate and would require the Debtor to divert limited resources to comply with all administrative requirements.

C. **Motion for an Order Extending Deadline for Debtor to File its Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Extension Motion")**

71. By the Extension Motion, the Debtor seeks an extension of the deadline by which it must file its schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules and Statements"). Although the Debtor has commenced the process of gathering the necessary information to prepare and finalize the Schedules and Statements, the 14-day time period provided by Bankruptcy Rule 1007 will be insufficient to complete those tasks. The nature and scope of the Debtor's operations require the maintenance of voluminous records and intricate accounting systems, some of which may now be under the control of the FDIC. The complexity of the Debtor's business and the limited staff available to perform the required internal review of its financial records and affairs and the pressure incident to the commencement of the

chapter 11 case, provides ample cause justifying, if not necessitating, a 30-day extension of the deadline to file the Schedules and Statements.

72.    While the Debtor, with the help of its professional advisors, is diligently preparing the Schedules and Statements, resources are limited. The Debtor's primary focus thus far has been preparing for the filing of the chapter 11 case and addressing the ramifications of Doral Bank being placed into receivership. Thus, the Debtor has not been able to gather and analyze all the necessary information to prepare and file its Schedules and Statements prior to the Petition Date. In view of the amount of work entailed in completing the Schedules and Statements and the competing demands upon the Debtor's employees and professionals to assist in efforts to wind down business operations and liquidate assets during the initial postpetition period, the Debtor will not be able to complete the Schedules and Statements properly and accurately within the required 14-day time period.

73.    I believe that focusing the attention of the Debtor's personnel on critical restructuring issues during the early days of the chapter 11 case will help the Debtor make a smoother transition into chapter 11 and, therefore, ultimately maximize the value of the estate for the benefit of creditors. Consequently, it is in the best interests of the Debtor to obtain a 31-day extension of the filing deadline, which would provide the Debtor with a total of 45 days from the Petition Date, until Monday, April 20, 2015, to file the Schedules and Statements.

        **D.    Motion for an Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals (the "Interim Compensation Motion")**

74.     By the Interim Compensation Motion, the Debtor seeks an order establishing procedures (the "Compensation Procedures") for interim monthly compensation and reimbursement of expenses of professionals whose services are authorized by this Court (the "Retained Professionals") and who will be required to file applications for allowance of such compensation and expenses. The Debtor proposes that all fees and expenses paid to professionals under the Compensation Procedures will be subject to disgorgement until final allowance by the Court.

75.     The Debtor further requests that the Court limit service of interim and final fee applications (collectively, the "Applications") to the Notice Parties (as defined in the Interim Compensation Motion), with notices of any hearings on the Applications (the "Hearing Notices") to be served on all other parties that have filed a notice of appearance with the Court and requested notice of pleadings in the chapter 11 case. The Debtor additionally requests that the Court require all Retained Professionals to provide a copy of any Application to any party other than the Notice Parties upon receipt of a written request from such party. I believe that serving the Applications and the Hearing Notices in this manner will permit the parties most active in the chapter 11 case to review and object to the Retained Professionals' fees efficiently and will save unnecessary duplications and mailing expenses.

76.     I believe that the proposed Compensation Procedures will enable the Debtor and other core parties in interest to closely monitor costs of administration, maintain a level cash flow availability and implement efficient cash management procedures. Moreover, the Compensation Procedures will allow the Court and key parties in interest to ensure the reasonableness and necessity of the compensation and

reimbursement sought by the Retained Professionals. I believe that the efficient administration of this chapter 11 case will be significantly aided by establishing the proposed Compensation Procedures.

**E.   Motion for an Order Authorizing Rejection of Certain Executory Contracts (the "Contract Rejection Motion")**

77.   By the Contract Rejection Motion, the Debtor seeks authority to reject certain contracts as of the Petition Date. The Debtor has determined that the contracts set forth on Schedule 1 to the Contract Rejection Motion (the "Executory Contracts") no longer provide a benefit to the Debtor's estate. Many of the Executory Contracts the Debtor seeks to reject are either (a) for services previously used by Doral Bank or its employees or (b) related to certain of the Debtor's operations that have been rendered moot by the Doral Bank having been placed into receivership.

78.   Rejection of the Executory Contracts will prevent the accumulation of unnecessary administrative expenses associated with the Executory Contracts, which no longer provide any benefit to the Debtor's estate. The relief requested in the Contract Rejection Motion will therefore expedite the Debtor's relief from the onerous obligations under the Executory Contracts.

**F.   Motion for an Order Authorizing (I) Rejection of Certain Unexpired Leases of Nonresidential Real Property and (II) Abandonment of Certain Property of the Estate (the "Lease Rejection Motion")**

79.   By the Lease Rejection Motion, the Debtor seeks authority to reject certain leases of non-residential real property, set forth on Schedule 1 to the Lease Rejection Motion, to which the Debtor is party as tenant or sub-lessor (the "Leases"). The Debtor no longer requires the premises that it leases as tenant pursuant to the Leases, and the Leases pursuant to which the Debtor is a sub-lessor are unprofitable or insufficient to

cover the cost of the over-lease. Therefore, the Debtor seeks authority to reject the Leases. I believe that rejection of the Leases will result in immediate savings for the estate by avoiding the further accrual of rent or other administrative expenses.

