**Hearing Date and Time: April 9, 2015 at 10:00 a.m. (Eastern Time)**
**Objection Deadline for Proposed Bidding Procedures: April 6, 2015 at 4:00 p.m. (Eastern Time)**

ROPES & GRAY LLP
Mark I. Bane
Meredith S. Tinkham (*pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

-and-

James A. Wright III
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

*Proposed Counsel for the Debtor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Doral Financial Corporation,[1] | : | Case No. 15-10573 (SCC) |
| | : | |
| Debtor. | : | |

------------------------------------------------------x

## MOTION OF THE DEBTOR FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF DORAL INSURANCE AGENCY LLC OR ITS ASSETS, (B) APPROVING THE PROPOSED EXPENSE REIMBURSEMENT AND BREAK-UP FEE, (C) APPROVING THE FORM AND MANNER OF NOTICE, AND (D) SCHEDULING AN AUCTION AND A SALE HEARING, AND (II) AN ORDER AUTHORIZING AND APPROVING THE SALE OF DORAL INSURANCE AGENCY, LLC OR ITS ASSETS

The debtor and debtor-in-possession in the above-captioned case (the "Debtor") submits

this motion (the "Motion") for entry of the Bidding Procedures Order and Sale Order (as each

---

[1] The last four digits of the taxpayer identification number of the Debtor are (2162).

term is defined herein) with respect to the sale (the "Sale") of the Debtor's 100% equity interest in Doral Insurance Agency, LLC ("Doral Insurance") or substantially all of the assets of Doral Insurance.  In support of the Motion, the Debtor submits the Declaration of Carol Flaton in Support of the Debtor's Motion for an Order Approving Bid and Notice Procedures and an Order Approving an Asset Purchase Agreement Between the Debtor and the Successful Bidder, sworn to on March 31, 2015, and attached hereto as **Exhibit D** (the "Flaton Declaration"), and respectfully represents:

### Jurisdiction

1.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105(a), 363, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002, 3007, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

2.        On March 11, 2015 (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtor to continue to operate its businesses and manage its properties as a debtor in possession. No request for the appointment of a trustee or examiner has been made in this chapter 11 case.  An Official Committee of Unsecured Creditors (the "UCC") was appointed on March 23, 2015.

49019483_10

3.      A summary of the Debtor's business, the Debtor's capital structure, and the events leading to this chapter 11 case,  are set forth in the *Declaration of Carol Flaton in Support of First Day Motions* [Dkt. No. 8] (the "First Day Declaration").

4.      Doral Insurance, a wholly-owned, non-debtor subsidiary of the Debtor, is an insurance general agent located in Puerto Rico which acts as an insurance agent primarily for customers of Doral Bank. Prior to the February 27, 2015, receivership of Doral Bank, Doral Insurance primarily serviced Doral Bank mortgage loan customers by connecting them with third party insurers for the purchase of insurance policies required under the borrowers' mortgage loans, such as property and title insurance. The primary revenue sources for Doral Insurance are the fees and commissions it receives from customers in its insurance policy portfolio, along with profit commissions earned through profit share agreement with select insurers.

5.      As discussed in greater detail in the First Day Declaration, as of October 2014, Doral Bank was operating under a consent order with the FDIC, and the Debtor had been directed by the FDIC to present a plan to increase Doral Bank's capital. By January 2015, the FDIC had rejected the Debtor's second capital restoration plan and directed Doral Bank to submit a third plan.

6.      As a result, the Debtor was aware in early 2015 of the possibility that, despite the Debtor's efforts, Doral Bank might end up being placed in receivership. In a Doral Bank receivership, the Debtor expected that the value of Doral Insurance's business could begin a rapid and substantial decline. Historically, 40% of Doral Insurance's commissions have come from new business generated from issuing policies to Doral Bank mortgage lending customers. A Doral Bank receivership would essentially terminate the flow of new potential customers.

7.     Moreover, Doral Insurance's customers are also under no obligation to use Doral Insurance as their agent to broker new policies. Given Doral Insurance's close business interplay with Doral Bank, the Debtor expected that once Doral Bank was put into receivership some customers may opt to switch to a new insurance agent when their existing policies come up for renewal, rather than renew with Doral Insurance. Further, the vast majority of Doral Insurance's customers are borrowers on loans held by Doral Bank.  The Debtor also expected that upon Doral Bank being put into receivership, many of its loans could be sold to other Puerto Rican banks with their own affiliate insurance businesses. It would be natural for such  banks to attempt to market their own propriety insurance agency services to Doral Insurance's customers as policies come up for renewal.

8.     In sum, the Debtor projected that, in a Doral Bank receivership, Doral Insurance's business, if wound down instead of being sold, would decline dramatically in 2015 and wind down completely in the subsequent few years.

9.     In late 2014 and early 2015, the Debtor received inquiries from three insurance businesses regarding an acquisition of Doral Insurance. The Debtor determined to explore a potential transaction with one of these entities. The Debtor also explored the possibility of selling Doral Insurance to two entities that had purchased pools of loans from the Debtor and Doral Bank in 2014, as some of the borrowers for those loans were customers of Doral Insurance.

10.     In this process, the Debtor ultimately received one offer to buy substantially all the assets of Doral Insurance.  This offer was extended by Anglo-Puerto Rican Insurance Corporation (the "Stalking Horse Bidder"). The Debtor also received an offer from an alternate potential buyer, but only to buy the portion of Doral Insurance's portfolio relating directly to the borrowers for certain loans held by such potential buyer, approximately 10% of Doral

Insurance's total business. Reviewing these offers, the Debtor determined that the Stalking Horse Bidder's offer was superior, not only because it was an offer to buy the entire business but also because the price offered, on a per unit basis, exceeded the offer from the potential buyer for a portion of the business.

11.     After completing negotiations, and after revising the terms of the agreement between the Stalking Horse Bidder and Doral Insurance subsequent to the bankruptcy filing by the Debtor, Doral Insurance and the Stalking Horse Bidder entered into that certain Asset Purchase and Sale Agreement, a copy of which is attached hereto as **Exhibit B** (the "Stalking Horse Agreement").  As reflected in the summary of the proposed transaction set forth below, the Stalking Horse Bidder was prepared to extend its commitment to the transaction in the context of a bankruptcy process only in consideration of the Breakup Fee and Expense Reimbursement described below.  In light of the rapidly diminishing value of the assets of Doral Insurance, the Stalking Horse Agreement contemplates an expedited auction sale process and provides certain bid protections to the Staking Horse Bidder.

**Summary of Proposed Sale**

12.     The principal terms of the Stalking Horse Agreement are summarized in the following chart:

| SUMMARY DESCRIPTION | |
|---|---|
| Parties | Seller: Doral Insurance Agency, LLC<br><br>Purchaser: Anglo-Puerto Rican Insurance Corporation |
| Property | Substantially all assets of Doral Insurance Agency, LLC, excluding rights in profit sharing agreements |
| Purchase Price/All Cash Transaction | $10.75 million, subject to a purchase price adjustment (the "Price Adjustment") |

| Closing Date | No later than May 22, 2015 |
| --- | --- |
| Breakup Fee | $250,000 |
| Expense Reimbursement | Reasonable expenses up to a cap of $200,000 |

As described above, under the terms of the Stalking Horse Agreement, in the event that the Stalking Horse Bidder is not designated as the purchaser of the assets of Doral Insurance, the Stalking Horse Bidder would be entitled to a fee of $250,000 (the "Breakup Fee") , along with reimbursement of reasonable expenses, up to a cap of $200,000 (the "Expense Reimbursement").

### Relief Requested

13.    By this Motion, the Debtor seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order") and, at the conclusion of the Sale Hearing (as defined herein), an order, substantially in the form attached hereto as **Exhibit C** (the "Sale Order") with respect to the sale of Doral Insurance or substantially all of its assets.  The Debtor seeks authority to sell substantially all of the assets of Doral Insurance or its equity in Doral Insurance to preserve flexibility for alternate structures for bids.

14.    The Debtor seeks entry of the Bidding Procedures Order:

    a.    authorizing and approving the bidding procedures for competitive bidding in connection with the Sale (as defined herein), substantially in the form attached hereto as Exhibit 1 to the Bidding Procedures Order (the "Bidding Procedures");

    b.    approving the form and manner of notice of the Sale by auction, the Sale Hearing and related matters, substantially in the form attached hereto as Exhibit 2 to the Bidding Procedures Order (the "Auction and Sale Notice");

    c.    approving the Breakup Fee and Expense Reimbursement for the Stalking Horse Bidder; and

    d.    establishing the following dates and deadlines, subject to modification:

    i.   Bid Deadline: May 6, 2015 at 12:00 p.m. (Eastern Time), as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "<u>Bid Deadline</u>").

    ii.   Auction: May 12, 2015 at 10 a.m. (Eastern Time), as the date and time the auction, if one is needed (the "<u>Auction</u>"), which will be held at the office of Ropes & Gray LLP, located at 1211 Avenue of the Americas, New York, New York 10036.

    iii.   Sale Objection Deadline: May 15, 2015 at 4:00 p.m. (Eastern Time), as the deadline to object to the Sale and/or the assumption and assignment of Assumed Contracts or cure amounts related thereto.

    iv.   Sale Hearing: May 21, 2015 at 10:00 a.m. (Eastern Time), as the date and time of the hearing to approve the Sale which will be held before Honorable Shelly C. Chapman, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004.

15.    The Debtor also seeks entry of the Sale Order following the conclusion of the Sale Hearing:

    a.   approving the Stalking Horse Agreement (or such other agreement as agreed to with respect to the Sale with the successful bidder at the Auction); and

    b.   if the sale is a sale of the Debtor's membership interests in Doral Insurance, approving the sale of such interests free and clear of all liens, claims, interests and encumbrances (collectively, "<u>Encumbrances</u>") to the Stalking Horse Bidder or such other party that is the successful bidder at the Auction.

