ROPES & GRAY LLP
Mark I. Bane
Meredith S. Tinkham (*pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

-and-

James A. Wright III
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

*Counsel to the Debtor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
In re                                  :   Chapter 11
                                       :
Doral Financial Corporation,[1]        :   Case No. 15-10573 (SCC)
                                       :
                      Debtor.          :
---------------------------------------------------------x

## DECLARATION OF CAROL FLATON IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE SALE OF DORAL INSURANCE AGENCY, LLC OR ITS ASSETS

I, Carol Flaton, being duly sworn according to law, state the following under penalty of perjury:

1. I am the Chief Restructuring Officer of Doral Financial Corporation ("the Debtor"), and an employee and managing director of Zolfo Cooper, LLC, the direct parent of Zolfo Cooper Management, LLC, a New Jersey limited liability company (collectively, "Zolfo

---

[1] The last four digits of the taxpayer identification number of the Debtor are (2162).

50509253_8

Cooper"). The information included in this declaration (the "Declaration") concerning the Debtor is based upon my personal knowledge, information supplied to me by members of the Debtor's management or its professionals, my review of relevant documents, or my opinion based upon my personal experience and knowledge of the Debtor's operations and financial condition.

2. This Declaration is being submitted in connection with the proposed sale of Doral Insurance Agency, LLC ("DIA"), a wholly-owned, non-debtor subsidiary of the Debtor, or substantially all of DIA's assets (the "Assets"), for which the Debtor seeks Court approval in its *Motion for an Order Authorizing and Approving the Sale of Doral Insurance Agency, LLC or its Assets* (the "Sale Motion"), filed on March 31, 2015 [Docket No. 68].[2]

## The Marketing and Sale Process

3. In late 2014 and early 2015, prior to Zolfo Cooper's involvement, the Debtor received inquiries from three insurance businesses regarding an acquisition of DIA or its Assets. The Debtor determined to explore a potential transaction with one of these entities. The Debtor also explored the possibility of selling DIA to two entities that had purchased pools of loans from the Debtor and Doral Bank in 2014, since some of the borrowers for those loans were customers of DIA. During this time, the Debtor did not receive any inquiry from the ultimate winner of the auction (the "Auction"), Popular Insurance, LLC ("Popular Insurance").

4. Prior to the Debtor's bankruptcy filing, the Debtor ultimately received one offer to buy substantially all the assets of DIA. This offer was extended by Anglo-Puerto Rican Insurance Corporation. The Debtor also received an offer from an alternate potential buyer, but this alternative offer was only to buy the portion of DIA's portfolio relating directly to the

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Sale Motion.

borrowers for certain loans held by such potential buyer, approximately 10% of DIA's total business. Reviewing these offers, the Debtor determined that Anglo-Puerto Rican Insurance Corporation's offer was superior, not only because it was an offer to buy the entire business but also because the price offered, on a per unit basis, exceeded the offer from the potential buyer for a portion of the business. On February 26, 2015, DIA and Anglo-Puerto Rican Insurance Corporation entered into an Asset Purchase and Sale Agreement (the "Original APA") memorializing the agreement to sell the Assets to Anglo-Puerto Rican Insurance Corporation.

5. Following Doral Bank's receivership and the Debtor's chapter 11 filing, Anglo-Puerto Rican Insurance Corporation and the Debtor reengaged to discuss the best approach to the transaction given the change in circumstances. Following these discussions, Anglo-Puerto Rican Insurance Corporation agreed to revise its bid to take the form of a stalking horse offer in an auction process. DIA and Anglo-Puerto Rican Insurance Corporation negotiated a revised form of the Original APA and entered into a new Asset Purchase and Sale Agreement for the Assets (the "Stalking Horse Agreement") on March 30, 2015. The Stalking Horse Agreement provided for DIA to sell substantially all of its assets to Anglo-Puerto Rican Insurance Corporation (now, the "Stalking Horse Bidder") for the originally negotiated purchase price of $10.75 million, subject to a purchase price adjustment. Under the terms of the Stalking Horse Agreement, if the Stalking Horse Bidder did not turn out to be the successful bidder, it was to be entitled to a breakup fee of $250,000 and reimbursement of reasonable expenses up to $200,000.

6. After entering into the Stalking Horse Agreement, the Debtor sought approval of the Stalking Horse Agreement and bidding procedures to solicit competing bids for and an auction of the Assets (the "Bidding Procedures"). On April 9, 2015, the Court approved the Break-Up Fee and expense reimbursement, Bidding Procedures, and sale process (the "Sale

Process") in the *Order (I) Approving Bidding Procedures or the Sale of Doral Insurance Agency, LLC or its Assets, (II) Approving the Breakup Fee and Expense Reimbursement, (III) Approving the Form and Manner and Notice, and (IV) Scheduling an Auction and a Sale Hearing* [Docket No. 95].

7. After the Court approved the Break-Up Fee and expense reimbursement, Bidding Procedures and Sale Process, the Debtor and its advisors solicited and received interest from additional parties. The Debtor or Zolfo Cooper (i) communicated with 31 additional bidders; (ii) sent form non-disclosure agreements ("NDAs") to 10 additional parties; and (iii) subsequently entered into 8 additional NDAs. Zolfo Cooper assisted these parties with their respective due diligence processes leading up to the auction of the Assets.

8. Pursuant to the Bidding Procedures, Bids were due by May 6, 2015 at 12:00 noon (the "Bid Deadline"). As of the Bid Deadline, the Debtor received one additional bid for the Assets, submitted by Popular Insurance. Following the Bid Deadline and prior to the Auction, the Debtor's advisors determined that Popular Insurance's bid was a qualified bid, and alerted the Stalking Horse Bidder that a competing qualified bid had been submitted. The Debtor's advisors then negotiated with Popular Insurance to maximize the value of its bid and clarify certain key terms and provisions. Zolfo Cooper also analyzed the differences in the proposed transactions between the Stalking Horse Agreement and the bid submitted by Popular Insurance to determine the relative values to the estate of the two alternatives.

9. Pursuant to the Bidding Procedures, the Auction was scheduled to commence at 10:00 am on Tuesday, May 12, 2015 at the offices of Ropes & Gray, LLP, 1211 Avenue of the Americas, New York, NY 10036. The auction commenced at approximately 10:30 a.m. on May 12, 2015, and was held on the record, as required under the Bidding Procedures. At the

commencement of the Auction, each bidder certified on the record that it had not and would not engage in any collusion with respect to the bidding or the sale. The Stalking Horse Bidder and Popular Insurance participated in 28 bidding rounds and concluded with a bid of $17.25 million submitted by Popular Insurance (the "Final Bid"). Upon the submission by Popular Insurance of the Final Bid, the Stalking Horse Bidder announced on the record that the Stalking Horse Bidder had decided to refrain from submitting additional bids. The Debtor, in concurrence with its advisors, and after consultation and agreement of the Official Committee of Unsecured Creditors, declared the Final Bid to be the highest and best bid for the Assets.

10. I believe the Sale Process and Auction conducted by the Debtor and its professionals was conducted in good faith, and I have observed no indication of collusion or inappropriate activity by any bidder or potential bidder. In addition, in the best of my judgment, I believe that the Bidding Procedures and Sale Process maximized the value of the Assets and that the successful Final Bid of Popular Insurance represents the highest and best price available for the Assets. As such, I believe that approval of the Sale Motion, including approval of Popular Insurance as the successful bidder, is in the best interest of the Debtor's estate and will yield the greatest recovery for the Debtor's creditors.

11. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 19, 2015

_____
Carol Flaton
Chief Restructuring Officer