## ASSET PURCHASE AND SALE AGREEMENT

This Asset Purchase and Sale Agreement (Insurance Policies) (hereinafter referred to as the "Agreement"), dated as of May 6, 2015, is by and between Doral Insurance Agency, LLC, a limited liability company organized under the laws of the Commonwealth of Puerto Rico, with offices located in San Juan, Puerto Rico ("Seller"), and Popular Insurance LLC, a limited liability company organized under the laws of the Commonwealth of Puerto Rico, with offices located in Guaynabo, Puerto Rico (hereinafter referred to as "Purchaser").

### WITNESSETH

**WHEREAS**, Seller is an insurance general agent and authorized representative duly licensed by the Office of the Insurance Commissioner of Puerto Rico (hereinafter referred to as "OIC") acting from time to time as general agent and authorized representative for several insurance companies authorized by the OIC to do business in the Commonwealth of Puerto Rico;

**WHEREAS**, on March 11, 2015, Doral Financial Corporation ("DFC"), which owns 100% of the membership interests in Seller, commenced a case under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, Seller, as appointed general agent and authorized representative of several insurance companies, manages and services an insurance policy portfolio related to insurance policies sold by Seller (hereinafter collectively referred to as "Business");

**WHEREAS**, pursuant to and in compliance with applicable provisions of the Insurance Code of Puerto Rico and its underlying Regulations, Purchaser desires to purchase and Seller desires to sell the assets related with the Business as specified in this Agreement identified and listed in the Insurance Policies' Schedule hereby attached as **Addendum A**;

**NOW, THEREFORE**, and in consideration of the mutual covenants made herein and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### PART I - SALE AND PURCHASE OF INSURANCE POLICIES -

Section 1.1.    Assets to Be Sold, Assigned and Transferred.

A.    In consideration of Purchaser's payment of the Purchase Price, and subject to and in accordance with applicable law and the terms and conditions of this Agreement, the Seller does hereby agree to sell, assign, transfer, convey and set over unto the Purchaser as of the Closing Date (as defined below), and the Purchaser, upon the terms and subject to the conditions of this Agreement, at the Closing does hereby agree to purchase from the Seller, all of Seller's rights, title and interests as an authorized representative in connection with the following specified assets of the Business:

1.    the renewal insurance commissions and all fees with respect to the Insurance Policies identified in **Addendum A** annexed hereto and in force as of the Closing Date;

2.    the contracts of Seller used in connection with the Business as identified in **Addendum A** annexed hereto;

3.    the existing relationships with clients under all existing Insurance Policies and the related customer lists, telephone numbers, directory files, customer account records (including but not limited to correspondence with the respective clients) and other Business records in the possession of the Seller with respect to the Business (the "Records"), but excluding, for the avoidance of doubt, corporate records of the Seller such as, by way of illustration and not as a limitations, Seller's stock ledger, stockholder records, stockholder and directors' minute books, employee records, financial accounting records and statements, business plans, and regulatory filings, reports and related correspondence with governmental agencies;

4.    the agreements, arrangements and any rights or entitlements of Seller to act as general agent and/or authorized representative of the insurance companies that have issued the Insurance Policies; and

5.    any rights of Seller to any payments from insurance carriers under any profit share agreements and/or arrangements for 2015 related to the Insurance Policies.

B.    The Purchaser is not acquiring the Excluded Assets listed in **Addendum A**.

C.    All assets described in A(1), A(2), A(3) and A(4) (the "Assets"), are free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrances.

D.    **Addendum A** may be amended by the parties as of the Closing Date (as defined below) to reflect the Assets as of the Closing Date.

Section 1.2.   Liabilities.

A.    Assumption of Liabilities.  On the terms and subject to the conditions set forth herein, on the Closing Date, Purchaser will assume the following liabilities and obligations of the Seller (the "Assumed Liabilities") but no others:

1.    Seller's obligation under the service and license arrangements with RSM ROC & Company related to the LIMS primary insurance management system (the "LIMS Agreement"); and

2.    Seller's obligation under the United States Postal Office box service agreement arising on and after the Closing Date.

-2-

B.     Excluded Liabilities.  Purchaser shall not assume any liabilities, obligations or commitments of the Seller relating to or arising out of the operation of the Business or the ownership of the Assets prior to the Closing Date other than the Assumed Liabilities.  Notwithstanding anything to the contrary in this Agreement, Purchaser shall not assume or in any way become liable for any of the debts, liabilities, or obligations of any nature whatsoever (other than the Assumed Liabilities) relating to the Seller, the Business or the Assets, whether accrued, absolute, contingent or otherwise, whether known or unknown, whether due or to become due, whether related to the Business or the Assets and whether disclosed on the Schedules attached hereto, and regardless of when or by whom asserted(collectively referred to herein as the "Excluded Liabilities",) and, for the avoidance of doubt and not in limitation of the foregoing, Purchaser shall not assume any of the liabilities, obligations or commitments of Seller that are described below (which shall also be Excluded Liabilities):

