ROPES & GRAY LLP
Mark I. Bane
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

-and-

James A. Wright III
Meredith S. Tinkham (*pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

*Counsel for Doral Financial Corporation and*
*Proposed Counsel for Doral Properties, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Doral Financial Corporation, et al.,[1] | : | Case No. 15-10573 (SCC) |
| | : | |
| | : | |
| Debtors. | : | (Joint Administration Requested) |

-----------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF**
**(I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE**
**SALE OF CERTAIN REAL ESTATE ASSETS, (B) APPROVING PROPOSED**
**BREAK-UP FEES AND EXPENSE REIMBURSEMENTS, (C) APPROVING**
**THE FORM AND MANNER OF NOTICE, AND (D) SCHEDULING AN AUCTION**
**AND A SALE HEARING, AND (II) AN ORDER AUTHORIZING AND APPROVING**
**THE SALE OF CERTAIN REAL ESTATE ASSETS FREE AND CLEAR OF LIENS**

The debtors and debtors-in-possession in the above-captioned cases (the "Debtors")

submit this motion (the "Motion") for entry of the Bidding Procedures Order and Sale Order (as

---

[1] The last four digits of the taxpayer identification numbers of the Debtors are: Doral Financial Corporation (2162);
Doral Properties, Inc. (2283).

each term is defined herein) with respect to Doral Properties, Inc.'s ("Doral Properties") primary assets, (1) an office building, parking deck, related land, and other related assets located at 1451 Franklin D. Roosevelt Avenue in San Juan, Puerto Rico and recorded in the Registry of Property of Puerto Rico, Third Section of San Juan (the "Registry") at volume ("tomo mòvil") 17 of Monacillos, property number 26,053 (the "Building") and (2) adjacent but independent warehouse buildings, related land and other related assets located in the Desarrollo Industrial Constituciòn, San Patricio Ward, San Juan, Puerto Rico and recorded, respectively, in the Registry at page 22 of volume 914 of Monacillos, property number 16,696 and at page 6, overleaf, of volume 466 of Monacillos, property number 17,301 ((1) and (2) collectively, the "Buildings"). By this Motion, the Debtors also seek authorization to sell an open air parking lot (the "OA Parking Lot") owned by Doral Properties' corporate parent, Doral Financial Corporation ("Doral Financial"), which parking lot is adjacent to the Buildings and recorded in the Registry of Volume ("tomo mòvil") XXV of Monacillos, property number 26,086. In support of the Motion, the Debtors submit the Declaration of Carol Flaton in Support of the Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures for the Sale of Certain Real Estate Assets, (B) Approving the Proposed Break-Up Fees and Expense Reimbursements, (C) Approving the Form and Manner of Notice, and (D) Scheduling an Auction and Sale Hearing, and (II) an Order Authorizing and Approving the Sale of Certain Real Estate Assets Free and Clear of Liens, sworn to on November 24, 2015, and attached hereto as **Exhibit A** (the "Flaton Declaration"), and respectfully represent:

### Jurisdiction

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to

28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105(a), 363, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002, 3007, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

2.      On March 11, 2015, Doral Financial filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. On the date hereof, Doral Properties filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and manage their properties as a debtor in possession. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

3.      A summary of the Debtors' business, the Debtors' capital structure, and the events leading to Doral Financial's chapter 11 case, are set forth in the *Declaration of Carol Flaton in Support of First Day Motions* [Dkt. No. 8] (the "First Day Declaration").

## I.      The Building

4.      The Buildings are Doral Properties' primary assets. The Buildings secure Doral Properties' only secured debt obligation, approximately $30.8 million in principal amount due under a Loan Agreement (as defined herein).