80.    Further, although the Debtor has removed all personal property of more than *de minimis* value from the premises associated with the Leases in which the Debtor is a tenant, the extent that the Debtor leaves any property in such premises, including, but not limited to, personal property, furniture, fixtures and/or equipment (collectively, "Expendable Property"), the Debtor has determined that such Expendable Property is of no continuing value to its estate and should be abandoned.

81.    The obligations under the Leases constitute unnecessary expenses of the Debtor's estate, and continued compliance with the terms of the Leases is therefore burdensome to the estate while providing little, if any benefit. The relief requested in the Lease Rejection Motion will therefore expedite the Debtor's relief from its obligations under the Leases.

G.    **Motion For a Waiver Under Section 345(b) Regarding the Debtor's Bank Account (the "345(b) Waiver Motion")**

82.    By the 345(b) Waiver Motion, the Debtor seeks entry of an order granting a waiver under Bankruptcy Code section 345(b) with respect to the Debtor's existing bank accounts with Citibank, N.A. (the "Bank Accounts"), which functions as the Debtor's sole operating deposit accounts.

83.    On February 27, 2015, OCIF appointed the FDIC as receiver for Doral Bank. Prior to the receivership, the Debtor performed most of its banking functions using deposit accounts at Doral Bank. According to the Debtor's records, the Debtor has approximately $84,000 in its deposit account with Doral Bank.

84.     The Debtor also has two accounts with Citibank (the "Bank Accounts"). The Bank Accounts held approximately $20.5 million as of the Petition Date. The Debtor has no other regular bank accounts.[16] The Bank Accounts now function as the Debtor's sole operating deposit accounts.

85.     The Debtor also has approximately $350,000 in deposit accounts with Banco Popular. Banco Popular acquired some of the assets of Doral Bank after it was placed into receivership.

86.     Prepetition, the Debtor sought to open a "debtor in possession" deposit account with Citibank and several other depositories, all of whom are listed on the approved debtor in possession depository list maintained by the Office of the United States Trustee (the "U.S. Trustee"). Citibank and the other depositories uniformly declined to grant the Debtor such a deposit account, on any terms. The U.S. Trustee's approved depository list notes that Citibank is not taking new debtor in possession accounts at this time.

87.     The Debtor initially requests only a temporary waiver of Bankruptcy Code section 345(b) for 90 days, to provide the Debtor time to pursue a deposit account with a U.S. Trustee approved depository in the postpetition period. If the Debtor can procure a bonded debtor in possession deposit account with an approved depository, the Debtor will use such account as its primary operating account and close the Bank Accounts. If

---

[16] The Debtor has a deposit account with The Bank of New York ("BONY") that relates to a Collateral Account Control Agreement, dated January 20, 2006, between BONY, the Debtor, and Fannie Mae. By agreement with Fannie Mae, the Debtor has pledged securities collateral to Fannie Mae to secure certain repurchase obligations the Debtor owes to Fannie Mae related to prepetition loan sales. The Debtor's deposit account with BONY is a part of this arrangement. The Debtor expects Fannie Mae would assert it holds a lien on any amounts in the BONY deposit account. The Debtor reserves its rights with respect to its arrangements with Fannie Mae and BONY.

the Debtor is unable to procure such an account, however, the Debtor reserves the right to seek an ongoing waiver of Bankruptcy Code section 345(b) for the Bank Accounts.

88.     The Bank Accounts are with Citibank, one of the largest financial institutions in the world. Citibank has a strong credit rating.[17] And Citibank, while apparently not accepting new "debtor in possession" accounts, is listed on the U.S. Trustee's approved depository list. Given the circumstances, the risk to creditors from the Debtor's deposits with Citibank are essentially nil.

89.     The Debtor also requests the authority to continue to use the Bank Accounts with the same account numbers as the Debtor used prepetition. If the relief requested in the Motion is granted, the Debtor will not pay, and will direct its bank to not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

90.     Finally, in connection with continuing the use of the Bank Accounts, the Debtor requests the authority to pay prepetition bank fees and charges to the extent of the amount of the Debtor's cash held in the accounts. Citibank may have setoff rights with respect to any of the Debtor's cash it holds and could request that this Court lift the automatic stay to exercise those setoff rights. The Debtor seeks authority to pay the prepetition bank fees and charges to the extent the Debtor determines, in its good faith business judgment, that Citibank has valid setoff claims pursuant to section 553 of the Bankruptcy Code (but only to the extent of such claims). This will save the Debtor the

---

[17] The long-term and short-term credit ratings of Citibank are set forth in the following chart:

|            | Moody's | S&P | Fitch |
|------------|---------|-----|-------|
| Long-term  | A2      | A   | A+    |
| Short-term | P1      | A1  | F1    |

time and expense of responding to a lift stay request and/or negotiating a stipulated order to allow Citibank to exercise setoff rights.

## **Conclusion**

91.    For all the reasons described herein and in the First Day Motions, I respectfully request that the Court grant the relief requested in each of the First Day Motions.


Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.


By: _____
Carol Flaton
Chief Restructuring Officer


Executed On: _March 11, 2015_____