<strong><u>Bidding Procedures</u></strong>

16.    In the context of the urgency imposed by the rapidly diminishing value of the assets of Doral Insurance, the Bidding Procedures are intended to permit a fair and efficient competitive sale process to confirm that the bid of the Stalking Horse Bidder is indeed the best offer, or promptly identify the alternative bid that is higher or otherwise better. The proposed Bidding Procedures are attached hereto as **Exhibit 1**.

## Form and Manner of Auction and Sale Notice

17.    Within two (2) business days of entry of the Bidding Procedures Order, the

Debtor will serve the Auction and Sale Notice by email or first class mail upon the following

parties: (i) the Office of the United States Trustee for the Southern District of New York, (ii) the

Internal Revenue Service, (iii) the United States Attorney for the Southern District of New York,

(iv) counsel to the UCC, (v) the U.S. Securities and Exchange Commission, (vi) any party

known or reasonably believed to have asserted any lien, claim, or encumbrance or other interest

in the Debtor or Doral Insurance, (vii) counsel to the indenture trustees for the Doral Notes and

AFICA Bonds, and (viii) parties required by Bankruptcy Rule 2002(a).  The Debtor submits that

the Auction and Sale Notice is reasonably calculated to provide all interested parties with timely

and proper notice of the proposed Sale, including (a) the date, time and place of the Auction (if

one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the Sale

Objection Deadline and the date, time and place of the Sale Hearing; and (d) instructions for

promptly obtaining a copy of the Stalking Horse Agreement.  The Debtor proposes that no other

or further notice of the Sale shall be required.  Accordingly, the Debtor requests that the form

and manner of the Auction and Sale Notice be approved.

18.    The Debtor also requests a waiver of the requirement that it serve its equity

holders pursuant to Bankruptcy Rule 2002(d), on the grounds that the Sale is unlikely, as an

economic matter, to impact their rights to a recovery.  The Debtor seeks this waiver to avoid the

substantial costs associated with service to the Debtor's public beneficial equity holders.

### Basis for Relief

**I. The Bid Procedures Are Appropriate and in the Best Interests of the Debtor and its Estate and Creditors**

19.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtor believes that a sale of Doral Insurance pursuant to a public auction governed by the proposed Bidding Procedures will maximize the sale proceeds received by the Debtor's estate, which is the paramount goal in any proposed sale of property of the estate. See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'") (quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)); see also Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand") (internal citation omitted). To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See, e.g., Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and . . . maximize the value of the debtor's assets"). The Debtor submits that the foregoing procedures are fair, transparent, and will derive the highest and best bid for Doral Insurance or its assets.

**II.     The Proposed Process for the Debtor to Designate a Stalking Horse and Provide a Breakup Fee and Expense Reimbursement Should Be Approved**

49019483_10

20.     The Debtor seeks authority to offer customary bid protections to the Stalking

Horse Bidder, including a Breakup Fee and Expense Reimbursement, as part of the Bidding

Procedures. The Stalking Horse Bidder has requested the enticement of a Breakup Fee and

Expense Reimbursement if the Stalking Horse Bidder loses at auction or otherwise to another

bidder. The use of a stalking horse in a public auction process for sales pursuant to section 363 of

the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse

bid is, in many circumstances, the best way to maximize value in an auction process by locking

in a price "floor" before exposing an asset to auction. As a result, stalking horse bidders virtually

always require breakup fees, expense reimbursements, and other forms of bid protections as an

inducement for holding their offer open while it is exposed to overbids in an auction process.

The use of bid protections, including breakup fees and expense reimbursements, has become an

established practice in chapter 11 cases.

21.     Bankruptcy courts have approved bidding incentives, similar to the Breakup Fee

and Expense Reimbursement, under the business judgment rule, in other cases in this district.

See, e.g., In re Aereo, Inc., Case No. 14-13200 (SHL) (Bankr. S.D.N.Y. Dec. 24, 2014) [Docket

No. 110]; In re The Fuller Brush Co., Case No. 12-10714 (SHL) (Bankr. S.D.N.Y.

Sept. 17, 2012) [Docket No. 178]; In re The Connaught Grp., Ltd., Case No. 12-10512 (SMB)

(Bankr. S.D.N.Y. Mar. 6, 2012) [Docket No. 109]; In re Gen. Maritime Corp., Case No. 11-

15285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011) [Docket No. 136]; In re Borders Grp., Inc., Case

No. 11-10614 (MG) (Bankr. S.D.N.Y. Sept. 27, 2011) [Docket No. 1876].

22.     The Debtor believes, based on its reasoned business judgment, that the presence

of the Breakup Fee and Expense Reimbursement would enhance its ability to maximize value

without chilling bidding. The presence of a Breakup Fee and Expense Reimbursement would

first and foremost point to the existence of a contractually-committed bidder at price believed to be fair and reasonable while providing the upside opportunity that the Debtor could potentially receive a higher or otherwise better offer which, absent such a bid floor, might not have otherwise been realized.  The Breakup Fee and Expense Reimbursement will therefore maximize value to the Debtor's estate from the Sale of Doral Insurance or its assets.

### III.    The Form and Manner of the Auction and Sale Notice Should be Approved

23.    As described above, the Debtor also seeks approval of the form of the Auction and Sale Notice. The Auction and Sale Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing, as well as the deadline for filing any objections to the relief requested in this Motion once they are set by the Court.

24.    The Debtor proposes that such a timeline is warranted and necessary given the exigent circumstances and the Debtor's need to sell Doral Insurance or its assets in a timely fashion. Moreover, the Debtor proposes that such a timeline is appropriate and will have little impact on the Debtor's ability to market the sale of Doral Insurance.

### IV.    The Sale of Doral Insurance Is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtor's Business Judgment

25.    Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, a Debtor may use, sell or lease property of the estate outside of the ordinary course of business. The Second Circuit requires that the sale of a debtor's assets be based upon the sound business judgment of the debtor. See, e.g., Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (holding that a court reviewing an application under Bankruptcy Code section 363(b) must find, based upon the evidence presented, a good business reason to grant such application); Comm. of

Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)_, 722 F.2d 1063, 1071 (2d Cir. 1983)

(same).

26.     A sound business purpose for use of property outside the ordinary course of

business exists where the sale is necessary to preserve the value of assets for the estate, its

creditors or interest holders. See, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir.

1986); In re Lionel Corp._, 722 F.2d 1063; In re GSC, Inc., 453 B.R. 132, 155 (Bankr. S.D.N.Y.

2011). In fact, the paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate. See In re Food Barn Stores, Inc., 107 F.3d at 564-65 (stating

that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate

at hand"); In re Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy

law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or

greatest overall benefit possible for the estate.") (quoting Cello Bag Co. v. Champion Int'l Corp.

(In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

27.     If a "debtor articulates a reasonable basis for its business decisions (as distinct

from a decision made arbitrarily or capriciously), courts will generally not entertain objections to

the debtor's conduct." Comm. of Asbestos-Related Litigants and/or Creditors v Johns-Manville

Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Indeed, when a

valid business justification exists, there is a strong presumption that the debtor's management

and directors "acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (internal

citations omitted).

28.     The Debtor submits that the proposed Sale satisfies section 363's requirements, to

the extent applicable. As discussed in detail above, Doral Insurance's business was directly

49019483_10

linked to Doral Bank's mortgage lending for developing new customers. Following the receivership of Doral Bank, the value of Doral Insurance's assets is expected to begin a rapid and precipitous decline. A prompt Auction and Sale will preserve Doral Insurance's current value as best as possible for the benefit of the Debtor's estate. The Sale of Doral Insurance is therefore in the best interest of the Debtor's estate and a valid exercise of the Debtor and Doral Insurance's business judgment.

29.    The Stalking Horse Agreement provides for a sale of the assets of Doral Insurance and contemplates this Court's approval of the sale process.    However, the Debtor will also entertain bids to buy its membership interests in Doral Insurance, which interests are assets of the Debtor.    This Court's approval is therefore necessary for either a sale of the assets of Doral Insurance or a sale of the Debtor's equity interest in Doral Insurance.

30.    Bankruptcy Code section 105(a) also supplies ample authority for the relief requested. Section 105(a) empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This equitable power is granted to effect the policies and goals of chapter 11 reorganization, which are to rehabilitate the debtor, In re Ionosphere Clubs, Inc., 98 B.R. 174, 176-77 (Bankr. S.D.N.Y. 1989), and to "create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately." Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987); see also In re Structurlite Plastics Corp., 86 B.R. 922, 932 (Bankr. S.D. Ohio 1998) (rejecting a bright line rule prohibiting payment of prepetition debts because it "may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code"). Accordingly, the Debtor respectfully submits that the relief requested herein should be granted in

all respects and is in the best interests of the Debtor's estate, its creditors, and other parties in interest.

### V.    The Sale of the Acquired Assets Free and Clear of Claims and Interests Is Authorized by Section 363(f) of the Bankruptcy Code

31.    If the Sale takes the form of a sale of the Debtor's equity in Doral Insurance (the "Membership Interests"), the Debtor requests approval to sell the Membership Interests free and clear of any and all liens, claims and encumbrances (the "Encumbrances") in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

    a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    b.    such entity consents;

    c.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    d.    such interest is in bona fide dispute; or

    e.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since Section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).

32. To facilitate the Sale, the Debtor seeks to sell its Membership Interests free and clear of all Encumbrances.  The Debtor believes that any party holding liens against the Membership Interest could be compelled to accept a monetary satisfaction of such interests. The Sale Order also provides that any Encumbrance in Doral Insurance will attach to the net proceeds of the Sale. Accordingly, the Debtor believes that the Sale will satisfy the statutory prerequisites of

-14-

section 363(f) of the Bankruptcy Code and the sale of the Membership Interests should be approved free and clear of all Encumbrances.

**Notice**

33.     Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the Stalking Horse Bidder; (c) counsel to the UCC; (d) the indenture trustees for the Doral Notes and AFICA Bonds, and (e) parties required by Bankruptcy Rule 2002(a).

WHEREFORE, the Debtor respectfully requests that the Court enter the Bidding Procedures Order and the Sale Order, granting the relief requested in the Motion and such other and further relief for the Debtor as may be just or proper.