1.     Any of the Seller's Liabilities or obligations under this Agreement, the Schedules attached hereto and any other agreements entered into by the Seller in connection with the transactions contemplated by this Agreement;

2.     any of the Seller's liabilities or obligations for expenses, fees or taxes incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby (including all attorneys, accountants' and brokerage fees);

3.     any of the Seller's liabilities or obligations with the Social Security Administration, the Federal Unemployment Insurance, the United States Department of Treasury, the Puerto Rico Department of Treasury ("Departamento de Hacienda"), the Puerto Rico State Insurance Fund ("Fondo del Seguro del Estado"), the Puerto Rico Department of Labor and Human Resources and any other state or federal agency, and municipality of the Commonwealth of Puerto Rico;

4.     any of the Seller's liabilities or obligations for any federal or Puerto Rico taxes  for any period prior to the Closing Date;

5.     any liability or obligation under or with respect to any employment agreement, any employee benefit plan, any employee health, disability or other welfare plan, program, policy or arrangement presently or formerly maintained or contributed to by Seller or its parents or affiliates, or with respect to which the Seller, parent or affiliate has any liability;

6.     any of the Seller's liabilities or obligations for vacation pay, sick pay, holiday pay, salary, bonuses, pension and/or retirement benefits, or other payments or liabilities arising at or before the Closing Date of any kind to any employees or current or former employee of the Seller;

-3-

7.    any liability or obligation relating to workers' compensation claims which were filed or presented by the Seller's employees at or before the Closing Date or which are filed or presented after the Closing Date but relate to claims and/or injuries first arising at or before the Closing Date;

8.    any of the Seller's liabilities or obligations (A) arising by reason of any violation or alleged violation of any law of any governmental entity or any requirement of any governmental entity, or (B) arising by reason of any breach or alleged breach by the Seller of any agreement, contract, lease, license, commitment, instrument, judgment, order or decree;

9.    any of Seller's liabilities or obligations relating to any legal action, proceeding or claim arising out of or in connection with Seller's conduct of the Business at or before the Closing Date or any other conduct of the Seller, the Seller's officers, directors, employees, consultants, agents or advisors at or prior to the Closing Date;

10.   any liabilities or obligations in respect of any of the Excluded Assets (including under any contracts, leases, commitments or understandings related thereto);

11.   any liabilities for premiums that may be due and payable to insurance companies for insurance written before the Closing Date, whether or not such premiums shall have been received by Seller in its capacity as general agent or authorized representative;

12.   any liability, obligation or commitment to return or refund to an insurance company, any unearned commission on policy cancellations or reductions in policy premiums collected on or prior to the Closing Date;

13.   any liabilities, obligations or commitments of Seller with respect to any statutory or contractual severance payment that may be due or payable to any of Seller's employees on account of their termination of employment with Seller (whether or not employed by Purchaser) as a result of or in connection with or resulting from the sale of the Assets and other transactions contemplated in this Agreement, including but not limited to any liability that may be imposed or asserted against the Seller under Act No. 80 of May 30, 1976, as amended (the "Act 80 Severance Payments"); and

14.   any other liabilities or obligations of Sellers other than Assumed Liabilities.

Section 1.3.   Purchase Price.

On the Closing Date, Purchaser shall pay to Seller in consideration for sale of the Assets the amount of Seventeen Million Two-Hundred Fifty Thousand Dollars ($17,250,000.00) (the "Purchase Price"). The Purchase Price shall be paid by wire transfer of immediately available

funds including the Escrow Deposit (as defined below) to the account or accounts designated by Seller.  Purchaser reserves the right to increase the amount of the Purchase Price pursuant and subject to the procedures set forth in the bidding procedures order entered by the Bankruptcy Court [Dkt.  No.  95] on April 9, 2015 (the "Bidding Procedures Order").

Section 1.4.    <u>Condition of Parties' Obligation to Close</u>.

    A.    The obligation of Seller under this Agreement will be subject to the entry of the Sale Order (as defined below).

    B.    The obligation of Purchaser under this Agreement will be subject to the entry of the Sale Order (as defined below).

Section 1.5.    <u>Execution and Closing</u>.

    A.    Purchaser has (a) executed this Agreement on and as of May 6, 2015, and the execution thereof by Seller is subject to, and shall occur upon, the approval of the Bankruptcy Court as of the date of said approval (the "Execution Date"); (b) executed that certain Escrow Agreement referred to and required in the Bidding Procedures Order, accompanied by the deposit with the escrow agent named therein (the "Escrow Agent") of the sum of $1,300,000, equivalent to 10% of the Purchase Price (the "Escrow Deposit"), transmitted on the date hereof by wire transfer to the Escrow Agent; provided, that Seller and Purchaser shall deliver written instructions to the Escrow Agent to the effect that the Escrow Deposit shall be (i) applied to the payment of the Purchase Price by the Purchaser, if this Agreement is approved by the Bankruptcy Court (as defined below), or (ii) returned to the Purchaser if the purchase of the Assets by Purchaser is not approved by the Bankruptcy Court (as defined below) or if Agreement is terminated for any reason.