5.      In 1999, Doral Properties arranged financing through the issuance of tax-preferred bonds by the Puerto Rico Industrial, Tourist, Education, Medical and Environmental Control Facilities Financing Authority ("AFICA"). AFICA issued $44,765,000 in bonds (the "1999 AFICA Bonds") and lent the proceeds from the issuance of the 1999 AFICA Bonds to finance the acquisition, development, and construction of the Buildings pursuant to a Loan and Guaranty

Agreement, dated as of November 3, 1999, among AFICA, Doral Properties, and Doral Financial (the "Loan Agreement"). The Loan Agreement is secured by a lien on the Buildings pursuant to a Pledge and Security Agreement, a Deed of Mortgage, and a Mortgage Note, each in favor of AFICA and each dated as of November 3, 1999. The Loan Agreement is also guaranteed as an unsecured obligation of Doral Financial. UMB Bank, N.A. is the trustee for the 1999 AFICA Bonds (in such capacity, the "Indenture Trustee") and has been assigned AFICA's rights under the Loan Agreement and the Pledge and Security Agreement.

6.      The Building was the former corporate headquarters of Doral Financial and its subsidiaries. The majority of the Building was occupied by Doral Bank Puerto Rico ("Doral Bank") pursuant to a lease with Doral Properties. On February 27, 2015, the Puerto Rico Office of the Commissioner of Financial Institutions ("OCIF") appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver for Doral Bank (the FDIC in its capacity as receiver, the "FDIC-R"). FDIC-R subsequently repudiated Doral Bank's lease with Doral Properties under 18 U.S.C. § 1821(e) on August 6, 2015.

7.      Following the receivership of Doral Bank, FDIC-R continued to occupy the Building. Banco Popular de Puerto Rico ("Banco Popular"), the purchaser of a substantial portion of Doral Bank's assets from FDIC-R, also occupied some parts of the Building. Following negotiations between the parties, several lease agreements were agreed to in early August 2015 whereby Doral Properties leased certain space at the Building to Banco Popular, including space needed by the FDIC-R (the leases, collectively, the "Banco Popular Leases"). Under the Banco Popular Leases, FDIC-R continued to occupy certain portions of the Building through September, but now has vacated the Building. Banco Popular continues to occupy

certain space at the Building, including the bank branch located on the ground floor, under one of the Banco Popular Leases (the "Remaining Lease").

8.      After Doral Financial filed for chapter 11 in March of this year, Doral Properties retained Caribbean Real Estate Services LLC and Commercial Centers Management Realty, S. en C. d/b/a Newmark Grubb Caribbean ("Newmark") to manage the Building (functions formerly performed by Doral Bank) and market it for potential sale or lease. On the date hereof, the Debtors filed an application to employ Newmark to continue providing these services to Doral Properties.

9.      Newmark has conducted an extensive marketing effort for a sale of the Building, including the preparation of a confidential investment memorandum. Newmark coordinated with 40 parties to gauge their interest in possibly leasing space or making an offer to purchase the Building. Of the 40 parties approached, 22 signed confidentiality agreements. Many of those parties performing due diligence in a virtual data room and by doing on-site visits.

10.     From May to August 2015, Newmark continued to follow up and answer questions from interested parties and advised them that letters of intent ("LOI") to purchase the Building were due on August 24, 2015. Newmark received requests from several parties asking for additional time to submit an LOI. After receiving the various LOIs, it was determined that a bid from Banco Popular (the "Stalking Horse") provided the highest and best offer for the Building.

11.     Following extensive arm's-length negotiations, and after Doral Properties commenced its voluntary chapter 11 case, Banco Popular as Stalking Horse entered into an Asset Purchase and Sale Agreement with Doral Properties for the sale of the Buildings, subject to court

5

approval and higher and better offers (the "Building APA"), a copy of which is attached as

**Exhibit B.**

12.    As reflected in the summary of the proposed Building APA transaction set forth

below, the Debtors propose to sell the Buildings in a standard bankruptcy auction process

undertaken pursuant to Bankruptcy Code section 363.