Dated: March 31, 2015
        New York, New York

*/s/ Mark I. Bane*
ROPES & GRAY LLP
Mark I. Bane
Meredith S. Tinkham (*pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: mark.bane@ropesgray.com
meredith.tinkham@ropesgray.com

-and-

James A. Wright III
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Email: james.wright@ropesgray.com

*Proposed Counsel to the Debtor*

### Exhibit A

**Proposed Bidding Procedures Order**

49019483_10

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

In re                                              :        Chapter 11
                                                   :
Doral Financial Corporation,[1]                    :        Case No. 15-_____ ( )
                                                   :
                 Debtor.                            :
---------------------------------------------------------x

**ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE**
**OF DORAL INSURANCE AGENCY, LLC OR ITS ASSETS, (II) APPROVING THE**
**BREAKUP FEE AND EXPENSE REIMBURSEMENT, (III) APPROVING THE FORM**
**AND MANNER AND NOTICE, AND**
**(IV) SCHEDULING AN AUCTION AND A SALE HEARING**

Upon the motion (the "Motion")[2] of the above-captioned debtor and debtor-in-possession

(the "Debtor") for entry of an order (a) authorizing and approving the bidding procedures for the

sale of substantially all assets of Doral Insurance or the Membership Interests, (b) approving the

Breakup Fee and Expense Reimbursement, (c) approving the form and manner of notice of the

Auction and Sale Hearing, and (d) scheduling an Auction and a Sale Hearing, as more fully set

forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion being a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to

28 U.S.C. §§ 1408 and 1409; and the Court having found that no other or further notice is needed

or necessary; and the Court having reviewed the Motion and the Flaton Declaration and having

heard statements in support of the Motion at a hearing held before the Court (the "Bid

Procedures Hearing"); and the Court having determined that the legal and factual bases set forth

in the Motion and at the Bid Procedures Hearing establish just cause for the relief granted herein;

and the relief requested in the Motion being in the best interests of the Debtor's estate, its

---

[1] The last four digits of the taxpayer identification number of the Debtor are (2162).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

49019483_10

creditors, and other parties in interest; and any objections to the relief requested in the Motion having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, THAT:**

1.    The Motion is GRANTED to the extent provided herein.

2.    The Stalking Horse Agreement, including the Breakup Fee and Expense Reimbursement provided therein, are approved, and the Breakup Fee and Expense Reimbursement are entitled to administrative priority pursuant to sections 503(a) and 507(a)(2) of the Bankruptcy Code.

3.    The Bidding Procedures, substantially in the form attached hereto as Exhibit 1, are hereby approved.  The Bidding Procedures shall govern the submission, receipt and analysis of all bids relating to the Sale of Doral Insurance's assets or the Membership Interests, and any party desiring to submit a higher or better offer for the assets of Doral Insurance or the Membership Interests shall do so strictly in accordance with the terms of the Bidding Procedures and this Order.

4.    As described in the Bidding Procedures, if the Debtor does not receive any Qualified Bids other than from the Stalking Horse Bidder, or if no Qualified Bidder other than the Stalking Horse Bidder indicates its intent to participate in the Auction, the Debtor will not hold the Auction, the Stalking Horse Bidder will be named the Successful Bidder and the Debtor will seek approval of the Stalking Horse Agreement at the Sale Hearing. If one or more Qualified Bids is timely received from a Qualified Bidder (other than the Stalking Horse Bidder) in accordance with the Bidding Procedures, the Debtor shall conduct the Auction as set forth herein.

49019483_10

5.      If the Auction is conducted, each Qualified Bidder participating in the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding process or the proposed Sale, the Auction will be conducted openly and shall be transcribed, audiotaped or videotaped.

6.      The Auction and Sale Notice, substantially in the form attached hereto as Exhibit 2 is hereby approved.

7.      Within two (2) business days of entry of this Bidding Procedures Order, the Debtor shall serve the Auction and Sale Notice by email or first class mail upon the following parties: (i) the Office of the United States Trustee for the Southern District of New York, (ii) the Internal Revenue Service, (iii) the United States Attorney for the Southern District of New York, (iv) counsel to the UCC, (v) the U.S. Securities and Exchange Commission, (vi) any party known or reasonably believed to have asserted any lien, claim, or encumbrance or other interest in the Debtor or Doral Insurance, (vii) counsel to the indenture trustees for the Doral Notes and AFICA Bonds, and (viii) parties required by Bankruptcy Rule 2002(a).

8.      The Debtor is authorized and empowered to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

9.      Notwithstanding any Bankruptcy Rules to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10.    The Court retains jurisdiction with respect to all matters arising from, or related

to, the implementation and interpretation of this Order.


Dated: _____, 2015
          New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1 to Bidding Procedures Order

## Bidding Procedures

49019483_10

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
Doral Financial Corporation,[1]          :    Case No. 15-_____ ( )
                                         :
                    Debtor.              :
------------------------------------------------------x

## BIDDING PROCEDURES

The following bidding procedures shall apply in connection with counteroffers for certain assets of Doral Insurance Agency or Doral Financial Corporation (the "Purchased Assets") as described in the Asset Purchase and Sale Agreement between Doral Financial Corporation ("Seller" or the "Debtor") and Anglo-Puerto Rican Insurance Corporation ("Buyer") (such agreement, the "Stalking Horse Agreement"):[2]

1. Any counteroffer or bid for any of the Purchased Assets (a "Counteroffer") shall comply with the following requirement:

    1.1. Any Counteroffer shall provide for a purchase price with a minimum cash or cash equivalent component payable at closing equal to the sum of (i) $10,750,000, subject to the Price Adjustment, plus (ii) $450,000, on account of the Breakup Fee and Expense Reimbursement, plus (iii) $150,000.

2. Any Counteroffer shall further comply with all of the following requirements; provided, that the Debtor may, in their discretion exercised in good faith and without further order of the Court, waive any such requirements:

    2.1. Any Counteroffer shall:

        2.1.1. be in writing and be served on counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Mark I. Bane; Ropes & Gray LLP, 800 Boylston St., Boston, MA 02199, Attn: James A. Wright III, so as to be received on or before 12:00 noon (Prevailing Eastern Time) on May 6, 2015 (the "Bid Deadline"), three business days prior to the first scheduled date of the Auction; and

        2.1.2. be accompanied by (i) a deposit in the amount of ten percent of the initial bid, delivered to an escrow agent (the identity of which is to be determined by the Debtor in consultation with counsel to the UCC), by certified or

---

[1] The last four digits of the taxpayer identification number of the Debtor are (2162).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the order approving these bidding procedures.

cashier's check or wire transfer, so as to be received on or before May 8, 2015, the last business day prior to the first scheduled date of the Auction (as defined below); (ii) an executed asset purchase agreement (the "Counteroffer Asset Purchase Agreement") and executed copies of all other transaction documents necessary to effect the proposed transaction (including all schedules) and a copy of the Stalking Horse Agreement marked to show all changes requested by the bidder (including those related to purchase price); (iii) an executed confidentiality agreement; and (iv) written evidence of a commitment for financing or other evidence of the party's ability to consummate the transaction and payment of the purchase price at the Closing.

2.2. The entity submitting a Counteroffer shall enter into joint escrow instructions with Seller and the escrow agent regarding the deposit delivered in connection with such Counteroffer.

2.3. The terms and conditions of the Counteroffer must be, in aggregate, not materially more burdensome to Seller than provisions contained in the Stalking Horse Purchase Agreement.

2.4. Any entity submitting a Counteroffer shall demonstrate to Seller's satisfaction, in Seller's sole discretion exercised in good faith, that such entity is able to consummate the transaction on the date and on the terms contemplated by the Counteroffer Asset Purchase Agreement.

3. An auction (the "Auction") for the Purchased Assets will be conducted by the Debtors at the offices of their counsel, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY, on May 12, 2015, at 10 a.m. (Prevailing Eastern Time), or at such other date and time as determined by the Debtor in its sole discretion, exercised in good faith and after consultation with counsel to the official committee of unsecured creditors (the "Committee"). The Debtor will send notice by electronic mail to the Core Notice Parties and counsel to any entity that has submitted a Counteroffer if the date, time, or place of the Auction changes.

3.1. The Debtor and its professionals will direct and preside over the Auction.

3.2. At the Auction, the Debtor may announce additional procedural or bidding rules for the Auction so long as the rules are not inconsistent with these Bid Procedures. The Debtor shall maintain a transcript of all bids made and announced at the Auction.

3.3. Each bidder participating at the Auction will certify on record at the commencement of the Auction that it has not and will not engage in any collusion with respect to the bidding or the sale.

3.4. The Debtor will continue the Auction until there is only one bid for the Purchased Assets that the Debtor determines in its sole discretion, exercised in good faith and after consultation with counsel to the UCC, is the highest or otherwise best bid for the Purchased Assets.

3.5. The Breakup Fee and Expense Reimbursement will be credited to the Stalking Horse Bidder's bid.

3.6. Each subsequent bid at the Auction must comply with the requirements for a Counteroffer set forth herein and be at least $100,000 greater than the preceding bid, or such amount as designated by the Debtor, after consultation with the UCC.

4.    A hearing to consider approval of the sale to Buyer pursuant to the Stalking Horse Agreement or another bidder submitting a higher and better offer at the Auction and any objections to such sale will be held on May 21, 2015, at 10 a.m. (Prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10002.

**Exhibit 2 to Bidding Procedures Order**

**Form of Auction and Sale Notice**

49019483_10

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
In re                                          :       Chapter 11
                                               :
Doral Financial Corporation,[1]                :       Case No. 15-_____ ( )
                                               :
                        Debtor.                :
-------------------------------------------------------x

## NOTICE OF SALE BY AUCTION AND SALE HEARING

PLEASE TAKE NOTICE that, on March 31, 2015, Doral Financial Corporation (the "Debtor") in the above-captioned chapter 11 case filed a motion [Docket No. [ ]] (the "Bid Procedures Motion") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (a) authorizing and approving the bidding procedures for the sale of (i) substantially all of the assets of Doral Insurance Agency LLC ("Doral Insurance") or (ii) the Debtor's equity interest in Doral Insurance, (b) approving the form and manner of notice of the Auction and Sale Hearing,and (c) scheduling an Auction and a Sale Hearing and setting other related dates and deadlines all as further described in the Bid Procedures Motion. On [ ], the Bankruptcy Court entered an order (the "Bidding Procedures Order")[2] approving certain bidding procedures attached thereto as Exhibit 1 (the "Bidding Procedures").