    B.    Seller shall continue to operate the Business with its employees from the Execution Date to the Closing Date as described in subsection E.  of this Section 1.5.

    C.    Unless mutually extended by the parties, the final closing of the transactions contemplated in this Agreement (the "Closing") will occur within five (5) business days after the Sale Order, as defined in Section 1.6 (A)(6), has been entered by the Bankruptcy Court (the "Closing Date").

    D.    [RESERVED]

    E.    The Parties agree that continuity of business operations up until the Closing Date is of the essence to this Agreement.  Therefore,

        1.    From the Execution Date until the Closing Date, except as otherwise consented to in writing by Purchaser, Seller shall:

            a.    conduct the Business only in the ordinary course of business;

-5-

b.      use its best efforts to (a) preserve the present business operations and organization, and (b) preserve the present relationships with any person or entity having business dealings with the Business including, without limitation, customers and suppliers;

c.      maintain all of the Assets named on **<u>Addendum A</u>** in their current condition;

d.      maintain the books, accounts and records of the Business in the ordinary course of business; continue to collect accounts receivable and pay accounts payable associated with the Business utilizing procedures consistent with past practices and without discounting or accelerating payment of such accounts; and comply with all contractual and other obligations applicable to the operation of the Business;

e.      permit Purchaser's representatives to remain on the business premises during normal business hours and to observe the operation of the business wherever conducted; provided Purchaser's representatives do not interfere with Seller's business operations;

f.      comply in all material respects with applicable laws; and

g.      not take any action which would adversely affect the ability of the parties to consummate the transactions contemplated by this Agreement.

2.      From the date hereof until the Closing Date, except as otherwise consented to in writing by Purchaser, Seller shall not:

a.      incur or assume any indebtedness with respect to the Assets named on Addendum A;

b.      sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Assets named on Addendum A;

c.      enter into or agree to enter into any merger or consolidation with, any corporation or other entity;

d.      introduce any material change with respect to the operation of the Business, including any material change in the types, nature, composition or quality of products or services, other than in the ordinary course of business;

e.      enter into any transaction with respect to the Assets named on Addendum A which by reason of its size, nature, or otherwise is not in the ordinary course of business;

    f.      terminate, amend, restate, supplement or waive any rights under any Material Contract;

    g.      or make anything which would make any of the representations and warranties of Seller in this Agreement untrue or incorrect in any material respect.

Section 1.6.   <u>Deliveries at the Closing</u>.

As a condition to Closing, the Seller and the Purchaser, as applicable, will deliver and/or cause to be delivered, and/or will execute and/or cause to be executed the following at the Closing:

A.    <u>The Seller</u>.

1.    An executed Bill of Sale in the form attached as Exhibit A;

2.    All of the Records, as described in Section 1.1 A(3) above.

3.    Certified copies of the Seller's Board of Directors' Corporate Resolutions authorizing 1) the sale of the Assets to Purchaser; 2) the execution of this agreement and; 3) the execution and delivery of all documents, deeds and instruments required for the transfer of the Assets to Purchaser and any other transaction contemplated in this agreement.

4.    An assignment of the LIMS Agreement.

5.    An order of the Bankruptcy Court approving the transactions under this Agreement entered by the date set in Section 6.3B, and in form and substance agreeable to Purchaser (substantially in the form annexed as Exhibit C hereto) (the "Sale Order") which shall be a final order not subject to any stay or appeal.  Seller must notify Purchaser of all documents filed with the Bankruptcy Court related to the sale of the Assets within twenty-four (24) hours after they are filed.

B.    <u>The Purchaser</u>.

1.    (a) Certified copies of the resolutions of Purchaser's Board of Directors authorizing the acquisition of the Assets from Seller, authorizing or ratifying the execution of this Agreement and the execution and delivery of all documents, deeds and instruments required for the acquisition of the Assets from Seller and authorizing the completion by Seller of all the transactions contemplated in this agreement, and (b) a certificate issued by an authorized officer of the Purchaser to the effect that the waiting period for the required prior notice given by Purchaser to the Federal Reserve Bank of New York ("FRB-NY") of the purchase of the Assets has expired (or been waived by the FRB-NY), or, if applicable (as may have been be determined to be required by the FRB-NY), that the approval of the FRB-NY for the purchase of the Assets by Purchaser has been received.

-7-

## PART II - REPRESENTATIONS AND WARRANTIES OF THE SELLER

Section 2.1.    <u>Representations and Warranties of the Seller</u>.

The Seller represents and warrants to, and covenants with Purchaser as of the Execution Date, with respect to the Assets delivered on the Closing Date, that:

A.    The Seller is duly organized and in good standing under the laws of the Commonwealth of Puerto Rico, and is licensed by the OCI to transact insurance business as a general agent and authorized representative.