13.    The principal terms of the Building APA are summarized in the following chart:

| SUMMARY DESCRIPTION - BUILDING APA | |
|---|---|
| Parties | Seller: Doral Properties, Inc. as debtor-in-possession |
| | Purchaser: Banco Popular de Puerto Rico |
| Purchased Assets | The Buildings, including two warehouses and the parking deck |
| Purchase Price | $20,300,000 |
| Deposit | $1,000,000 |
| Breakup Fee | $600,000, which is approximately 3% of the Purchase Price. The Breakup Fee will be payable if the Debtor sells the Building to another bidder. |
| Expense Reimbursement | Purchaser is entitled to reimbursement of its reasonable expenses incurred in connection with the transactions contemplated by the Stalking Horse Agreement, in an amount not to exceed $250,000. |

14.    The Remaining Lease with Banco Popular was amended shortly before the

commencement of Doral Properties' chapter 11 case, to extend the term from January 31, 2016

to April 30, 2016. Banco Popular currently operates a bank branch location in the Building in

space covered by the Remaining Lease. Banco Popular requested, and Doral Properties agreed,

to an extension given the proposed timing for a Sale of the Buildings. Under the proposed

schedule, Banco Popular would not know who won the auction for the Buildings until mid-

January, which would leave Banco Popular with insufficient time to provide the statutorily-

6

required notices of closure of the bank branch. To avoid this, Doral Properties agreed to a short three-month extension for the Remaining Lease prepetition.

15.     Doral Properties also agreed to include in the proposed Bidding Procedures a requirement that counter-offers for the Building must include an agreement by the bidder to accept assignment of the Remaining Lease upon purchasing the Building. The proposed form of Sale Order provides for this assignment to the winning bidder for the Buildings, at a cure cost of $0. Doral Properties agreed to include this provision to protect Banco Popular's right to remain in the bank branch through April 30, 2016. Copies of the Remaining Lease will be provided upon request.

16.     Doral Properties submits that, given the short term of the Remaining Lease, this provision is reasonable and will not materially impact the results at the auction for the Buildings. Potential purchasers may prefer to have a short window to negotiate with Banco Popular regarding a continued tenancy, and any potential purchaser that desires to end Banco Popular's tenancy need only wait three months.

## II.     The OA Parking Lot

17.     When Banco Popular initially indicated an interest in acquiring the Buildings, Banco Popular also indicated an interest in acquiring the OA Parking Lot owned by Doral Financial. Following this inquiry, Newmark, at the Debtors request, engaged in a marketing process for the OA Parking Lot with potentially interested parties identified by the Debtors. After considering the results of this process, the Debtors determined to accept a bid from Banco Popular and pursue simultaneous sales of the OA Parking Lot and Buildings.

18.     Following extensive arm's-length negotiations, and after commencement of Doral Properties' chapter 11 case, Doral Financial and Banco Popular as Stalking Horse entered into an

Asset Purchase and Sale Agreement for the sale of the OA Parking Lot subject to court approval and higher and better offers (the "Parking Lot APA", and together with the Building APA, the "Stalking Horse Agreements"). A copy of the Parking Lot APA is attached as **Exhibit D**.

19.    As reflected in the summary of the proposed Parking Lot APA transaction set forth below, the Debtors propose to sell the OA Parking Lot in a standard bankruptcy auction process undertaken pursuant to Bankruptcy Code section 363.

20.    The principal terms of the Parking Lot APA are summarized in the following chart:

| SUMMARY DESCRIPTION – PARKING LOT APA | |
|---|---|
| Parties | Seller: Doral Financial Corporation, as debtor-in-possession<br><br>Purchaser: Banco Popular de Puerto Rico |
| Purchased Assets | OA Parking Lot |
| Purchase Price | $1,500,000 |
| Deposit | $100,000 |
| Breakup Fee | $50,000 |
| Expense Reimbursement | $25,000 |
| Purchase Condition | Banco Popular's obligation to acquire the OA Parking Lot pursuant to the Parking Lot APA is conditioned on Banco Popular being the successful purchaser of the Building. |