Copies of the Bid Procedures Motion, Bidding Procedures Order, and other documents related thereto are available free of charge on the website of the Debtor's noticing and claims agent, Garden City Group, at http://cases.gcginc.com/dor/.

PLEASE TAKE FURTHER NOTICE that the Debtor is soliciting offers for the purchase of Doral Insurance (as defined in the Bidding Procedures). All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order. To the extent there are any inconsistencies between this notice and the Bidding Procedures, the latter shall govern in all respects.

PLEASE TAKE FURTHER NOTICE that, if the Debtor receives competing Qualified Bids within the requirements and time frame specified by the Bidding Procedures, the Debtor will conduct an auction (the "Auction") of Doral Insurance on May 12, 2015 at 10 a.m. (Eastern Time) at the offices of counsel to the Debtor: Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036.

PLEASE TAKE FURTHER NOTICE that the Debtor will seek approval of the sale of Doral Insurance at a hearing scheduled to commence on May 21, 2015 at 10 a.m. (prevailing Eastern Time) (the "Sale Hearing") or as soon thereafter as counsel may be heard, before the

---

[1] The last four digits of the taxpayer identification number of the Debtor are (2162).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

-2-

Honorable Shelley C. Chapman, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that objections to the proposed sale of Doral Insurance, if any, must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and the Case Management Order [Docket No. [ ]] entered in this chapter 11 case; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) filed with the Court and served so the objection is actually received no later than May 15, 2015 at 4:00 p.m. (Eastern Time) (the "Sale Objection Deadline") by the following parties (the "Notice Parties"): (i) counsel to the Debtor, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Mark I. Bane, (ii) counsel to the UCC, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022, Attn: Brian D. Pheiffer; and (iii) parties required by Bankruptcy Rule 2002(a).

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION

Any party or entity who fails to timely file and serve an objection to the Sale of Doral Insurance on or before the Sale Objection Deadline in accordance with the Bidding Procedures Order shall be forever barred from asserting any objection to such Sale, including with respect to the transfer of property free and clear of all liens, claims, encumbrances and other interests.

49019483_10

**<u>Exhibit B</u>**

**Stalking Horse Agreement**

## ASSET PURCHASE AND SALE AGREEMENT

This Asset Purchase and Sale Agreement (Insurance Policies) (hereinafter referred to as the "Agreement"), dated as of March 30th, 2015, is by and between **Doral Insurance Agency, LLC,** a limited liability corporation organized under the laws of the Commonwealth of Puerto Rico, with offices located in San Juan, Puerto Rico ("Seller"), and **Anglo-Puerto Rican Insurance Corporation,** a corporation organized under the law of the Commonwealth of Puerto Rico, with offices located in San Juan, Puerto Rico (hereinafter referred to as "Purchaser").

### WITNESSETH

**WHEREAS,** Seller is an insurance general agent and authorized representative duly licensed by the Office of the Insurance Commissioner of Puerto Rico (hereinafter referred to as "OIC") acting from time to time as general agent and authorized representative for several insurance companies authorized by the OIC to do business in the Commonwealth of Puerto Rico;

**WHEREAS,** on March 11, 2015, Doral Financial Corporation ("DFC"), which owns 100% of the membership interests in Seller, commenced a case under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");



**WHEREAS,** Seller, as appointed general agent and authorized representative of several insurance companies, manages and services an insurance policy portfolio related to insurance policies sold by Seller: (hereinafter collectively referred to as "Business");



**WHEREAS,** pursuant to and in compliance with applicable provisions of the Insurance Code of Puerto Rico and its underlying Regulations, Purchaser desires to purchase and Seller desires to sell the assets related with the Business as specified in this Agreement identified and listed in the Insurance Policies' Schedule hereby attached as **Addendum A;**

**NOW, THEREFORE,** and in consideration of the mutual covenants made herein and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### PART I - SALE AND PURCHASE OF INSURANCE POLICIES

Section 1.1.    Assets to Be Sold, Assigned and Transferred

      A.      In consideration of Purchaser's payment of the Purchase Price, and in further consideration of Bankruptcy Court approval of the Breakup Fee and Expense Reimbursement (as defined below), and subject to and in accordance with applicable law and the terms and conditions of this Agreement, the Seller does hereby agree to sell, assign, transfer, convey and set over unto the Purchaser as of the Closing Date (as defined below), and the Purchaser, upon the terms and subject to the conditions of this Agreement, at the Closing does hereby agree to purchase from the Seller, all of Seller's rights, title and interests as an authorized representative in connection with the following specified assets of the Business:

1.    the renewal insurance commissions with respect to the Insurance Policies identified in **Addendum A** annexed hereto;

2.    the equipment, contracts and other physical assets of Seller used in connection with the Business and identified in **Addendum A** annexed hereto; and

3.    the customer lists, telephone numbers, directory files, customer account records and other Business records in the possession of the Seller with respect to the Business.

B.    The Purchaser is not acquiring the Excluded Assets listed in **Addendum A.**

C.    All assets described in A(1), A(2) and A(3) (the "Assets"), are free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrances.

D.    **Addendum A** may be amended by the parties as of the Closing Date (as defined below) to reflect the Assets as of the Closing Date.

Section 1.2.    Liabilities

A.    Assumption of Liabilities.  On the terms and subject to the conditions set forth herein, on the Closing Date, Purchaser will assume the following liabilities and obligations of the Seller (the "Assumed Liabilities") but no others:

1.    Seller's obligation under the Real Property Lease with Jimenez Seda Archilla, PSC arising on and after the Closing Date;

2.    Seller's obligation under the Iron Mountain Lease arising on and after the Closing Date; and

3.    Seller's obligation under the United States Postal Office box service agreement arising on and after the Closing Date.

B.    Excluded Liabilities.  Purchaser shall not assume any liabilities, obligations or commitments of the Seller relating to or arising out of the operation of the Business or the ownership of the Assets prior to the Closing Date other than the Assumed Liabilities.  Notwithstanding anything to the contrary in this Agreement, Purchaser shall not assume or in any way become liable for any of the debts, liabilities, or obligations of any nature whatsoever (other than the Assumed Liabilities) relating to the Seller, the Business or the Assets, whether accrued, absolute, contingent or otherwise, whether known or unknown, whether due or to become due, whether related to the Business or the Assets and whether disclosed on the Schedules attached hereto, and regardless of when or by whom asserted that are described herein and collectively referred to herein as the "Excluded Liabilities"):

49020527_4



1.   Any of the Seller's Liabilities or obligations under this Agreement, the Schedules attached hereto and any other agreements entered into by the Seller in connection with the transactions contemplated by this Agreement;

2.   any of the Seller's liabilities or obligations for expenses, fees or taxes incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby (including all attorneys, accountants' and brokerage fees);

3.   any of the Seller's liabilities or obligations with the Social Security Administration, the Federal Unemployment Insurance, the United States Department of Treasury, the Puerto Rico Department of Treasury ("Departamento de Hacienda"), the Puerto Rico State Insurance Fund ("Fondo del Seguro del Estado"), the Puerto Rico Department of Labor and Human Resources and any other state or federal agency and municipality of the Commonwealth of Puerto Rico.



4.   any of the Seller's liabilities or obligations for taxes for any period prior to the Closing Date;

5.   any liability or obligation under or with respect to any employee benefit plan, program, policy or arrangement presently or formerly maintained or contributed to by Seller or its parents or affiliates, or with respect to which the Seller, parent or affiliate has any liability;

6.   any of the Seller's liabilities or obligations for vacation pay, sick pay, holiday pay, salary, bonuses or other payments or Liabilities arising at or before the Closing Date of any kind to any employees or current or former employee of the Seller;

7.   any liability or obligation relating to workers' compensation claims which were filed or presented by the Seller's employees at or before the Closing Date or which are filed or presented after the Closing Date but relate to claims and/or injuries first arising at or before the Closing Date;

8.   any of the Seller's liabilities or obligations (A) arising by reason of any violation or alleged violation of any law of any governmental entity or any requirement of any governmental entity, or (B) arising by reason of any breach or alleged breach by the Seller of any agreement, contract, lease, license, commitment, instrument, judgment, order or decree;

9.   any of Seller's liabilities or obligations relating to any legal action, proceeding or claim arising out of or in connection with Sellers' conduct of the Business at or before the Closing Date or any other conduct of the Seller, the Seller's officers, directors, employees, consultants, agents or advisors at or prior to the Closing Date;

-3-

10.    any liabilities or obligations in respect of any of the excluded Assets (including under any contracts, leases, commitments or understandings related thereto);

11.    any other liabilities or obligations of Sellers other than Assumed Liabilities.

Section 1.3.   <u>Purchase Price</u>.

On the Closing Date, Purchaser shall pay to Seller in consideration for sale of the Assets the amount of Ten Million Seven Hundred Fifty Thousand Dollars ($10,750,000.00) less the Net Income Amount, as defined below, if any (the "Purchase Price"). The Purchase Price shall be paid by wire transfer of immediately available funds to the account or accounts designated by Seller.

Section 1.4.   <u>Condition of Seller's Obligation to Close</u>.

The obligation of Seller under this Agreement will be subject to (a) the entry of the Sale Order (as defined below) and (b) the satisfaction, on or before the Closing Date, of the receipt by Seller from Purchaser's subsidiary, Antilles Insurance Company, of the amount of One Million Three Hundred Thirty Thousand Nine Hundred Fifty-Seven Dollars ($1,330,957.00) corresponding to the contingent commissions due Seller from Antilles Insurance Company for calendar year 2014.



Section 1.5.   <u>Execution and Closing</u>.