B.    Subject to approval of the Bankruptcy Court, Seller has the required corporate power and authority to execute and deliver this Agreement and consummate the transactions contemplated hereby.  Subject to approval of the Bankruptcy Court, the execution and delivery of this Agreement to which it becomes a party, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Seller, and no further corporate authorization on the part of Seller is necessary to approve this Agreement.  This Agreement has been, and as of the Closing Date, will have been, duly executed and delivered by Seller, and, assuming the due authorization, execution and delivery of this Agreement to which it becomes a party, and subject to approval of the Bankruptcy Court, this Agreement constitutes, as of the Closing Date, the legal, valid and binding obligations of Purchaser, enforceable against Seller in accordance with its terms (subject as to enforceability to bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar laws relating to or affecting the rights of creditors generally, general equitable principles).

C.    Subject to approval of the Bankruptcy Court, the Seller has the power and authority to own, hold, manage, and service the Insurance Policies and to conduct the Business as presently conducted, and to execute, deliver and perform, and to enter into and consummate, the transactions contemplated by this Agreement; has duly authorized the execution, delivery and performance of this Agreement; has duly executed and delivered this Agreement; and, this Agreement constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

D.    Subject to approval of the Bankruptcy Court, neither the execution or delivery of this Agreement, nor the consummation of any other of the transactions herein contemplated, will result in the breach of any term or provision of the charter or by-laws of the Seller or conflict with, result in a breach, violation or acceleration of, or constitute a default under, the terms of any agreement or instrument to which the Seller is a party or by which it is bound, or any statute, order or regulation, applicable to the Seller, of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Seller.  Subject to approval of the Bankruptcy Court, the Seller is not a party to, bound by or in breach or violation of any agreement or instrument, or subject to or in violation of

any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects the ability of the Seller to perform its obligations under this Agreement.

E.      Seller has been duly appointed as authorized representative and general agent by several insurance companies, authorized, supervised and examined by the OIC.

F.      With the delivery of the Assets under this Agreement, the Seller does not believe nor does it have any reason or cause to believe that it cannot make any covenant, representation and warranty or perform each and every obligation contained in this Agreement.

G.      Immediately prior to the conveyance and assignment contemplated herein, the Seller had good and marketable title to the Assets; at the Closing Date, subject to applicable law, the Purchaser will acquire good, valid, marketable title to the Assets.

H.      Other than as disclosed in Exhibit B, no litigation, including any arbitration, investigation or other proceeding of or before any court, arbitrator or governmental or regulatory official, body or authority is pending against Seller or which relates to the assets of Seller, or the transactions effected by or contemplated in this Agreement, nor does Seller know of any reasonably likely proceeding, the result of which could adversely affect Seller, its assets or the transactions effected hereby.

Other than as disclosed in Exhibit B, the Seller has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any term or requirement of any order to which the Seller, or any of the assets used in the business, is or has been subject.

I.      With respect to the Insurance Policies:

1.      The information set forth in **Addendum A** is true and correct.

2.      That all premiums, if any, due and payable to insurance companies for insurance written before the Execution Date, which have been received by Seller in its capacity as authorized representative, have been or will be paid to such companies on or before the Closing Date.

3.      That there is no pending obligation to return or refund to an insurance company, any unearned commission on policy cancellations or reductions in policy premiums collected.

4.      That the Insurance Policies have been procured and negotiated in accordance with the applicable provisions set forth the Insurance Code of Puerto Rico and its underlying regulations.

-9-

J.      That Seller will comply with the requirements and obligations imposed by Article 9.401 of the Insurance Code, 26 L.P.R.A.  §953(a), as to the purchase and sale of the Insurance Policies, as well as any other applicable law, regulation and order regarding the sale of its assets.

K.      Other than the Sale Order, the Seller is not required to obtain (i) any regulatory approval or (ii) any third party consents in connection with the Seller's execution and delivery of this Agreement to which it becomes a party, or such consents or approvals have already been obtained.

L.      To the knowledge of the Seller, the Seller is not in violation of any applicable law, statute, ordinance, order, rule or regulation promulgated or judgment entered by any regulatory authority relating to the operation or conduct of the Seller or the ownership of the Insurance Policies.

## PART III - REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Section 3.1.    Representations and Warranties of the Purchaser.

Purchaser represents and warrants to, and covenants with Seller as of the Execution Date that:

A.      Purchaser is duly organized and in good standing under the laws of the Commonwealth of Puerto Rico, and is licensed by the OCI to transact insurance business as a general agent and authorized representative.

B.      Purchaser has the required corporate power and authority to execute and deliver this Agreement and consummate the transactions contemplated hereby.  The execution and delivery of this Agreement to which it becomes a party, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Purchaser, and no further corporate authorization on the part of Purchaser is necessary to approve this Agreement.  This Agreement has been, and as of the Closing Date, will have been, duly executed and delivered by Purchaser, and, assuming the due authorization, execution and delivery of this Agreement to which it becomes a party, this Agreement constitutes, as of the Closing Date, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms.

C.      Neither the execution nor delivery of this Agreement, nor the consummation of any other of the transactions herein contemplated, will result in the breach of any term or provision of the charter or by-laws of the Purchaser or conflict with, result in a breach, violation or acceleration of, or constitute a default under, the terms of any agreement or instrument to which the Purchaser is a party or by which it is bound, or any statute, order or regulation, applicable to the Purchaser, of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Purchaser.  The Purchaser is not a party to, bound by or in breach or violation of any agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative

-10-

agency or governmental body having jurisdiction over it, which materially and adversely affects the ability of the Purchaser to perform its obligations under this Agreement.