### III.    Assertions of Doral Bank Regarding OA Parking Lot

21.    Doral Financial has performed a search of the title records, which shows that Doral Financial is the owner of the OA Parking Lot. A copy of Doral Financial's title search is attached as **Exhibit C**.[2] However, the Federal Deposit Insurance Corporation (in its capacity as

---

[2] The title search is in Spanish. To the extent FDIC-R contests the validity of the title search, Doral Financial will have an appropriate translation prepared.

receiver, "FDIC-R"), as receiver for Doral Bank Puerto Rico ("Doral Bank"), asserted in Doral

Bank's proof of claim filed in Doral Financial's chapter 11 case that, "[o]n information and

belief," the OA Parking Lot is "beneficially owned" by Doral Bank. Despite requests by the

Debtors, FDIC-R has to date been unable to provide any evidence to support FDIC-R's

contention.

22.      In the proposed Sale Order, the Debtors seek an express finding by this Court that

Doral Financial owns the OA Parking Lot and Doral Bank has no interest in the OA Parking Lot.

The Debtors intend to engage with counsel to FDIC-R in advance of the hearing on the Bidding

Procedures Order to discuss whether it will be necessary to litigate this issue and, if so, what the

appropriate schedule for discovery should be.

23.      The Debtors also understand that the OA Parking Lot is currently being used by a

third party under a lease from Doral Bank. The Debtors believe this lease is invalid, as the

purported landlord (Doral Bank) does not own the OA Parking Lot. Doral Financial reserves its

rights against Doral Bank and FDIC-R with respect to this circumstance, including with respect

to any rent payments for use of the OA Parking Lot. The Debtors intend to engage with the third

party regarding its use of the OA Parking Lot and have provided notice to such party of this

Motion. In the proposed Sale Order, the Debtors seek an express finding by this Court that the

OA Parking Lot will be sold free and clear of any asserted leasehold interests, and that any

parties asserting a leasehold interest in the OA Parking Lot shall have no claims against the

buyer of the OA Parking Lot.

## IV.    Proceeds of Buildings Sale and Post-Sales Process

24.      While negotiating with Banco Popular, Doral Properties also engaged in

negotiations with the Indenture Trustee regarding the sale of the Buildings, which are collateral

for the Loan Agreement. As reflected in a contemporaneous motion for authority to use cash collateral, Doral Properties has reached agreement with the Indenture Trustee on use of cash collateral to facilitate the sale process.

25.    Doral Properties and the Indenture Trustee have also reached agreement on the proposed orders attached to this Motion. In particular, Doral Properties has agreed, subject to approve of the Court, to have the proceeds for the sale of the Buildings paid directly to the Indenture Trustee and used to pay down the secured claims under the Loan Agreement; provided, that $1 million of the proceeds will be paid to Doral Properties to be used to fund a chapter 11 plan of liquidation for Doral Properties' case. Should the auction results succeed to the extent that the secured claims under the Loan Agreement may be paid in full, the excess over the principal amount outstanding under the Loan Agreement will be paid to Doral Properties for further determination.

26.    These agreements with the Indenture Trustee provide a path to auction and sell the Buildings, avoid potentially costly disputes regarding a sale of the Buildings free and clear of liens under Bankruptcy Code section 363(f), and confirm a chapter 11 plan for Doral Properties.

## **Relief Requested**

27.    By this Motion, the Debtors seek entry of an order, substantially in the form attached as **Exhibit E** (the "Bidding Procedures Order") and, at the conclusion of the Sale Hearing (as defined herein), an order, substantially in the form attached as **Exhibit F** (the "Sale Order") with respect to the sale of the Buildings and the OA Parking Lot (such sales, the "Sales").