A.    The execution of this Agreement by the Parties will occur on March 30th, 2015, or at such other date as Seller and Purchaser may mutually agree in writing (the "Execution Date").

B.    On February 27th, 2015 (the "Cut-Off Date") Seller settled accounts and closed out all escrow accounts for tracking purposes. Seller shall continue to operate the Business with its employees from the Cut-off Date to the Closing Date as described subsection E. of this Section 1.5. The net income (commissions earned less related expenses) earned between the Cut-Off Date and the Closing Date (the "Net Income Amount"), if any, will be retained by Seller but reduced from the Purchase Price payable on the Closing Date as per Section 1.3.

C.    Unless mutually extended by the parties, the final closing of the transactions contemplated in this Agreement (the "Closing") will occur within five (5) business days after the Sale Order, as defined in Section 1.6 (A)(6), has been entered by the Bankruptcy Court (the "Closing Date").

D.    [RESERVED]

E.    The Parties agree that continuity of business operations up until the Closing Date is of the essence to this Agreement. Therefore,

-4-



1.      From the Execution Date until the Closing Date, except as otherwise consented to in writing by Purchaser, Seller shall:

      a.      conduct the Business only in the ordinary course of business;

      b.      use its best efforts to (a) preserve the present business operations and organization, and (b) preserve the present relationships with any person or entity having business dealings with the Business including, without limitation, customers and suppliers;

      c.      maintain all of the Assets named on **Addendum A** in their current condition;

      d.      maintain the books, accounts and records of the Business in the ordinary course of business; continue to collect accounts receivable and pay accounts payable associated with the Business utilizing procedures consistent with past practices and without discounting or accelerating payment of such accounts; and comply with all contractual and other obligations applicable to the operation of the Business;

      e.      permit Purchaser's representatives to remain on the business premises during normal business hours and to observe the operation of the business wherever conducted; provided Purchaser's representatives do not interfere with Seller's business operations;

      f.      comply in all material respects with applicable laws; and

      g.      not take any action which would adversely affect the ability of the parties to consummate the transactions contemplated by this Agreement.

2.      From the date hereof until the Closing Date, except as otherwise consented to in writing by Purchaser, Seller shall not:

      a.      incur or assume any indebtedness with respect to the Assets named on Addendum A;

      b.      sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Assets named on Addendum A;

      c.      enter into or agree to enter into any merger or consolidation with, any corporation or other entity;

      d.      introduce any material change with respect to the operation of the Business, including any material change in the types, nature,



composition or quality of products or services, other than in the ordinary course of business,

e.   enter into any transaction with respect to the Assets named on Addendum A which by reason of its size, nature, or otherwise is not in the ordinary course of business;

f.   terminate, amend, restate, supplement or waive any rights under any Material Contract;

g.   or make anything which would make any of the representations and warranties of Seller in this Agreement untrue or incorrect in any material respect.

Section 1.6.    <u>Deliveries at the Closing.</u>

As a condition to Closing, the Seller and the Purchaser, as applicable, will deliver and/or will execute and/or cause to be executed the following at the Closing:

A.    <u>The Seller.</u>




1.   An executed Bill of Sale in the form attached as **Exhibit A;**

2.   The Business records described in Section 1.1 A(3) above.

3.   Certified copies of the Seller's Board of Director's Corporate Resolutions authorizing 1) the sale of the Assets to Purchaser; 2) the execution of this agreement and; 3) the execution and delivery of all documents, deeds and instruments required for the transfer of the Assets to Purchaser and any other transaction contemplated in this agreement.

4.   An assignment of the Lease Agreements with Jiménez Seda & Archilla, PSC and with Iron Mountain Inc., and the box service agreement with the US Postal Office.

5.   A written legal opinion signed by the Seller's legal counsel, in form and substance reasonably satisfactory to the Purchaser, addressed to the Purchaser, and dated as of the Closing Date, in connection with the requirement of a prior approval from the Federal Reserve Bank of New York and/or any other regulatory agency as to the execution of this Agreement.

6.   An Order or Resolution from the Bankruptcy Court approving the transactions under this Agreement within the term agreed upon on Section 6.12(a) (the "Sale Order"). Seller must notify Purchaser of all documents filed with the Bankruptcy Court related to the sale of the Assets within twenty-four (24) hours after they are filed.

-6-

B.      The Purchaser.

    1.      Certified copies of the resolutions of Purchaser's Board of Directors authorizing the acquisition of the Assets from Seller, authorizing or ratifying the execution of this Agreement and the execution and delivery of all documents, deeds and instruments required for the acquisition of the Assets from Seller and authorizing the completion by Seller of all the transactions contemplated in this agreement.

## PART II - REPRESENTATIONS AND WARRANTIES OF THE SELLER

Section 2.1.    Representations and Warranties of the Seller.

The Seller represents and warrants to, and covenants with Purchaser as of the Execution Date, with respect to the Assets delivered on the Closing Date, that:

A.      The Seller is duly organized and in good standing under the laws of the Commonwealth of Puerto Rico, and is licensed by the OCI to transact insurance business as a general agent and authorized representative.

B.      Subject to approval of the Bankruptcy Court, Seller has the required corporate power and authority to execute and deliver this Agreement and consummate the transactions contemplated hereby. Subject to approval of the Bankruptcy Court, the execution and delivery of this Agreement to which it becomes a party, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Seller, and no further corporate authorization on the part of Seller is necessary to approve this Agreement. This Agreement has been, and as of the Closing Date, will have been, duly executed and delivered by Seller, and, assuming the due authorization, execution and delivery of this Agreement to which it becomes a party, and subject to approval of the Bankruptcy Court, this Agreement constitutes, as of the Closing Date, the legal, valid and binding obligations of Purchaser, enforceable against Seller in accordance with its terms (subject as to enforceability to bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar laws relating to or affecting the rights of creditors generally, general equitable principles).




C.      Subject to approval of the Bankruptcy Court, the Seller has the power and authority to own, hold, manage, and service the Insurance Policies and to conduct the Business as presently conducted, and to execute, deliver and perform, and to enter into and consummate, the transactions contemplated by this Agreement; has duly authorized the execution, delivery and performance of this Agreement; has duly executed and delivered this Agreement; and, this Agreement constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

D.      Subject to approval of the Bankruptcy Court, neither the execution or delivery of this Agreement, nor the consummation of any other of the transactions herein

49020527_4

contemplated, will result in the breach of any term or provision of the charter or by-laws of the Seller or conflict with, result in a breach, violation or acceleration of, or constitute a default under, the terms of any agreement or instrument to which the Seller is a party or by which it is bound, or any statute, order or regulation, applicable to the Seller, of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Seller. Subject to approval of the Bankruptcy Court, the Seller is not a party to, bound by or in breach or violation of any agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects the ability of the Seller to perform its obligations under this Agreement.

E.    Seller has been duly appointed as authorized representative and general agent by several insurance companies, authorized, supervised and examined by the OIC.

F.    With the delivery of the Assets under this Agreement, the Seller does not believe nor does it have any reason or cause to believe that it cannot make any covenant, representation and warranty or perform each and every obligation contained in this Agreement.



G.    Immediately prior to the conveyance and assignment contemplated herein, the Seller had good and marketable title to the Assets; at the Closing Date, subject to applicable law, the Purchaser will acquire good, valid, marketable title to the Assets.

H.    Other than as disclosed in Exhibit B, no litigation, including any arbitration, investigation or other proceeding of or before any court, arbitrator or governmental or regulatory official, body or authority is pending against Seller or which relates to the assets of Seller, or the transactions effected by or contemplated in this Agreement, nor does Seller know of any reasonably likely proceeding, the result of which could adversely affect Seller, its assets or the transactions effected hereby.

Other than as disclosed in Exhibit B, the Seller has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any term or requirement of any order to which the Seller, or any of the assets used in the business, is or has been subject.

I.    With respect to the Insurance Policies:

1.    The information set forth in **Addendum A** is true and correct.

2.    That all premiums, if any, due and payable to insurance companies for insurance written before the Execution Date, which have been received by Seller in its capacity as authorized representative, have been or will be paid to such companies on or before the Closing Date.

-8-

3.  That there is no pending obligation to return or refund to an insurance company, any unearned commission on policy cancellations or reductions in policy premiums collected.

4.  That the Insurance Policies have been procured and negotiated in accordance with the applicable provisions set forth the Insurance Code of Puerto Rico and its underlying regulations.

J.  That Seller will comply with the requirements and obligations imposed by Article 9.401 of the Insurance Code, 26 L.P.R.A. §953(a), as to the purchase and sale of the Insurance Policies, as well as any other applicable law, regulation and order regarding the sale of its assets.

K.  Other than the Sale Order, the Seller is not required to obtain (i) any regulatory approval or (ii) any third party consents in connection with the Seller's execution and delivery of this Agreement to which it becomes a party, or such consents or approvals have already been obtained.

L.  To the knowledge of the Seller, the Seller is not in violation of any applicable law, statute, ordinance, order, rule or regulation promulgated or judgment entered by any regulatory authority relating to the operation or conduct of the Seller or the ownership of the Insurance Policies.



## PART III - REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Section 3.1.    Representations and Warranties of the Purchase

Purchaser represents and warrants to, and covenants with Seller as of the Execution Date that:

A.  Purchaser is duly organized and in good standing under the laws of the Commonwealth of Puerto Rico, and is licensed by the OCI to transact insurance business as a general agent and authorized representative.

B.  Purchaser has the required corporate power and authority to execute and deliver this Agreement and consummate the transactions contemplated hereby. The execution and delivery of this Agreement to which it becomes a party, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Purchaser, and no further corporate authorization on the part of Purchaser is necessary to approve this Agreement. This Agreement has been, and as of the Closing Date, will have been, duly executed and delivered by Purchaser, and, assuming the due authorization, execution and delivery of this Agreement to which it becomes a party, this Agreement constitutes, as of the Closing Date, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms.