D.      Except for the expiration or waiver of the waiting period for the required prior notice given to the FRB-NY of the purchase of the Assets, Purchaser is not required to obtain (i) any regulatory approval or (ii) any third party consents in connection with Purchaser's execution and delivery of this Agreement to which it becomes a party, or such consents or approvals have already been obtained.

E.      There is no action, suit, or proceeding, at law or in equity, before any governmental entity, or any local or federal court, wherein an unfavorable decision, ruling or finding would materially adversely affect (a) the validity or enforceability of this Agreement, or (b)the consummation of the transactions contemplated hereby, or (c) any approval or third party consent required to be obtained by Purchaser hereunder, or (d) the ability of Purchaser to perform its obligation.; under this Agreement.

F.      Purchaser has not paid or agreed to pay any fee or commission to any agent, broker, finder or other person for or on account of services rendered as a broker or finder in connection with this Agreement or the transactions covered and contemplated hereby.

G.      Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Assets as contemplated hereunder.   Purchaser has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Purchaser acknowledges that Seller has given Purchaser complete and open access to the key employees, documents and facilities of the Business. Purchaser will undertake prior to the Closing Date, such further investigation and request such additional documents and information as it deems necessary. Purchaser understands that any cost estimates, projections or other predictions, which have been provided, are not and shall not be deemed to be representations or warranties of Seller.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other predictions, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other predictions so furnished to it, and that Purchaser shall have no claim against the Seller with respect thereto.

H.      That Purchaser will comply with the requirements and obligations imposed by Article 9.401 of the Insurance Code, 26 L.P.R.A. §953(a), as to the purchase and sale of the Insurance Policies.

## PART IV - COVENANTS OF SELLER

Section 4.1.    <u>Conduct of Business</u>.

    A.    From and after the Execution Date and up to the Closing Date, Seller agrees to conduct its insurance operations in accordance with all applicable laws, and in a manner consistent with safe and sound commercial practices. Seller shall comply with the terms of Section 1.5(E) of this Agreement during that period.

    B.    Prior to the Closing, Seller will allow Purchaser (and its agents'. and representatives) reasonable access to pertinent information related to the Business and the Assets in order for Purchaser to conduct its analysis and review of the Assets being purchased pursuant to this Agreement.

    C.    If Seller shall receive after the Closing Date any payments related to the Insurance Policies sold to Purchaser or any other remittance that pursuant to the terms hereof, should have been paid to the Purchaser, the Seller shall transmit the funds to Purchaser within two (2) business days of receipt thereof.

## PART V - EMPLOYEES

Section 5.1.    <u>Seller Employees</u>. The Seller acknowledges that the Purchaser is not assuming any of the Seller's obligations or liabilities with respect to its employees, and that the Purchaser may, but has no obligation to, offer employment to any of the Seller's employees. The Seller shall pay and otherwise satisfy in a timely fashion to all of its employees and former employees (whether or not hired by the Purchaser) all payments and benefits that are owed preceding the Closing Date under applicable law, including accrued and unpaid wages, severance pay under any applicable state or Federal law, including but not limited to the Act 80 Severance Payments, vacations, contributions to any employee pension or retirement plan and any other accumulated fringe benefit. The Seller shall also be responsible for giving to its employees and/or contractors any notice that is legally required under any applicable law, regulation or standing order.

## PART VI - BANKRUPTCY MATTERS

Section 6.1.    <u>Breakup Fee and Expense Reimbursement</u>. The parties agree that the Assets will be sold pursuant to an auction process subject to the approval of the Bankruptcy Court. If the Assets are sold to Purchaser, Anglo-Puerto Rican Insurance Corporation shall be entitled to a breakup fee of $250,000 (the "Breakup Fee") and reimbursement of its reasonable expenses up to an amount of $200,000 (the "Expense Reimbursement") related to pursuing the purchase of the Assets, payable from the proceeds of the sale of the Assets to Purchaser. Seller represents to Purchaser that, pursuant to an order of the Bankruptcy Court, the Breakup Fee and Expense Reimbursement shall be paid to Anglo-Puerto Rican Insurance Corporation from the proceeds of the sale to Purchaser on the terms set forth in the Bidding Procedures Order. The Bidding Procedures Order provides that the Bankruptcy Court and Seller will consider the obligation to pay the Breakup Fee and Expense Reimbursement in determining which party has made the highest and best offer at the auction.

50486624_3

Section 6.2.    Form of Sale Order.  The Sale Order shall be in form and substance acceptable to Purchaser, and substantially in the forms annexed as Exhibit C hereto.

Section 6.3.    Timing Requirements.  Purchaser may terminate this Agreement, in its discretion, if:

    A.    An auction for the Assets has not occurred by May 12th, 2015; or

    B.    The Bankruptcy Court has not entered the Sale Order in form and substance acceptable to Purchaser by May 22nd, 2015.