10

28.     The Debtors seek entry of the Bidding Procedures Order:

    a.  authorizing and approving the bidding procedures for competitive bidding in connection with the Sales (as defined herein), substantially in the form attached as Exhibit 1 to the Bidding Procedures Order (the "<u>Bidding Procedures</u>");

    b.  approving the form and manner of notice of the Sales by auction, the Sale Hearing and related matters, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order (the "<u>Auction and Sale Notice</u>");

    c.  approving the terms and Banco Popular's rights to payment of the Breakup Fees and Expense Reimbursements as administration expenses of the Debtors' estates; and

    d.  establishing the following dates and deadlines, subject to modification:

        i.  Bid Deadline: January 8, 2016 at 4:00 p.m. (Eastern Time), as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "<u>Bid Deadline</u>").

        ii.  Auction: January 12, 2016 at 10:00 a.m. (Eastern Time), as the date and time the auction, if one is needed (the "<u>Auction</u>"), which will be held at the office of Ropes & Gray LLP, located at 1211 Avenue of the Americas, New York, New York 10036.

        iii.  Sale Objection Deadline: January 7, 2016 at 4:00 p.m. (Eastern Time), as the deadline to object to the Sale.

        iv.  Sale Hearing: January 14, 2016, as the date of the hearing to approve the Sale which will be held before Honorable Shelly C. Chapman, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004.

29.     The Debtors also seek entry of the Sale Order following the conclusion of the Sale Hearing:

    a.  approving the Stalking Horse Agreements (or such other agreement or agreements as agreed to with respect to the Sales with the successful bidder(s) at the Auction); and

    b.  approving the sale of the Buildings and the OA Parking Lot free and clear of all liens, claims, interests and encumbrances (collectively, "<u>Encumbrances</u>") to the Stalking Horse or such other party that is the successful bidder at the Auction.

## Bidding Procedures

30.     The proposed Bidding Procedures are attached as **Exhibit 1** to the proposed

Bidding Procedures Order. The Bidding Procedures are intended to permit a fair and efficient

competitive sale process to confirm that the Stalking Horse Agreements are indeed the best

offers for the Buildings and the OA Parking Lot, or promptly identify the alternative bid, or

collection of bids, that might be higher or otherwise better. Because the Buildings, on the one

hand, and the OA Parking Lot, on the other, are owned by different Debtors with different estates

and creditors, the Debtors intend to conduct an auction of the Buildings first, followed by an

auction of the OA Parking Lot. The OA Parking Lot is located adjacent to the Building and the

Debtors therefore anticipate that, while some prospective buyers might be interested in

purchasing the OA Parking Lot as a stand-alone asset, others (such as Banco Popular) will be

interested in purchasing the OA Parking Lot only to the extent they purchase the Building.

## Form and Manner of Auction and Sale Notice

31.     Within two (2) business days of entry of the Bidding Procedures Order, the

Debtors will serve the Auction and Sale Notice (in substantially the form annexed as Exhibit 2 to

the proposed Bidding Procedures Order) by email or first class mail upon the following parties:

(i) the Office of the United States Trustee for the Southern District of New York, (ii) the Internal

Revenue Service, (iii) the United States Attorney for the Southern District of New York,

(iv) counsel to the UCC, (v) the U.S. Securities and Exchange Commission, (vi) any party

known or reasonably believed to have asserted any lien, claim, or encumbrance or other interest

in any of the Buildings or OA Parking Lot (collectively, "Encumbrances"), (vii) counsel to the

indenture trustees for the Doral Notes and AFICA Bonds (each as defined in the First Day

Declaration), (viii) parties required by Bankruptcy Rule 2002(a), and (ix) any parties who have expressed interest in any of the Buildings or the OA Parking Lot.

32.     The Debtors submit that the Auction and Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sales, including (a) the date, time and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the Sale Objection Deadline and the date, time and place of the Sale Hearing; and (d) instructions for promptly obtaining copies of the Stalking Horse Agreements. The Debtors propose that no other or further notice of the proposed Sales shall be required. The Debtors request that the form and manner of the Auction and Sale Notice be approved.