C.  Neither the execution nor delivery of this Agreement, nor the consummation of any other of the transactions herein contemplated, will result in the breach of any

-9-

term or provision of the charter or by-laws of the Purchaser or conflict with, result in a breach, violation or acceleration of, or constitute a default under, the terms of any agreement or instrument to which the Purchaser is a party or by which it is bound, or any statute, order or regulation, applicable to the Purchaser, of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Purchaser. The Purchaser is not a party to, bound by or in breach or violation of any agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects the ability of the Purchaser to perform its obligations under this Agreement.

D.     Purchaser is not required to obtain (i) any regulatory approval or (ii) any third party consents in connection with Purchaser's execution and delivery of this Agreement to which it becomes a party, or such consents or approvals have already been obtained.

E.     There is no action, suit, or proceeding, at law or in equity, before any governmental entity, or any local or federal court, wherein an unfavorable decision, ruling or finding would materially adversely affect (a) the validity or enforceability of this Agreement, or (b)the consummation of the transactions contemplated hereby, or (c) any approval or third party consent required to be obtained by Purchaser hereunder, or (d) the ability of Purchaser to perform its obligations under this Agreement.



F.     Purchaser has not paid or agreed to pay any fee or commission to any agent, broker, finder or other person for or on account of services rendered as a broker or finder in connection with this Agreement or the transactions covered and contemplated hereby.



G.     Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Assets as contemplated hereunder.   Purchaser has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.   Purchaser acknowledges that Seller has given Purchaser complete and open access to the key employees, documents and facilities of the business. Purchaser will undertake prior to the Closing Date, such further investigation and request such additional documents and information as it deems necessary. Purchaser understands that any cost estimates, projections or other predictions, which have been provided, are not and shall not be deemed to be representations or warranties of Seller.   Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other predictions, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all

estimates, projections and other predictions so furnished to it, and that Purchaser shall have no claim against the Seller with respect thereto.

H.   That Purchaser will comply with the requirements and obligations imposed by Article 9.401 of the Insurance Code, 26 L.P.R.A. §953(a), as to the purchase and sale of the Insurance Policies.

## PART IV - COVENANTS OF SELLER

Section 4.1.   Conduct of Business.

A.   From and after the Execution Date and up to the Closing Date, Seller agrees to conduct its insurance operations in accordance with all applicable laws, and in a manner consistent with safe and sound commercial practices. Seller shall comply with the terms of Section 1.5(E) of this Agreement during that period.



B.   Prior to the Closing, Seller will allow Purchaser (and its agents and representatives) reasonable access to pertinent information related to the Business and the Assets in order for Purchaser to conduct its analysis and review of the Assets being purchased pursuant to this Agreement.

C.   If Seller shall receive after the Closing Date any payments related to the Insurance Policies sold to Purchaser or any other remittance that pursuant to the terms hereof, should have been paid to the Purchaser, the Seller shall transmit the funds to Purchaser within two (2) business days of receipt thereof.

## PART V - EMPLOYEES



Section 5.1.   Seller Employees.  The Seller acknowledges that the Purchaser is not assuming any of the Seller's obligations or liabilities with respect to its employees, and that the Purchaser may, but has no obligation to, offer employment to any of the Seller's employees.  The Seller shall pay and otherwise satisfy in a timely fashion to all of its employees and former employees (whether or not hired by the Purchaser) all payments and benefits that are owed preceding the Closing Date under applicable law, including accrued and unpaid wages, severance pay under any applicable state or Federal law, including but not limited to Act. No. 80 of May 30, 1976, vacations, contributions to any employee pension or retirement plan and any other accumulated fringe benefit.  The Seller shall also be responsible for giving to its employees and/or contractors any notice that is legally required under any applicable law, regulation or standing order.

## PART VI - BANKRUPTCY MATTERS

Section 6.1.   Breakup Fee and Expense Reimbursement:  The parties agree that the Assets will be sold pursuant to an auction process subject to the approval of the Bankruptcy Court. If the Assets are not sold to Purchaser, Purchaser shall be entitled to a breakup fee of $250,000 (the "Breakup Fee") and reimbursement of Purchaser's reasonable expenses up to an amount of $200,000 (the "Expense Reimbursement") related to pursuing the purchase of the Assets, payable from the proceeds of any sale of the Assets to a third party that closes within twelve months of the execution of this Agreement. Seller shall make commercially reasonable efforts to obtain an order of the Bankruptcy Court providing that the Breakup Fee and Expense

-11-

Reimbursement shall be paid to Purchaser from the proceeds of a sale to a party other than Purchaser on the terms set forth herein (the "Bidding Procedures Order"). The Bidding Procedures Order shall provide that the Bankruptcy Court and Seller will consider the obligation to pay the Breakup Fee and Expense Reimbursement in determining which party has made the highest and best offer at the auction.

Section 6.2.    Form of Orders: The Bidding Procedures Order and the Sale Order shall be in form and substance reasonably acceptable to Purchaser.

Section 6.3.    Timing Requirements: Purchaser may terminate this Agreement, in its discretion, if:

    A.    A motion to sell the Assets, seeking approval of this Agreement, has not been filed with the Bankruptcy Court by March 31st, 2015;

    B.    The Bankruptcy Court has not entered the Bidding Procedures Order by April 10th, 2015;

    C.    An auction for the Assets has not occurred by May 10th, 2015; or

    D.    The Bankruptcy Court has not entered the Sale Order by May 22nd, 2015.

## PART VII - MISCELLANEOUS PROVISIONS

Section 7.1.    Survival.  The parties' respective representations, warranties and indemnification obligations contained in this Agreement will survive the Closing.




Section 7.2.    Binding Effect.  Subject to the terms set forth in Section 4.9, this Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Except as expressly provided in Section 4.9, the parties hereto intend that this Agreement will not benefit or create any right or cause of action in or on behalf of any person other than the parties hereto.

Section 7.3.    Amendments.

This Agreement may be amended or supplemented in writing, by Purchaser and Seller, or DFC in the event of Seller's dissolution.

Section 7.4.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

Section 7.5.    Indemnification.

The Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgment, and other costs and expenses resulting from any claim, demand, defense or assertion based or grounded upon, or resulting from (i) any breach or failure to perform by the Seller of any of its representations, warranties, covenants or agreements contained in this Agreement; (ii) the failure of the Seller to pay or satisfy when due any of the debts, liabilities or obligations whatsoever of the Seller pursuant to this Agreement;

49020527_4

(iii) any claim, based in contract, tort or otherwise, arising out of or related to the operation of the Business prior to Closing; and (iv) any claims asserted by any of Seller's present or former employees and related to their employment or termination of employment of service with Seller or the period of employment with the Seller, including but not limited to, any claim or entitlement based upon unpaid wages or benefits or upon Act No. 80 of May 30, 1976.

The Purchaser shall indemnify Seller, or its parent company in the event of Seller's dissolution and hold it harmless against any losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgment, and other costs and expenses resulting from (i) any claim, demand, defense or assertion based or grounded upon, or resulting from Purchaser's failure to perform any of its obligations hereunder; (ii) from any breach or failure to perform by the Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement (iii) arising out of or in connection with any litigation relating to the servicing of any of the Insurance Policies; (iv) any claim, based in contract, tort or otherwise, arising out of or related to the operation of the Business after the Closing; and (v) any claims asserted by any of Purchaser employees that were former employees of Seller and related to their employment or termination of employment of service with Purchaser or the period of employment with the Purchaser.



To the fullest extent permitted by applicable law, none of the parties hereto shall assert, and each party hereby waives, any claim on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, or in connection with this Agreement, even if advised of the possibility hereof.

In the event of a claim by a third party for which indemnification protection exists, a party seeking indemnification pursuant to this section (an "Indemnified Party") shall give prompt notice to the parties from whom such indemnification is sought (the "Indemnifying Party") of the assertion of any claim, or the commencement of any action or proceeding, in respect of which indemnity may be sought hereunder. The Indemnified Party shall assist the Indemnifying Party in the defense of any such action or proceeding. The Indemnifying Party shall have the right to, and shall at the request of the Indemnified Party, assume the defense of any such action or proceeding at its own expense. In any such action or proceeding, the Indemnifying Party shall have the right to retain its own counsel provided that the fees and expenses of such counsel shall be at its own expense unless (i) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such suit, action or proceeding (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and, in the reasonable judgment of the Indemnified Party, representation of both parties by the same counsel would be inappropriate due to actual differing interests between them.



The Indemnifying Party shall not be liable under this Section for any settlement effected without its consent of any claim, litigation or proceeding in respect of which indemnity may be sought hereunder. The Indemnifying Party may settle any claim without the consent of the Indemnified Party, but only if the sole relief awarded are monetary damages that are paid in full by the Indemnifying Party. An Indemnified Party shall, subject to its reasonable business needs, use reasonable efforts to minimize the indemnification sought from the Indemnifying Party hereunder. Notwithstanding the foregoing, no investigation by an Indemnified Party at or prior to the Closing Date shall relieve the Indemnifying Party of any liability hereunder, unless the

-13-

Indemnified Party seeks indemnity in respect of a representation or warranty which it actually has reason to believe to be incorrect as a result of its investigation prior to the Closing Date and the Indemnified Party intentionally failed to bring such belief to the attention of the Indemnifying Party prior to the Closing.

Other than a claim of fraud or claims which cannot be waived as a matter of law, Purchaser and the Seller agree than an action for indemnity under this Section shall be the sole basis for asserting any claim arising under or related to this Agreement and the transactions contemplated hereby.

Seller and Purchaser agree that effective on the Closing Date, Purchaser shall have no recourse against Seller with respect to any chargeback, including without limitation, a return of unearned insurance commissions with respect to any of the Insurance Policies or Assets identified in **Addendum A.**

Section 7.6.    No Agency Relationship.

At no time shall the Seller represent that it is acting as an agent for or on behalf of Purchaser.

Section 7.7.    Governing Law.

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Puerto Rico, and the obligations, rights and remedies of the parties shall be determined in accordance with such laws.



Section 7.8.    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, revisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.



Section 7.9.    Assignment.