## PART VII - MISCELLANEOUS PROVISIONS

Section 7.1.    Survival.  The parties' respective representations, warranties and indemnification obligations contained in this Agreement will survive the Closing.

Section 7.2.    Binding Effect.  Subject to the terms set forth in Section 4.9, this Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Except as expressly provided in Section 4.9, the parties hereto intend that this Agreement will not benefit or create any right or cause of action in or on behalf of any person other than the parties hereto.

Section 7.3.    Amendments.  This Agreement may be amended or supplemented in writing, by Purchaser and Seller, or DFC in the event of Seller's dissolution.

Section 7.4.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

Section 7.5.    Indemnification.  The Seller shall indemnify Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgment, and other costs and expenses resulting from any claim, demand, defense or assertion based or grounded upon, or resulting from (i) any breach or failure to perform by the Seller of any of its representations, warranties, covenants or agreements contained in this Agreement; (ii) the failure of the Seller to pay or satisfy when due any of the debts, Liabilities or obligations whatsoever of the Seller pursuant to this Agreement;(iii) any claim, based in contract, tort or otherwise, arising out of or related to the operation of the Business prior to Closing (including, but not limited to, claims against Seller and/or Purchaser (A) by third parties and (B) claims for fines or other penalties brought by the OCI or any regulatory agency); and (iv) any claims asserted by any of Seller's present or former employees and related to their employment or termination of employment of service with Seller or the period of employment with the Seller, including but not limited to, any claim or entitlement based upon unpaid wages or benefits or upon Act No.  80 of May 30, 1976 (including but not limited to the Act 80 Severance Payments.)

The Purchaser shall indemnify Seller, or its parent company in the event of Seller's dissolution and hold it harmless against any losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgment, and other costs and expenses resulting from (i) any claim, demand, defense or assertion based or grounded upon, or resulting from Purchaser's failure to perform

-13-

any of its obligations hereunder; (ii) from any breach or failure to perform by the Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement (iii) arising out of or in connection with any litigation relating to the servicing of any of the Insurance Policies; (iv) any claim, based in contract, tort or otherwise, arising out of or related to the operation of the Business after the Closing; and (v) any claims asserted by any of Purchaser's employees that were employees of Seller prior to Closing, which claims arise out of such employees' subsequent employment or termination of employment by Purchaser and that arise during the period of employment with the Purchaser.

To the fullest extent permitted by applicable law, none of the parties hereto shall assert, and each party hereby waives, any claim on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, or in connection with this Agreement, even if advised of the possibility hereof.

In the event of a claim by a third party for which indemnification protection exists, a party seeking indemnification pursuant to this section (an "Indemnified Party") shall give prompt notice to the parties from whom such indemnification is sought (the "Indemnifying Party") of the assertion of any claim, or the commencement of any action or proceeding, in respect of which indemnity may be sought hereunder.  The Indemnified Party shall assist the Indemnifying Party in the defense of any such action or proceeding.  The Indemnifying Party shall have the right to, and shall at the request of the Indemnified Party, assume the defense of any such action or proceeding at its own expense.  In any such action or proceeding, the Indemnified Party shall have the right to retain its own counsel provided that the fees and expenses of such counsel shall be at its own expense unless (i) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such suit, action or proceeding (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and, in the reasonable judgment of the Indemnified Party, representation of both parties by the same counsel would be inappropriate due to actual differing interests between them.

The Indemnifying Party shall not be liable under this Section for any settlement effected without its consent of any claim, litigation or proceeding in respect of which indemnity may be sought hereunder.  The Indemnifying Party may settle any claim without the consent of the Indemnified Party, but only if the sole relief awarded are monetary damages that are paid in full by the Indemnifying Party.  An Indemnified Party shall, subject to its reasonable business needs, use reasonable efforts to minimize the indemnification sought from the Indemnifying Party hereunder.  Notwithstanding the foregoing, no investigation by an Indemnified Party at or prior to the Closing Date shall relieve the Indemnifying Party of any liability hereunder, unless the Indemnified Party seeks indemnity in respect of a representation or warranty which it actually has reason to believe to be incorrect as a result of its investigation prior to the Closing Date and the Indemnified Party intentionally failed to bring such belief to the attention of the Indemnifying Party prior to the Closing.

Other than a claim of fraud or claims which cannot be waived as a matter of law, Purchaser and the Seller agree than an action for indemnity under this Section shall be the sole basis for asserting any claim arising under or related to this Agreement and the transactions contemplated hereby.

-14-

Seller and Purchaser agree that effective on the Closing Date, Purchaser shall have no recourse against Seller with respect to any chargeback, including without limitation, a return of unearned insurance commissions with respect to any of the Insurance Policies or Assets identified in **Addendum A**.

Section 7.6.   <u>No Agency Relationship</u>.  At no time shall the Seller represent that it is acting as an agent for or on behalf of Purchaser.

Section 7.7.   <u>Governing Law</u>.   This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Puerto Rico, and the obligations, rights and remedies of the parties shall be determined in accordance with such laws.