33.     The Debtors also request a waiver of the requirement that they serve Doral Financial's equity holders pursuant to Bankruptcy Rule 2002(d), on the grounds that the Sales are unlikely, as an economic matter, to impact the equity holders' rights to a recovery. The Debtors seek this waiver to avoid the substantial costs associated with service to Doral Financial's public beneficial equity holders.

<u>**Basis for Relief**</u>

**I.     The Proposed Bidding Procedures Are Appropriate and in the Best Interests of the Debtors and their Estates and Creditors**

34.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe a sale of the Buildings and OA Parking Lot pursuant to public auctions governed by the proposed Bidding Procedures will maximize the sale proceeds received by the Debtors' estates, which is the paramount goal in any proposed sale of property of the estate. <u>See, e.g.</u>, <u>Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)</u>, 147 B.R. 650, 659

(S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the . . . [debtors']
duty with respect to such sales is to obtain the highest price or greatest overall benefit possible
for the estate.'") (quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging
Prods., Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)); see also Four B. Corp. v. Food Barn
Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in
bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at
hand") (internal citation omitted). To that end, courts recognize that procedures intended to
enhance competitive bidding are consistent with the goal of maximizing the value received by
the estate and therefore are appropriate in the context of bankruptcy sales. See, e.g., Integrated
Res., 147 B.R. at 659 (such procedures "encourage bidding and . . . maximize the value of the
debtor's assets"). The Debtors submit that the foregoing procedures are fair, transparent, and will
derive the highest or otherwise best bid for the Buildings and the OA Parking Lot.

## II.     The Proposed Process for the Debtors to Designate a Stalking Horse and Provide Breakup Fees and Expense Reimbursements Should Be Approved

35.     The Debtors seek authority to offer customary bid protections to the Stalking
Horse, including Breakup Fees and Expense Reimbursements, as part of the Bidding Procedures.
The Stalking Horse has required as a condition of each Stalking Horse Agreement entitlement to
payment of a Breakup Fee and Expense Reimbursement if the Stalking Horse loses at auction or
otherwise to another bidder. The use of a stalking horse in a public auction process for sales
pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as
the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an
auction process by locking in a price "floor" before exposing an asset to auction. As a result,
stalking horse bidders virtually always require breakup fees and other forms of bid protections as
an inducement for holding their offer open while it is exposed to overbids in an auction process.

14

The use of bid protections, including breakup fees, has become an established practice in chapter 11 cases.

36.     Bankruptcy courts have approved bidding incentives similar to the Breakup Fees and Expense Reimbursements under the business judgment rule in other cases in this district. See, e.g., In re Aereo, Inc., Case No. 14-13200 (SHL) (Bankr. S.D.N.Y. Dec. 24, 2014) [Docket No. 110]; In re The Fuller Brush Co., Case No. 12-10714 (SHL) (Bankr. S.D.N.Y. Sept. 17, 2012) [Docket No. 178]; In re The Connaught Grp., Ltd., Case No. 12-10512 (SMB) (Bankr. S.D.N.Y. Mar. 6, 2012) [Docket No. 109]; In re Gen. Maritime Corp., Case No. 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011) [Docket No. 136]; In re Borders Grp., Inc., Case No. 11-10614 (MG) (Bankr. S.D.N.Y. Sept. 27, 2011) [Docket No. 1876]. And this Court has previously approved similar bid protections in these chapter 11 cases. See Order (I) Approving Bidding Procedures for the Sale of Doral Insurance Agency LLC or its Assets, (II) Approving the Proposed Expense Reimbursement and Break-Up Fee, (III) Approving the Form and Manner of Notice, and (IV) Scheduling an Auction and a Sale Hearing [Dkt. No. 95]; Order (I) Approving Bidding Procedures for the Sale of Certain Mortgage Loans and Real Estate Owned Properties, (II) Approving the Break-Up Fee, (III) Approving the Form and Manner of Notice, and (IV) Scheduling an Auction and a Sale Hearing [Dkt. No. 329].