Purchaser shall have the right to assign its rights and obligations under this Agreement to any affiliate of Purchaser, without the consent of the Seller.   All covenants, agreements, representations and warranties made by or on behalf of the Seller or Purchaser under this Agreement shall inure to the benefit of the successors and assigns of Purchaser or Seller, as the case may be.  Nothing contained in this Section 6.9 shall be deemed to authorize or permit the Seller to assign any of its rights or obligations hereunder to any other person (other than an affiliate of the Seller), without the prior written consent of Purchaser, and the Seller agrees that any such purported assignment shall be void.

Section 7.10.    Notices, Demands and Requests.

All notices, demands and requests to be given or made hereunder to or by the parties shall be in writing and shall be properly made if delivered personally, or sent by registered or certified mail,

or by a nationally recognized express courier service, all charges prepaid, to the other party at the address set forth below, or at such other address as may hereafter be provided in writing. The date of personal delivery, or the date of mailing or of delivery to such nationally recognized express courier service, as the case may be, shall be the date of such notice, demand or request:

(a)    Purchaser

> **Anglo-Puerto Rican Insurance Corporation**
> PO Box 9023752
> San Juan PR 00902-3752
> Att. Roberto Fortuno, CFO

(b)    Seller



> Doral Insurance Agency, LLC
> P.O. Box 71318
> San Juan, Puerto Rico 00936
> Attn: Caridad Diez

> With a copy to:

> Doral Financial Corporation
> 999 Ponce de Leon Boulevard, Suite 730
> Coral Gables, FL 33134
> Attn: Enrique Ubarri, General Counsel

> And



> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036
> Attn: Mark I Bane

Section 7.11.    <u>Confidentiality: Public Notice</u>

(a)    Each party shall maintain confidential: (i) all the information acquired with respect to the other parties during the negotiations conducted prior to the execution of this Agreement, and (ii) all information acquired with respect to the other parties or exchanged between the parties in connection with the provisions of this Agreement or related to the transactions contemplated under this Agreement, and none of the parties shall reveal or publicly disclose any part of such information nor the terms and conditions of this Agreement, without prior authorization from the other parties, except for:

(i)    any disclosure that is required as part of any notification or request for approval that must be made to the regulatory agencies, Court of Law or any other government authorities; and

(ii)    any other disclosures required contractually or by applicable law in effect.

-15-

(b)    Each of the parties shall also require its respective directors, officers, employees, agents and any other person that obtains access to information with respect to this Agreement to honor and comply with the confidentiality obligations herein established.

(c)    Neither Seller, Purchaser nor its respective stockholders will make, or cause to be made, any press release for general circulation or public announcement with respect to any of the transactions contemplated hereby without the prior written consent of the other party hereto, which consent will not be unreasonably withheld.

Section 7.12.    Termination.



A.    This Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Closing Date: (i) by mutual agreement of the parties; (ii) by the sole discretion of the Purchaser, if the Closing contemplated by this Agreement is not closed on or before May 25th, 2015, unless a written extension is requested by the Purchaser; or (iii) if, by the Closing Date, the Assets named on **Addendum A** are materially diminished for reasons attributable to the Seller actions or omissions, or to the actions of Court of Law with jurisdiction over the Seller.

B.    in the eventuality that this Agreement is terminated by either party, the Purchaser shall have no obligations whatsoever towards the Seller.

Section 7.13.    Disputes.

Unless otherwise expressly provided to the contrary elsewhere in this Agreement, the dispute resolution procedures in this Section 6.13 shall be the first mechanism to resolve any dispute, controversy or claim arising out of or relating to this Agreement (each a "Dispute"). For purpose of this Section 6.13, a Dispute shall be deemed to arise when one Party sends another party a written notice of Dispute. The parties agree to use their respective best efforts to informally resolve any Dispute resulting under this Agreement. Both parties agree to proceed diligently with their obligations under the Agreement while the final resolution of any Dispute arising under this Agreement is pending.

A.    **Conciliation.**    All Disputes shall in the first instance be brought before a conciliation committee consisting of executives representing both parties which shall negotiate in good faith and attempt to resolve any Dispute within thirty (30) days after the date that a party gives written notice of such Dispute to the other party.

B.    **Litigation.**    If the conciliation process fails, claims shall be brought by either party in a court of competent jurisdiction. Nothing in this section shall oblige either party to delay the filing of any claim in order to await the result of the conciliation process if to do so would lead to that party's claim being time-barred by the applicable statute of limitations or repose.

C.    **Survival.**    The provisions of this Section shall survive any termination of this Agreement.

Section 7.14.    Entire Agreement.

-16-

49020527_4

The foregoing represents the entire agreement between the parties and replaces the Asset Purchase and Sale Agreement between the parties dated February 26, 2015.

Section 7.15.   Section Headings Not Controlling.

The headings of the several sections of this Agreement have been prepared for convenience of reference only and shall not control, affect the meaning of, or be taken as an interpretation of any provision of this Agreement.

Section 7.16.   Further Assurances.

Each party will, whenever and as often as reasonably requested to do so by the other do, execute, acknowledge and deliver any and all such other and further acts, assignments, transfers, instruments of further assurance, approvals and consents as are necessary or proper in order to complete the transactions contemplated hereby.

Section 7.17.   Incorporation by Reference.

 **Addendum A** is incorporated into this Agreement in full by reference and made a part hereof as fully as if set forth at length herein.

Section 7.18.   Expenses Incurred by Each Party

Except for the Expense Reimbursement, on the terms set forth in Section 6.1 of this Agreement, all expenses incurred by each party with relation to this Agreement and compliance with the conditions stipulated herein shall be paid or borne by the party incurring the expense, and there shall be no obligation or entitlement to reimbursement for such expenses, provided that nothing  herein shall be interpreted as to affect, limit or preclude a claim for reimbursement of expenses in an event of default or violation of this Agreement that results in the filing of a claim under Section 6.5, which may include a claim for reimbursement of expenses.

Section 7.19.   Waiver

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

[SIGNATURE PAGE IN THE FOLLOWING PAGE]

-17-

**IN WITNESS WHEREOF,** Purchaser and Seller have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

**ANGLO-PUERTO RICAN INSURANCE CORPORATION**

By: _____

Name: _ROBERTO FORTUÑO SANCHEZ_

Title: _Exec VP x CFO_

**DORAL INSURANCE AGENCY, LLC**

By: _____

Name: _Caridad Diez_

Title: _VP Manager_

Affidavit - 974 -

Personally appeared before me, the undersigned authority, Roberto F. Fortuño Sánchez, married, Chief Financial Officer of the Anglo-Puerto Rican Insurance Corporation, resident of San Juan, Puerto Rico, who is personally known to me, and who, after first being sworn by me, affixed his signature in the space provided above and his initials in every page, on this 30th day of March 2015.

_____
Signature of Notary Public

_ANTONIO TORRES - MIRANDA_
Printed Name of Notary Public

Affidavit:2919

Personally appeared before me, the undersigned authority, Caridad Diez Blanco, married, VP Manager of the Doral Insurance Agency, LLC, resident of San Juan, Puerto Rico, who is personally known to me, and who, after first being sworn by me, affixed his signature in the space provided above and his initials in every page, on this 31 day of March 2015

_____
Notary Public.



## ADDENDUM "A"

The rights of the Seller to receive revenues from the insurance policies listed in Tab A.

In addition to the rights of Seller to receive revenues from the insurance policies listed in Tab A, the rights to receive revenues from policies under the General Agency codes 1086 and 1057 with Triple S Vida.

### Fixed Assets

See Tab B*

The following fixed assets in Tag B are not being transferred to Purchaser because they are owned by Jimenez Seda Archilla, PSC:

8 office desk
7 employee chairs
15 client/reception chairs
1 reception desk



### Excluded Assets

For the avoidance of doubt, cash in deposit accounts and the amounts due and payable to Seller from insurance carriers under profit share agreements for 2014 and 2015 (year to date) are not being transferred to Purchaser.

### Contracts



1. Real Property Lease with Jimenez Seda Archilla, PSC arising on and after the Closing Date;

2. Agreement for data services with Iron Mountain Lease arising on and after the Closing Date;

3. United States Postal Office box service agreement arising on and after the Closing Date

49020527_4

## EXHIBIT A

## BILL OF SALE

BILL OF SALE, dated as of _____ __, 2015, between Doral Insurance Agency, LLC, a limited liability corporation organized under the laws of the Commonwealth of Puerto Rico, with offices located in San Juan, Puerto Rico ("Seller"), and Anglo-Puerto Rican Insurance Corporation, a corporation organized under the laws of the Commonwealth of Puerto Rico, with offices located in San Juan, Puerto Rico (hereinafter referred to as "Purchaser").

### WITNESSETH

WHEREAS, pursuant to the terms of that certain Asset Purchase and Sale Agreement (the "Agreement"; all capitalized terms used herein that are not otherwise defined shall have the meanings set forth in the Agreement), Seller has agreed to sell, transfer and assign to Purchaser the Assets described in Addendum A to the Agreement in exchange for the Purchase Price;

NOW, THEREFORE, for good and valuable consideration and in accordance with the terms of the Agreement, Seller and Purchaser agree as follows:



1.   On the terms and subject to the conditions set forth in the Agreement, Seller hereby sells, transfers, assigns, and otherwise conveys to Purchaser, without recourse, all the right, title and interest of Seller in and to in the Assets as described in **Addendum A** attached hereto and made to form a part hereof.

2.   Purchaser acknowledges receipt of the Assets and Seller acknowledges receipt of the Purchase Price.

3.   This Bill of Sale shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico.

IN WITNESS WHEREOF, the Seller and the Purchaser hereto have caused this Bill of Sale to be duly executed as of the day and year first above written.

## ANGLO-PUERTO RICAN INSURANCE CORPORATION

By:_____
Name:_____
Title:_____

## DORAL INSURANCE AGENCY, LLC

By:_____
Name:_____
Title:_____

-20-

**EXHIBIT B**

**LITIGATION DISCLOSURE**

IN RE: DORAL INSURANCE AGENCY LLC; ANTILLES INSURANCE COMPANY

Case No. I-0017626-2014

Office of the Insurance Commissioner of Puerto Rico

IN RE DORAL FINANCIAL CORPORATION, CASE NO: 15-10573 (BANKR. S.D.N.Y.)