Section 7.8.   <u>Severability of Provisions</u>.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, revisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 7.9.   <u>Assignment</u>.  Purchaser shall have the right to assign its rights and obligations under this Agreement to any affiliate of Purchaser, without the consent of the Seller.  All covenants, agreements, representations and warranties made by or on behalf of the Seller or Purchaser under this Agreement shall inure to the benefit of the successors and assigns of Purchaser or Seller, as the, case may be.  Nothing contained in this Section 6.9 shall be deemed to authorize or permit the Seller to assign any of its rights or obligations hereunder to any other person (other than an affiliate of the Seller), without the prior written consent of Purchaser, and the Seller agrees that any such purported assignment shall be void.

Section 7.10.   <u>Notices, Demands and Requests</u>.  All notices, demands and requests to be given or made hereunder to or by the parties shall be in writing and shall be properly made if delivered personally, or sent by registered or certified mail, or by a nationally recognized express courier service, all charges prepaid, to the other party at the address set forth below, or at such other address as may hereafter be provided in writing.  The date of personal delivery, or the date of mailing or of delivery to such nationally recognized express courier service, as the case may be, shall be the date of such notice, demand or request:

> (a)   Purchaser
>
> Popular Insurance LLC
> PO Box 70331
> San Juan, PR 00936-8331
> Attention: Ramón D. Lloveras, Esq., President
>
> With a copy to:
>
> Javier Ferrer, Esq.
> P.O. Box 362708
> San Juan, Puerto Rico 00936-2708

    (b)    Seller

Doral Insurance Agency, LLC
P.O. Box 71318
San Juan, Puerto Rico 00936
Attn: Caridad Diez

With a copy to:

Doral Financial Corporation
999 Ponce de Leon Boulevard, Suite 730
Coral Gables, FL 33134
Attn: Enrique Ubarri, General Counsel

And

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attn.: Mark I Bane

Section 7.11.  <u>Confidentiality - Public Notice</u>.

(a)    Each party shall maintain confidential: (1) all the information acquired with respect to the other parties during the negotiations conducted prior to the execution of this Agreement, and (ii) all information acquired with respect to the other parties or exchanged between the parties in connection with the provisions of this Agreement or related to the transactions contemplated under this Agreement, and none of the parties shall reveal or publicly disclose any part of such information nor the terms and conditions of this Agreement, without prior authorization from the other parties, except for:

    (i)    any disclosure that is required as part of any notification or request for approval that must be made to the regulatory agencies, Court of Law or any other government authorities; and

    (ii)    any other disclosures required contractually or by applicable law in effect.

(b)    Each of the parties shall also require its respective directors, officers, employees, agents and any other person that obtains access to information with respect to this Agreement to honor and comply with the confidentiality obligations herein established.

(c)    Neither Seller, Purchaser nor its respective stockholders will make, or cause to be made, any press release for general circulation or public announcement with respect to any of the transactions contemplated hereby without the prior written consent of the other party hereto, which consent will not be unreasonably withheld.

-16-

Section 7.12.   <u>Termination</u>.

A.   This Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Closing Date: (i) by mutual agreement of the parties; (ii) by the sole discretion of the Purchaser, if the Closing contemplated by this Agreement is not closed on or before June 30th, 2015, unless a written extension is requested by the Purchaser; or (iii) if, by the Closing Date, the Assets named on **<u>Addendum A</u>** are materially diminished for reasons attributable to the Seller actions or omissions, or to the actions of Court of Law with jurisdiction over the Seller.

B.   In the eventuality that this Agreement is terminated by either party, the Purchaser shall have no obligations whatsoever towards the Seller.

Section 7.13.   <u>Disputes</u>.

Unless otherwise expressly provided to the contrary elsewhere in this Agreement, the dispute resolution procedures in this Section 6.13 shall be the first mechanism to resolve any dispute, controversy or claim arising out of or relating to this Agreement (each a "Dispute").  For purpose of this Section 6.13, a Dispute shall be deemed to arise when one Party sends another party a written notice of Dispute.  The parties agree to use their respective best efforts to informally resolve any Dispute resulting under this Agreement.  Both parties agree to proceed diligently with their obligations under the Agreement while the final resolution of any Dispute arising under this Agreement is pending;

A.   **Conciliation.**   All Disputes shall in the first instance be brought before a conciliation committee consisting of 'executives representing both parties which shall negotiate in good faith and attempt to resolve any Dispute within thirty (30) days after the date that a party gives written notice of such Dispute to the other party.

B.   **Litigation.**   If the conciliation process fails, claims shall be brought by either party in a court of competent jurisdiction.  Nothing in this section shall oblige either party to delay the filing of any claim in order to await the result of the conciliation process if to do so would lead.  to that party's claim being time-barred by the applicable statute of limitations or repose.

C.   **Survival.**   The provisions of this Section shall survive any termination of this Agreement.

Section 7.14.   <u>Entire Agreement</u>.

The foregoing represents the entire agreement between the parties.

Section 7.15.   <u>Section Headings Not Controlling</u>.