37.     The Debtors believe, based on their reasoned business judgment, that the use and judicial approval of the respective Breakup Fees and Expense Reimbursements provided for in the respective Stalking Horse Agreements will enhance their ability to maximize value without chilling bidding. A committed Stalking Horse points to the existence of a contractually-committed bidder at price believed to be fair and reasonable, while providing the upside opportunity that the Debtors could potentially receive a higher or otherwise better offer which,

absent such a bid floor, might not have otherwise been realized. The Breakup Fees and Expense Reimbursements are express conditions of the Stalking Horse's offers set forth in each of the Stalking Horse Agreements. The Stalking Horse's offer for the OA Parking Lot is conditioned upon the Stalking Horse being the successful purchaser of the Building. The Breakup Fees and Expense Reimbursements thus are necessary to stimulate competitive interest among potential competing bidders for the Purchased Assets and establish baseline values for the same. Approval of the Breakup Fees and Expense Reimbursements thus will maximize value to the Debtors' estates from the Sales.

### III.    The Form and Manner of the Auction and Sale Notice Should be Approved

38.    As described above, the Debtors also seek approval of the form of the Auction and Sale Notice. The Auction and Sale Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing, as well as the deadline for filing any objections to the relief requested in this Motion once they are set by the Court.

39.    The Debtors submit that the proposed timeline is appropriate under the circumstances.

### IV.    The Sales of the Buildings and OA Parking Lot Are Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment

40.    Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, a debtor may use, sell or lease property of the estate outside of the ordinary course of business. The Second Circuit requires that the sale of a debtor's assets be based upon the sound business judgment of the debtor. See, e.g., Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (holding that a court reviewing an application under Bankruptcy Code section 363(b) must find, based upon the evidence presented, a good business reason to grant such application); Comm. of

Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

41.    A sound business purpose for use of property outside the ordinary course of business exists where the sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063; In re GSC, Inc., 453 B.R. 132, 155 (Bankr. S.D.N.Y. 2011). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Food Barn Stores, Inc., 107 F.3d at 564-65 (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

42.    If a "debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants and/or Creditors v Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Indeed, when a valid business justification exists, there is a strong presumption that the debtor's management and directors "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (internal citations omitted).

43.    The Debtors submit that the proposed Sales satisfy section 363's requirements. An auction and sale of the Buildings and OA Parking Lot will determine the current value of

these assets and liquidate them for the benefit of the Debtors' estates. The Sales are in the best

interest of the Debtors' estates and are a valid exercise of the Debtors' business judgment.

44.    Bankruptcy Code section 105(a) also supplies ample authority for the relief

requested. Section 105(a) empowers the court to "issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This

equitable power is granted to effect the policies and goals of chapter 11 reorganization, which are

to rehabilitate the debtor, In re Ionosphere Clubs, Inc., 98 B.R. 174, 176-77 (Bankr. S.D.N.Y.

1989), and to "create a flexible mechanism that will permit the greatest likelihood of survival of

the debtor and payment of creditors in full or at least proportionately." Mich. Bureau of

Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287

(S.D.N.Y. 1987); see also In re Structurlite Plastics Corp., 86 B.R. 922, 932 (Bankr. S.D. Ohio

1998) (rejecting a bright line rule prohibiting payment of prepetition debts because it "may well

be too inflexible to permit the effectuation of the rehabilitative purposes of the Code").

Accordingly, the Debtors respectfully submit that the relief requested herein should be granted in

all respects and is in the best interests of the Debtors' estates, their creditors, and other parties in

interest.