-21-

**<u>Exhibit C</u>**

**Proposed Sale Order**

49019483_10

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
In re                                          :        Chapter 11
                                               :
Doral Financial Corporation,[1]                :        Case No. 15-_____ ( )
                                               :
                    Debtor.                    :
-------------------------------------------------------x

## ORDER AUTHORIZING AND APPROVING THE SALE
## OF DORAL INSURANCE AGENCY, LLC OR ITS ASSETS

Upon the motion (the "Motion")[2] of the above-captioned debtor and debtor-in-possession

(the "Debtor") for entry of an order approving the sale of either (i) the Debtor's equity interest in

Doral Insurance or (ii) substantially all of the assets of Doral Insurance; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334;

and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and

venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having

found that no other or further notice is needed or necessary; and the Court having reviewed the

Motion and the Flaton Declaration and having heard statements in support of the Motion at a

hearing held before the Court (the "Sale Hearing"); and the Court having determined that the

legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the

relief granted herein; and the relief requested in the Motion being in the best interests of the

Debtor's estate, its creditors, and other parties in interest; and any objections to the relief

requested in the Motion having been withdrawn or overruled on the merits; and after due

deliberation and sufficient cause appearing therefor, it is hereby

---

[1] The last four digits of the taxpayer identification number of the Debtor are (2162).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

-2-

**ORDERED, THAT:**

11.      The Motion is GRANTED to the extent provided herein.

12.      The Debtor is authorized to enter into the Asset Purchase and Sale Agreement ("APA"), attached hereto as Exhibit A, and to take all actions necessary to consummate the transactions contemplated thereby.  Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the sale and transfer of the Assets (as defined in the APA) to the party that submitted the highest and best bid at the Auction (the "Purchaser") pursuant to the APA is a legal, valid and effective disposition of the Assets, and vests the Purchaser with all right, title and interest of the Debtor to and in the Assets free and clear of all Encumbrances.[3]

13.      The APA and the transactions contemplated thereby may not be avoided under 11 U.S.C. § 363(n).

14.      Upon the Closing, Purchaser will be deemed to have acted in good faith, as that term is used in 11 U.S.C, § 363(m), with respect to entry into the APA and consummation of the transactions thereby, and no reversal or modification of this Order on appeal will affect the validity of the APA or the transactions contemplated thereby.

15.      This Order and the APA shall inure to the benefit of and be binding on the Purchaser, the Debtor, its estates, its creditors, and their respective successors and assigns, and any trustees, if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion to Chapter 7 under the Bankruptcy Code.

16.      To the extent of any inconsistency between this Order or the APA, this Order shall control.

---

[3] In the case of a sale of the Membership Interests, all Encumbrances on Doral Insurance will be satisfied or will attach to the proceeds of the Sale with the same force, effect and priority as such liens currently have, subject to the rights and defenses, if any, of the Debtor and any party in interest with respect thereto.

49019483_10

17.     Notwithstanding any Bankruptcy Rules to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

18.     The Court retains jurisdiction with respect to all matters arising from, or related to, the implementation and interpretation of this Order.

Dated: _____, 2015
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A to Sale Order**

**APA**

**<u>Exhibit D</u>**

**Flaton Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                 :
In re:                             :        Chapter 11
                                   :
DORAL FINANCIAL CORPORATION,   :        Case No. 15-10573 (SCC)
                                   :
                   Debtor.    :
                                   :
--------------------------------------------------------------X

**DECLARATION OF CAROL FLATON IN SUPPORT OF
DEBTOR'S MOTION FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES
FOR THE SALE OF DORAL INSURANCE AGENCY LLC OR ITS ASSETS, (B)
APPROVING THE PROPOSED EXPENSE REIMBURSEMENT AND BREAKUP FEE,
(C) APPROVING THE FORM AND MANNER OF NOTICE, AND (D) SCHEDULING
AN AUCTION AND A SALE HEARING, AND (II) AN ORDER AUTHORIZING AND
<u>APPROVING THE SALE OF DORAL INSURANCE AGENCY, LLC OR ITS ASSETS</u>**

       I, Carol Flaton, being duly sworn according to law, state the following under

penalty of perjury:

       1.       I am an employee and managing director of Zolfo Cooper, LLC, the direct parent

of Zolfo Cooper Management, LLC, a New Jersey limited liability company (collectively, "<u>Zolfo

Cooper</u>").  The information included in this declaration (the "<u>Declaration</u>") concerning Zolfo

Cooper is based upon my personal knowledge, information supplied to me by members of the

Debtor's management or its professionals, my review of relevant documents, or my opinion

based on upon my personal experience and knowledge of the Debtor's operations and financial

condition.

       2.       This Declaration is being submitted in connection with the proposed sale of

substantially all of the assets of Doral Insurance Agency, LLC ("<u>Doral Insurance</u>"), a wholly-

owned, non-debtor subsidiary of the Debtor, for which the Debtor seeks court approval in its

Motion for (I) an Order (A) Approving Bidding Procedures for the Sale of Doral Insurance

Agency LLC or its Assets, (B) Approving the Proposed Expense Reimbursement and Breakup Fee, (C) Approving the Form and Manner of Notice, and (D) Scheduling an Auction and a Sale Hearing, and (II) an Order Authorizing and Approving the Sale of Doral Insurance Agency, LLC or its Assets (the "Motion")[1].

3.    Prior to the February 27, 2015 receivership of Doral Bank, Doral Insurance primarily serviced Doral Bank mortgage loan customers by connecting them with third party insurers for the purchase of insurance policies required under the borrowers' mortgage loans, such as property and title insurance. The primary revenue sources for Doral Insurance are the fees and commissions it receives from customers in its insurance policy portfolio, along with profit commissions earned through profit share agreement with select insurers.

4.    The Debtor was aware in early 2015 of the possibility that, despite the Debtor's efforts, Doral Bank might end up being placed in receivership. In a Doral Bank receivership, the Debtor expected that the value of Doral Insurance's business could begin a rapid and substantial decline. Historically, 40% of Doral Insurance's commissions have come from new business generated from issuing policies to Doral Bank mortgage lending customers. A Doral Bank receivership would essentially terminate the flow of new potential customers.

5.    Doral Insurance's customers are also under no obligation to use Doral Insurance as their agent to broker new policies. Given Doral Insurance's close business interplay with Doral Bank, the Debtor expected that once Doral Bank was put into receivership some customers may opt to switch to a new insurance agent when their existing policies come up for renewal, rather than renew with Doral Insurance. Further, the vast majority of Doral Insurance's customers are borrowers on loans held by Doral Bank. In a Doral Bank receivership, many of

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Doral Bank's loans could likely be sold to other Puerto Rican banks with their own affiliate insurance businesses.  As a result of these factors, I believe that, in a Doral Bank receivership, Doral Insurance's business, if wound down instead of being sold, could suffer dramatic declines in value in the very near term.

6.      In late 2014 and early 2015, prior to Zolfo Cooper's involvement, the Debtor received inquiries from three insurance businesses regarding an acquisition of Doral Insurance. The Debtor determined to explore a potential transaction with one of these entities. The Debtor also explored the possibility of selling Doral Insurance to two entities that had purchased pools of loans from the Debtor and Doral Bank in 2014, as some of the borrowers for those loans were customers of Doral Insurance.

7.      In this process, the Debtor ultimately received one offer to buy substantially all the assets of Doral Insurance.  This offer was extended by Anglo-Puerto Rican Insurance Corporation (now the "Stalking Horse Bidder"). The Debtor also received an offer from an alternate potential buyer, but only to buy the portion of Doral Insurance's portfolio relating directly to the borrowers for certain loans held by such potential buyer, approximately 10% of Doral Insurance's total business. Reviewing these offers, the Debtor determined that the Stalking Horse Bidder's offer was superior, not only because it was an offer to buy the entire business but also because the price offered, on a per unit basis, exceeded the offer from the potential buyer for a portion of the business.

8.      After completing negotiations, and after revising the terms of the agreement between the Stalking Horse Bidder and Doral Insurance subsequent to the bankruptcy filing by the Debtor, Doral Insurance and the Stalking Horse Bidder entered into that certain Asset Purchase and Sale Agreement, a copy of which is attached to the Motion as **Exhibit B** (the

"Stalking Horse Agreement").  As reflected in the summary of the proposed transaction set forth in the Motion, the Stalking Horse Bidder was prepared to extend its commitment to the transaction in the context of a bankruptcy process only in consideration for the Breakup Fee and Expense Reimbursement.

9.      To protect against the rapidly diminishing value of the assets of Doral Insurance, the Stalking Horse Agreement contemplates an expedited auction sale process and provides certain bid protections to the Stalking Horse Bidder.  The Stalking Horse Agreement provides for Doral Insurance to sell substantially all its assets to the Stalking Horse Bidder for a purchase price of $10.75 million, subject to a purchase price adjustment, and for a breakup fee of $250,000 and reimbursement of reasonable expenses up to $200,000.  I believe that the sale price, breakup fee, and expense reimbursement provided in the Stalking Horse Agreement are fair, reasonable, and in the best interest of the Debtor's estate.

10.      By the Motion, the Debtor seeks court approval of the proposed Bidding Procedures.  I believe the Bidding Procedures will permit a fair and efficient competitive sale process to confirm that the bid of the Stalking Horse Bidder is the best offer, or identify an alternative bid that is higher or otherwise better.  The Bidding Procedures are fair, transparent, and will derive the highest and best bid for Doral Insurance or its assets.  The timeline proposed for the Auction and Sale Hearing is warranted and necessary given the exigent circumstances and the need to sell Doral Insurance in a timely fashion.

11.      I believe that, given the potentially rapid decline of the value of Doral Insurance, approval of the Sale of Doral Insurance or its assets, on the terms set forth in the Motion, is the best way to preserve the current value of Doral Insurance for the benefit of the Debtor and its estate.

12.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Dated: March 31, 2015

_____
Carol Flaton
Managing Director