The headings of the several sections of this Agreement have been prepared for convenience of reference only and shall not control, affect the meaning of, or be taken as an interpretation of any provision of this Agreement

Section 7.16.   <u>Further Assurances</u>.

Each party will, whenever and as often as reasonably requested to do so- by the other do, execute, acknowledge and deliver any and all such other and further acts, assignments, transfers, instruments of further assurance, approvals and consents as are necessary or proper in order to complete the transactions contemplated hereby, and shall cooperate with the other party to ensure the timely consummation of the transactions contemplated in this Agreement and the orderly transition of the Business.

Section 7.17.   <u>Incorporation by Reference</u>.

**<u>Addendum A</u>** is incorporated into this Agreement in full by reference and made a part hereof as fully as if set forth at length herein.

Section 7.18.   <u>Expenses Incurred by Each Party</u>

Except for the Expense Reimbursement, on the terms set forth in Section 6.1 of this Agreement, all expenses incurred by each party with relation to this Agreement and compliance with the conditions stipulated herein shall be paid or borne by the party incurring the expense, and there shall be no obligation or entitlement to reimbursement for such expenses, provided that nothing herein shall be interpreted as to affect, limit or preclude a claim for reimbursement of expenses in an event of default or violation of this Agreement that results in the filing of a claim under Section 6.5, which may include a claim for reimbursement of expenses.

Section 7.19.   <u>Waiver</u>

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a.  party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement

[SIGNATURE PAGE IN THE FOLLOWING PAGE]

50486624_3

IN WITNESS WHEREOF, Purchaser and Seller have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

POPULAR INSURANCE LLC

By: _____

Name: _____

Title: _____

DORAL INSURANCE AGENCY, LLC

By: _____

Name: _____

Title: _____

50486624_3

## ADDENDUM "A"

Insurance Policies

The rights of the Seller to receive revenues from the list of customers with in-force insurance policies listed in Tab A, which Tab A will be provided on the Closing Date and will list all in-force insurance policies as of the Closing Date.

In addition to the rights of Seller to receive revenues from the insurance policies listed in Tab A, the rights to receive revenues from policies under the General Agency codes 1086 and I057, with Triple S Vida.

Fixed Assets

Purchaser is not assuming any Fixed Assets, including but not limited to the following fixed assets that are not being transferred to Purchaser because they are owned by Jimenez Seda Archilla, PSC:

8 office desk
7 employee chairs
15 client/reception chairs
1 reception desk

Excluded Assets

For the avoidance of doubt, the following assets are not being transferred to Purchaser: cash in deposit accounts, accounts receivable and the amounts due and payable to Seller from insurance carriers under profit share agreements for 2014, including the contingent commissions due Seller from Antilles Insurance Company for calendar year 2014, in the aggregate amount of One Million Three Hundred Thirty Thousand Nine Hundred Fifty-Seven Dollars ($1,330,957.00).

Contracts

1.    United States Postal Office box service agreement arising on and after the Closing Date

2.    LIMS Agreement

# EXHIBIT A

## BILL OF SALE

BILL OF SALE, dated as of _____ , 2015, between Doral Insurance Agency, LLC, a limited liability company organized under the laws of the Commonwealth of Puerto Rico, with offices located in San Juan, Puerto Rico ("Seller"), and Popular Insurance LLC, a limited liability company organized under the laws of the Commonwealth of Puerto Rico, with offices located in San Juan, Puerto Rico (hereinafter referred to as "Purchaser").

WITNESSETH

WIEREAS, pursuant to the terms of that certain Asset Purchase and Sale Agreement (the "Agreement"; all capitalized terms used herein that are not otherwise defined shall have the meanings set forth in the Agreement), Seller has agreed to sell, transfer and assign to Purchaser the Assets described in Addendum A to the Agreement in exchange for the Purchase Price;

NOW, THEREFORE, for good and valuable consideration and in accordance with the terms of the Agreement, Seller and Purchaser agree as follows:

1.      On the terms and subject to the conditions set forth in the Agreement, Seller hereby sells, transfers, assigns, and otherwise conveys to Purchaser, without recourse, all the right, title and interest of Seller in and to in the Assets as described in **Addendum A** attached hereto and made to form a part hereof.

2.      Purchaser acknowledges receipt of the Assets and Seller acknowledges receipt of the Purchase Price.

3.      This Bill of Sale shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico.

IN WITNESS WHEREOF, the Seller and the Purchaser hereto have caused this Bill of Sale to be duly executed as of the day and year first above written.

POPULAR INSURANCE LLC

By: _____

Name: _____

Title: _____

DORAL INSURANCE AGENCY, LLC

By: _____

Name: _____

Title: _____

**EXHIBIT B**

**LITIGATION DISCLOSURE**

IN RE: DORAL INSURANCE AGENCY LLC; ANTILLES INSURANCE COMPANY

Case No.  I-0017626-2014

Office of the Insurance Commissioner of Puerto Rico

IN RE DORAL FINANCIAL CORPORATION, CASE NO 15-10573 (BANKR. S.D.N.Y.)