**V.    The Sale of the Buildings and OA Parking Lot Free and Clear of Claims and
Interests Is Authorized by Section 363(f) of the Bankruptcy Code**

45.    The Debtors request approval to sell the Buildings and OA Parking Lot free and

clear of any and all Encumbrances, in accordance with section 363(f) of the Bankruptcy Code.[3]

A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any

---

[3] For clarity, the term "Encumbrances" shall not include the Banco Popular Leases, which shall remain in full force
and effect and subject in all respects to Banco Popular's rights under the terms thereof and applicable law, including,
without limitation, Bankruptcy Code § 365.

interest in such property of an entity other than the estate" if any one of the following conditions

is satisfied:

    a.   applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    b.   such entity consents;

    c.   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    d.   such interest is in bona fide dispute; or

    e.   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); In re Dewey & LeBoeuf LLP, No. 12-12321 (MG), 2012 WL 5386276, at *5 (Bankr. S.D.N.Y. Nov. 1, 2012) (noting that since Section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met) (citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988)); In re Grubb & Ellis Co., No. 12-10685 (MG), 2012 WL 1036071, at *10 (Bankr. S.D.N.Y. Mar. 27, 2012); In re Borders Grp., Inc., 453 B.R. 477, 483-84 (Bankr. S.D.N.Y. 2011).

    46.    The Buildings are subject to liens securing the claims under the Loan Agreement. As discussed above, the Indenture Trustee has agreed to consent to the sale of the Buildings and provide a release of the liens upon consummation of the sale of the Buildings, pursuant to the auction process proposed by this Motion and conditioned upon certain provisions of the proposed Bidding Procedures Order and Sale Order.

    47.    The Debtors believe the OA Parking Lot is currently unencumbered. Even if the OA Parking Lot were encumbered, however, any sale of the OA Parking Lot is expected to return a price that exceeds any liens thereon, satisfying Bankruptcy Code section 363(f)(3).

48.    Further, the Debtors believe that any party holding liens against any of the Assets could be compelled to accept a monetary satisfaction of such interests. In this jurisdiction, sales for value below the amount of a lien are permitted. See, e.g., In re Boston Generating, LLC, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010) ("Section 363(f)(5) does not require that the sale price for the property exceed the value of the interests"). As is typical in 363 sales, the Sale Order provides that any Encumbrance on the Buildings or OA Parking Lot will attach to the net proceeds of the Sale. Accordingly, the Debtors believe that the Sales will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and the sales of the Buildings and OA Parking Lot should be approved free and clear of all Encumbrances.

### Timely Entry of Procedures Order Required

49.    Banco Popular's obligations under the Stalking Horse Agreements are conditioned on this Court authorizing and approving Banco Popular's rights to payment of the Breakup Fees and Expense Reimbursements with entry of the Bidding Procedure Order, in form and substance agreeable to Banco Popular, on or before December 4, 2015.

50.    Accordingly, the Debtors respectfully request entry of the Bidding Procedure Order on or before December 4, 2015.

### Notice

51.    Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the Stalking Horse; (c) counsel to the Official Committee of Unsecured Creditors; (d) counsel to the Indenture Trustee; (e) upon the Master Service List as defined in the *Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates* [Docket No. 74] (the "Case

Management Order") previously entered in Doral Financial's chapter 11 case; and (f) upon the

top 25 unsecured creditors listed in Doral Properties' chapter 11 petition.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding

Procedures Order and the Sale Order, granting the relief requested in the Motion and such other

and further relief for the Debtors as may be just or proper.

Dated: November 25, 2015
      New York, New York

                    */s/ Mark I. Bane*
                    ROPES & GRAY LLP
                    Mark I. Bane
                    1211 Avenue of the Americas
                    New York, NY 10036-8704
                    Telephone: (212) 596-9000
                    Facsimile: (212) 596-9090
                    Email: mark.bane@ropesgray.com


                    -and-

                    James A. Wright III
                    Meredith S. Tinkham (*pro hac vice*)
                    Prudential Tower
                    800 Boylston Street
                    Boston, MA 02199-3600
                    Telephone: (617) 951-7000
                    Facsimile: (617) 951-7050
                    Email: james.wright@ropesgray.com
                    meredith.parkinson@ropesgray.com

                    *Counsel to Doral Financial Corporation and*
                    *Proposed Counsel to Doral Properties, Inc.*