## Exhibit D

Execution Version

## ASSET PURCHASE AGREEMENT
### (Parking Parcel)

**THIS ASSET PURCHASE AGREEMENT**, dated as of November 25, 2015 (this "Agreement"), is entered into by and between DORAL FINANCIAL CORPORATION, a Puerto Rico corporation, as Chapter 11 debtor-in-possession ("Seller"), and BANCO POPULAR DE PUERTO RICO, a Puerto Rico banking corporation ("Buyer").

## WITNESSETH:

**WHEREAS**, on March 11, 2015 (the "Petition Date"), Seller filed a voluntary petition for reorganization relief (the "Bankruptcy Case") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, Seller is the owner of that certain parcel of land more particularly described in Exhibit A (the "Land"); and

**WHEREAS**, Seller desires to sell, transfer and assign to Buyer pursuant to Section 363 of the Bankruptcy Code, and Buyer desires to acquire from Seller, free and clear of all Liens, all of Seller's right and interest in and good and marketable title to the Land and the other Purchased Assets hereafter described.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.1    Certain Definitions**. For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Adjacent Assets" has the meaning assigned to the term "Purchased Assets" in the Adjacent Assets Purchase Agreement.

"Adjacent Assets Purchase Agreement" shall mean that certain Asset Purchase Agreement, dated the date hereof, between Buyer and Doral Properties, Inc. ("DPI") pursuant to which DPI agreed to sell to Buyer, and Buyer agreed to purchase from Buyer, that certain office building commonly known as Doral Plaza located in San Juan, Puerto Rico, two adjacent warehouse buildings, and the land and other assets related thereto.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or

cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Auction" shall have the meaning set forth in Section 7.2(b).

"Bankruptcy Case" shall have the meaning set forth in the Recitals.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bidding Procedures" shall have the meaning set forth in Section 7.2(b).

"Bidding Procedures Order" shall have the meaning set forth in Section 7.1.

"Break-Up Fee" shall have the meaning set forth in Section 7.1.

"Business Day" means any day of the year that is not a Saturday, Sunday or other day on which commercial banks in New York City or Puerto Rico are authorized or required by law to remain closed.

"Buyer" shall have the meaning set forth in the Recitals.

"Buyer Documents" shall have the meaning set forth in Section 6.1.

"Closing" shall have the meaning set forth in Section 4.1.

"Closing Date" shall have the meaning set forth in Section 4.1.

"Competing Bid" shall have the meaning set forth in Section 7.2(a).

"Contract" means any oral or written contract, indenture, note, bond, lease or other agreement to which Seller is a party relating to the Purchased Assets or any part thereof.

"Documents" means all files, documents, instruments, papers, books, reports, records, budgets, title policies, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), and other similar materials related to the Purchased Assets, in each case whether or not in electronic form.

"DPI" shall have the meaning set forth in the definition of "Adjacent Assets Purchase Agreement".

"Earnest Money" shall have the meaning set forth in Section 3.1(b).

"Earnest Money Escrow Agreement" shall have the meaning set forth in Section 3.1(b).

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Body, relating in any way to pollution or protection of the environment or similar health or safety matters, or natural resources, including, without limitation, those relating to the uses, handling, transportation, treatment, storage, disposal, release or discharge of hazardous materials.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Escrow Agent" means, initially, Signature Bank (together with any successor Escrow Agent appointed by Seller and Buyer).

"Expense Reimbursement" shall have the meaning set forth in Section 7.1.

"Final Order" means an Order, judgment, or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired; provided, however, that any such Order, judgment or other decree of the Bankruptcy Court shall be deemed to be a Final Order upon its entry (without reference to the expiration of the time for appeal or review) if no objection to such Order, judgment or other decree is received by the Bankruptcy Court prior to its entry by the Bankruptcy Court.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Improvements" shall have the meaning set forth in Section 2.1(b).

"Intangible Property" shall have the meaning set forth in Section 2.1(d).

"Land" shall have the meaning set forth in the Recitals.

"Law" means any federal, state (including Puerto Rico), local or foreign law, statute, code, ordinance, rule or regulation.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, option, right of first refusal, easement, servitude, transfer restriction or similar agreement or encumbrance.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Parties" means Seller and Buyer.

"Permits" means all governmental permits, including licenses and authorizations and other entitlements, required for the development, construction, ownership, use, possession, maintenance and operation of the Purchased Assets, including, without limitation, use permits, certificates of occupancy, elevator certificates, building permits, signage permits, site use approvals, zoning and subdivision certificates, environmental and land use permits, health and safety certificates, administrative concessions and any and all necessary approvals from state or local authorities.

"Permitted Exceptions" means (i) statutory Liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the ordinary course of business; (iii) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated in any material respect; (iv) utility easements for electricity, water, gas, sanitary sewer, surface water drainage or other general easements of record in the Registry of Property of Puerto Rico granted to any Governmental Body in the ordinary course of developing the Land; (v) other easements of record in the Registry of Property of Puerto Rico established on the Land; and (vi) such other imperfections in title which would not materially interfere with the ownership, use and operation of the Purchased Assets.

"Person" means any individual, corporation, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property" shall have the meaning set forth in Section 2.1(c).

"Petition Date" shall have the meaning set forth in the Recitals.

"Purchase Price" shall have the meaning set forth in Section 3.1.

"Purchased Assets" shall have the meaning set forth in Section 2.1.

"Real Property" shall have the meaning set forth in Section 2.1(b).

"Sale Motion" shall have the meaning set forth in Section 7.3

"Sale Order" means an Order of the Bankruptcy Court, in form and substance acceptable to Buyer and Seller, approving this Agreement and all of the terms and conditions hereof; approving the sale and assignment to Buyer of all of the Purchased Assets (assuming Buyer is the winning bidder at the Auction contemplated hereby); and approving and authorizing Seller to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens (other than Permitted Exceptions), claims, encumbrances and interests (including Liens, claims, encumbrances and interests of any Governmental Body), such Liens, claims, encumbrances and interests to attach to the proceeds of sale of the Purchased Assets; (ii) Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 14.2 hereof; (v) this Agreement and the transactions contemplated hereby are not subject to rejection or avoidance by any chapter 7 or chapter 11 trustee of Seller; and (vi) Doral Financial Corporation and its estate is the exclusive owner of the Purchased Assets, and upon the Closing the Purchased Assets shall be sold to the Buyer free and clear of any claims of the FDIC-Receiver or any other person or entity that might have asserted ownership or leasehold interests in the Purchased Assets, and the Buyer shall not be subject to any claims of or obligations owed to the FDIC or any other person or entity arising under any putative lease as to which Doral Bank is a party.

"Seller" shall have the meaning set forth in the Recitals.

"Seller's Broker" shall have the meaning set forth in Section 5.1

"Seller Documents" shall have the meaning set forth in Section 5.1.

"Taxes" means (i) all federal, state, Puerto Rico, local or foreign taxes, charges or other assessments, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Termination Date" shall have the meaning set forth in Section 4.4(e).

"Termination Notice" shall have the meaning set forth in Section 4.5.

"Transfer Costs" means any and all stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or other governmental charges payable in connection with the transactions contemplated by this Agreement.

### Section 1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

<u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

<u>Dollars</u>. Any reference in this Agreement to $ shall mean U.S. dollars.

<u>Exhibits/Schedules</u>. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall not be deemed to have been disclosed on any other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

<u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

<u>Headings</u>. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

<u>Herein</u>. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

<u>Including</u>. The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE

**Section 2.1     Purchase and Sale**. On the terms and subject to the conditions set forth in this Agreement, at the Closing Buyer shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all of Seller's right, title and interest in,

to and under the Purchased Assets subject to the Permitted Exceptions. "Purchased Assets" shall mean the following assets:

(a)    (i) the fee simple ("*pleno dominio*") estate in and to the Land, and (ii) all and singular the benefits, easements, rights of way, privileges, servitudes, tenements, hereditaments, appurtenances and other rights, of Seller pertaining to the Land;

(b)    all buildings, structures, fixtures, walls, fences, landscaping and other improvements situated on or affixed or appurtenant to the Land (including, without limitation, all pavement, access ways, curb cuts, parking support systems and facilities, drainage systems and facilities, air ventilation and filtering systems and facilities, utility systems and facilities and connections for sanitary sewer, potable water, irrigation, electricity, telephone, cable television, natural gas and other utilities), and, to the extent in Seller's possession or control, all plans and specifications relating thereto (collectively, the "Improvements"; the Land and the Improvements hereinafter collectively referred to as the "Real Property");

(c)    all tangible personal property upon the Land or within the Improvements, including specifically, without limitation, appliances, furniture, furnishings, equipment and machines (including, without limitation, office, telephone and other telecommunication, cable and satellite television and computer equipment and machines), devices, tools, carpeting, draperies, curtains and other floor, window and wall coverings, lighting fixtures, decorations, artwork, signs and signage, and other items of personal property located at the Real Property, together with any additions thereto prior to the Closing (collectively, the "Personal Property"); and

(d)    to the extent in Seller's actual possession and control and assignable or transferable without cost to Seller, (i) all existing warranties and guaranties (expressed or implied) issued or assigned to Seller in connection with the Real Property and the Personal Property, if any, (ii) all Permits, licenses, franchises and any other approvals and authorizations granted by any public body (or by any private party), and all applications therefor, used in or relating to the development, ownership, possession, occupancy, use or operation of the Real Property and the Personal Property or any part thereof, (iii) all architectural, engineering or other plans (including, without limitation, "as-built" plans), drawing and specifications, operating and maintenance manuals and records used in or relating to the development, ownership, possession, occupancy, use or operation of the Real Property and the Personal Property or any part thereof, and (iv) all security and other deposits relating to the ownership, possession, occupancy, use or operation of the Real Property and the Personal Property or any part thereof including, without limitation, deposits with any utility provider (the items set forth in clauses (i) through (iv) are herein referred to, collectively, as the "Intangible Property").

**Section 2.2    Excluded Assets**. Nothing herein contained shall be deemed an agreement by Seller to sell, transfer, assign or convey, or an agreement by Buyer to acquire or accept, the Excluded Assets, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean all assets, properties, interests and rights of Seller other than the Purchased Assets.

**Section 2.3    No Assumption of Liabilities**. Except as set forth in Section 13.2, Buyer will not assume or have any responsibility with respect to any Liability of Seller.

**Section 2.4    Pre-Closing Operations**.  From and after the date hereof and until the Closing Date, Seller shall:

(a)    maintain and preserve the Purchased Assets in good working order and condition, reasonable wear and tear excepted;

(b)    comply in all material respects with all Laws applicable to the Purchased Assets;

(c)    pay all Taxes levied or assessed or imposed against the Purchased Assets consistent with the Bankruptcy Code;

(d)    not remove, demolish, reduce or alter any of the Purchased Assets in any material respect;

(e)    not create, incur or assume or suffer to exist any material Lien or other material type of preferential arrangement creating a similar benefit, upon or with respect to any of the Purchased Assets, other than those existing as of the date of this Agreement, Permitted Exceptions, and Liens provided as adequate protection in Seller's Bankruptcy Case;

(f)    not merge or consolidate with any other Person;

(g)    except with respect to leases permitted by Section 2.4(h), not sell, lease, assign, transfer or otherwise dispose of any of the Purchased Assets;

(h)    not enter into any Contract (other than any Contract with Buyer) with respect to the Purchased Assets that would be binding upon Buyer or the Purchased Assets after the Closing Date; or

(i)    not initiate or support any limiting change in the permitted uses of the Real Property (or, to the extent applicable, in the zoning classification of the Real Property).

**Section 2.5    Purchase of Adjacent Assets**.  Seller acknowledges that, anything herein to the contrary notwithstanding, Buyer's obligation to acquire the Purchased Assets pursuant to this Agreement is contingent upon Buyer's acquisition of the Adjacent Assets pursuant to the Adjacent Assets Purchase Agreement.  Therefore, in the event that Buyer does not acquire the Adjacent Assets on the date of Closing by reason of a permitted termination of the Adjacent Assets Purchase Agreement or because the conditions precedent to the obligation of Buyer to purchase the Adjacent Assets have not been satisfied in accordance with the Adjacent Assets Purchase Agreement, Seller agrees that Buyer may terminate this Agreement.

**Section 2.6    Further Assurances**. From time to time following the Closing, Seller and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to

assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

## ARTICLE III

## CONSIDERATION

**Section 3.1    Purchase Price and Earnest Money**.

(a)    In consideration of the transfer of title to the Purchased Assets to Buyer and the other undertakings set forth herein, Buyer will pay to Seller the amount of One Million Five Hundred Thousand Dollars ($1,500,000) (the "Purchase Price"), subject to all prorations and adjustments set forth herein; provided, however, that the Purchase Price shall not be adjusted for any reason other than as expressly set forth herein and shall thus be considered as a lump sum price ("*precio alzado*").

(b)    No later than 4:00 P.M. E.S.T. on three Business Days after execution of this Agreement, Buyer shall deliver to Escrow Agent by wire transfer of immediately available U.S. dollar funds the amount of One Hundred Thousand Dollars ($100,000) (the "Earnest Money"), as earnest money for Buyer's performance of its obligations under this Agreement. Escrow Agent shall hold the Earnest Money in accordance with the terms of an escrow agreement in the form attached hereto as Exhibit B (the "Earnest Money Escrow Agreement") entered into among Seller, Buyer and Escrow Agent concurrently with the execution of this Agreement.

## ARTICLE IV

## CLOSING AND TERMINATION

**Section 4.1    Closing Date**. Subject to the satisfaction of the conditions set forth in Section 11.1, Section 11.2 and Section 11.3 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets provided for in Article II hereof (the "Closing") shall take place at the offices of Buyer's counsel in San Juan, Puerto Rico (or at such other place as the Parties may designate in writing) as soon as practicable following the satisfaction or waiver of the conditions set forth in Article XI (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) and no later than a date that is five (5) Business Days after the Sale Order becomes a Final Order, unless another time or date, or both, are agreed to in writing by the Parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date," and the Closing shall be deemed effective at the close of business on the Closing Date.

**Section 4.2**    **Deliveries by Seller**. At the Closing, Seller shall deliver to Buyer:

(a)    the deed conveying good, recordable and marketable fee simple ("*pleno dominio*") title in and to the Real Property (subject only to the Permitted Exceptions) in substantially the form attached hereto as Exhibit C (the "Deed"), duly executed by Seller before a Notary Public selected by Buyer;

(b)    the bill of sale in the form attached hereto as Exhibit D, duly executed by Seller before a Notary Public, transferring to Buyer all of Seller's right, title, and interest in and to the Personal Property (the "Bill of Sale");

(c)    the Assignment of Permits and Intangible Property (the "Assignment") in the form attached hereto as Exhibit E, duly executed by Seller before a Notary Public, assigning to Buyer all of Seller's right, title and interest, to the extent transferable or assignable, in and to (i) all Permits, and (ii) all Intangible Property.

(d)    the officer's certificate required to be delivered pursuant to Section 11.1(a) and Section 11.1(b);

(e)    a copy of a certificate of the Secretary of State of the Commonwealth of Puerto Rico dated no earlier than ten (10) days before the Closing, certifying that Seller is in good standing under the Laws of the Commonwealth of Puerto Rico;

(f)    certified resolutions of the Board of Directors of Seller, authorizing the execution, delivery and performance of this Agreement and the Seller Documents by Buyer;

(g)    possession of the Purchased Assets subject only to the Permitted Exceptions;

(h)    keys in possession of Seller to locks at the Real Property;

(i)    a certified copy of the Sale Order; and

(j)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Purchased Assets to Buyer.

**Section 4.3**    **Deliveries by Buyer**. At the Closing, Buyer shall deliver to Seller:

(a)    the Deed, duly executed by Buyer before a Notary Public selected by Buyer;

(b)    the Bill of Sale, duly executed by Buyer;

(c)    the Assignment, duly executed by Buyer;

(d)       the Purchase Price, in immediately available funds, as set forth in <u>Section 3.1</u> hereof;

(e)       the officer's certificate required to be delivered pursuant to <u>Section 11.2(a)</u> and <u>Section 11.2(b)</u> hereof; and

(f)       all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Seller, as may be necessary to convey the Purchased Assets to Buyer.

**Section 4.4**       <u>**Termination of Agreement**</u>. This Agreement may be terminated prior to the Closing as follows:

(a)       by mutual written consent of Seller and Buyer;

(b)       by Buyer, (x) if the Bankruptcy Court has not entered the Bidding Procedures Order, in form and substance acceptable to Buyer and granting approval of the Break-Up Fee and Expense Reimbursement, on or before December 4, 2015 (and Buyer has exercised its right to terminate for such failure prior to entry of the Bid Procedures Order), or the Sale Order on or before January 15, 2016 (and Buyer has exercised its right to terminate for such failure prior to entry of the Sale Order), or (y) if the Auction for the Purchased Assets has not occurred on or before January 12, 2016 (and Buyer has exercised its right to terminate for such failure prior to the commencement of the Auction);

(c)       with no further action by either Party, if the Bankruptcy Court shall enter an Order approving a Competing Bid and, subject to paragraph 2.4 of the Bidding Procedures, the transaction contemplated by such Competing Bid is thereafter consummated;

(d)       by Buyer, if the Closing shall not have occurred by the close of business on the date which is ten (10) Business Days after the Sale Order becomes a Final Order (the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer, then Buyer may not terminate this Agreement pursuant to this <u>Section 4.4(d)</u>.

(e)       by Buyer, if any of the conditions to the obligations of Buyer set forth in <u>Section 11.1</u> and <u>Section 11.3</u> shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(f)       by Buyer, if there shall be a material breach by Seller of any representation, warranty, covenant, or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 11.1</u> or <u>Section 11.3</u> and which breach cannot be cured or has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Buyer to Seller of such breach and (ii) the Termination Date;

(g)    by Seller, if any condition to the obligations of Seller set forth in
Section 11.2 or Section 11.3 shall have become incapable of fulfillment other than as a result of a
breach by Seller of any covenant or agreement contained in this Agreement, and such condition
is not waived by Seller;

(h)    by Seller, if there shall be a material breach by Buyer of any
representation, warranty, covenant, or agreement contained in this Agreement which would
result in a failure of a condition set forth in Section 11.2 or Section 11.3 and which breach cannot
be cured or has not been cured by the earlier of (i) ten (10) Business Days after the giving of
written notice by Seller to Buyer of such breach and (ii) the Termination Date; or

(i)    by Buyer, pursuant to the provisions of Sections 9.1 or 2.5; or

(j)    by Buyer, if in the Sale Order, the Bankruptcy Court does not find and
determine that Doral Financial Corporation is the exclusive owner of the Purchased Assets being
sold and that the FDIC-Receiver for Doral Bank has no legal or equitable ownership interests in
the Purchased Assets.

Section 4.5    **Procedure Upon Termination**. In the event of termination and
abandonment by Buyer or Seller, or both such Parties, pursuant to Section 4.4 hereof, written
notice thereof (the "Termination Notice") shall forthwith be given to the other Party or Parties,
with a copy to Escrow Agent, and this Agreement shall terminate, and the purchase of the
Purchased Assets hereunder shall be abandoned, without further action by Buyer or Seller. If this
Agreement is terminated pursuant to Sections 4.4(a), (b), (c), (d), (e), (f), (i) or (j), then, unless
Buyer elects to pursue the remedy of specific performance (to the extent applicable) as provided
in Section 4.6(c), the Earnest Money shall be returned to Buyer by Escrow Agent (and Buyer and
Seller shall so instruct Escrow Agent in writing).  If this Agreement is terminated pursuant to
Sections 4.4(g) (with respect to Section 11.2, but not Section 11.3) or Section 4.4(h), then the
Earnest Money shall be paid over to Seller by Escrow Agent (and Buyer and Seller shall so
instruct Escrow Agent in writing). If this Agreement is terminated pursuant to Section 4.4(c),
Seller shall also pay the Break-Up Fee and the Expense Reimbursement to Buyer promptly upon
the effective date of termination of this Agreement in accordance with the provisions hereof.

Section 4.6    **Effect of Termination; Remedies**.

(a)    In the event that this Agreement is validly terminated in accordance with
Section 4.4, this Agreement shall terminate and each of the Parties shall be relieved of its
respective duties and obligations arising under this Agreement after the date of such termination;
provided, however, that the rights and obligations of the Parties set forth in Section 4.5, Section
4.6 and Section 7.1 hereof shall survive any such termination and shall be enforceable hereunder.

(b)    If the Closing does not occur by reason of Buyer's breach of any
representation, warranty, covenant or agreement on its part to be performed hereunder, then
Seller may take one or more of the following actions: (i) bring an action for specific performance
by Buyer and claims for any damages related to the need to bring such action, including, without
limitation, reimbursement for associated attorneys' fees and expenses, (ii) terminate this

Agreement pursuant to the applicable provisions of Section 4.4, (iii) receive the Earnest Money as provided for in this Agreement as compensation for the losses, damages and expenses suffered by Seller as a result of such breach by Buyer, and (iv) bring an action against Buyer to recover any losses, damages and expenses suffered by Seller in addition to those compensated by payment of the Earnest Money to Seller, including, without limitation, reimbursement of associated attorneys' fees and expenses, as a result of Buyer's breaches.

(c)    If the Closing does not occur by reason of Seller's breach of any representation, warranty, covenant or agreement on its part to be performed hereunder, then (x) if the Sale Order has not yet been entered and become a Final Order, Buyer's remedies against Seller shall be limited to Buyer's entitlements to the Earnest Money, Breakup Fee and Expense Reimbursement as provided herein, and (y) if the Sale Order has been entered and become a Final Order, Buyer may take one or more of the following actions: (i) bring an action for specific performance by Seller and claims for any damages related to the need to bring such action, including, without limitation, reimbursement for associated attorneys' fees and expenses, (ii) terminate this Agreement pursuant to the applicable provisions of Section 4.4, (iii) receive the Earnest Money as provided for in this Agreement, and (iv) bring an action against Seller to recover any losses, damages and expenses suffered by Buyer, including, without limitation, reimbursement of associated attorneys' fees and expenses, as a result of Seller's breaches.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

**Section 5.1    Representations and Warranties**.  Seller hereby represents and warrants to Buyer that:

(a)    **Due Organization; Authorization of Agreement**. (i) Seller is a corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Puerto Rico; (ii) subject to the entry of the Sale Order, Seller has all requisite power, authority and legal capacity to execute, and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby; (iii) subject to the entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and each Seller Document have been duly authorized by all necessary action on behalf of Seller; and (iv) this Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

(b)    **Title to Purchased Assets**. Subject to entry of the Sale Order, Seller has good, recordable and marketable fee simple ("*pleno dominio*") title to the Real Property, and,

subject to the entry of the Sale Order, at Closing Buyer will be vested with such title free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. Seller owns each of the other Purchased Assets, and, subject to the entry of the Sale Order, at Closing Buyer will be vested with good title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

(c)    **Brokers**. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Buyer or Seller in respect thereof, in each case other than Caribbean Real Estate Services, LLC d/b/a Newmark Grubb Caribbean ("Seller's Broker"). The compensation payable to Seller's Broker shall be paid entirely by Seller in accordance with the provisions of a separate agreement between Seller and Seller's Broker. Under no circumstances shall Buyer be obligated to pay any compensation to Seller's Broker or to any other broker claiming compensation in connection with the transactions contemplated by this Agreement if such claim is based on dealings or agreements with Seller, and the Sale Order shall so provide.

(d)    **Litigation**. Except for the Bankruptcy Case, there is no suit, action, litigation, arbitration proceeding or governmental proceeding, including appeals and applications for review, in progress, pending or, to the best of Seller's knowledge, threatened or commenced against or relating to Seller or the Purchased Assets or any judgment, decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might adversely affect the ability of Seller to enter into this Agreement or to consummate the transactions contemplated hereby, and Seller is not aware of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

(e)    **Laws**. To the knowledge of Seller, the Real Property materially complies in all material respects with all applicable Laws (including, without limitation, all Environmental Laws and all applicable building, construction and zoning ordinances and codes).

(f)    [**RESERVED**]

(g)    **Contracts**. Seller is not a party to any Contract that would be binding on Buyer or the Purchased Assets after Closing.

(h)    **Options; Rights of First Refusal, Etc.** There is no outstanding option, right of first refusal, right of first offer or any other right in favor of any Person to purchase or otherwise acquire ownership or possession of the Purchased Assets, any portion thereof or any interest therein, or any interest in Seller, that has not expired by its terms.

(i)    **Parties in Possession**. Except as set forth in Schedule 5.1(k), there are no tenants, squatters or other parties in possession of the Real Property, and no other Person has any possessory interest in the Real Property or right to occupy the same.

**Section 5.2**    **Condition of the Purchased Assets**. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V hereof, and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis and "WITH ALL FAULTS," subject to reasonable use, wear, tear and natural deterioration from the date of this Agreement until the Closing Date.  Buyer acknowledges and represents that it is fully aware of the physical condition and state of repair of the Purchased Assets as of the date of this Agreement based on Buyer's own inspection and investigation thereof, and Buyer agrees that it is entering into this Agreement based solely upon such inspection and investigation and not upon any information, data, statements, or representations, written or oral, as to the physical conditions, state of repair, use, cost of operation or any other matter (other than any such other matter expressly provided in this Agreement) related to the Purchased Assets.  Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets; provided, however, that, upon Closing, Seller shall undertake and accept with respect to the Real Property the warranty of title (*"saneamiento por evicción"*) imposed upon sellers of real property by the Civil Code of Puerto Rico.

**Section 5.3**    **Seller's Representations and Warranties Generally**. All representations and warranties contained in this Article V shall be deemed remade as of the Closing Date and shall not survive the Closing. Seller's representations and warranties herein are made by Seller in a corporate capacity, without personal liability to Seller's directors, officers, members or counsel, or Seller's signatory, other than with respect to fraudulent or criminal activity with respect to the transactions contemplated hereby.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

**Section 6.1**    **Representations and Warranties**.   Buyer hereby represents and warrants to Seller that:

(a)    **Due Organization; Authorization of Agreement**. (i) Buyer is a banking corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Puerto Rico; (ii) Buyer has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby and thereby (the "Buyer Documents"), and to consummate the transactions contemplated hereby and thereby; (iii) the execution, delivery and performance by Buyer of this Agreement and each Buyer Document have been duly authorized by all necessary action on behalf of Buyer; and (iv) this Agreement has been, and each Buyer Document will be at or prior to the Closing, duly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)    **Brokers**. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the transactions contemplated by this Agreement and no person is entitled to any fee or commission or like payment in respect thereof.

(c)    **Financial Capability**. Buyer (i) has, as of the date hereof, and will have as of the Closing, sufficient funds available to pay the Purchase Price and any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement; (ii) has, as of the date hereof, and will have at Closing, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (iii) has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or Liability of any kind which would impair or adversely affect such resources and capabilities.

**Section 6.2**    **Buyer's Representations and Warranties Generally**.      All representations and warranties contained in this Article VI shall be deemed remade as of the Closing Date and shall not survive the Closing. Buyer's representations and warranties herein are made by Buyer in a corporate capacity, without personal liability to Buyer's directors, officers, members or counsel, or Buyer's signatory, other than with respect to fraudulent or criminal activity with respect to the transactions contemplated hereby.

## ARTICLE VII

## BANKRUPTCY COURT APPROVAL

**Section 7.1    Approval of Bidding Procedures, Auction, Break-Up Fee and Expense Reimbursement**.  In consideration for Buyer entering into this Agreement and having expended considerable time and expense in connection with this Agreement and the due diligence relating to the Purchased Assets, Seller shall obtain entry on or before December 4, 2015, of an Order of the Bankruptcy Court (the "Bidding Procedures Order"), in form and substance acceptable to Buyer, that authorizes and approves (i) the Bidding Procedures, (ii) the Auction and (iii) Seller's payment of, and obligation to pay Buyer, promptly upon the effective date of termination of this Agreement in accordance with the provisions of Section 4.4(c) a break-up fee in the amount of Fifty Thousand Dollars ($50,000) (the "Break-Up Fee") and the Buyer's reasonable expenses incurred in connection with the transactions contemplated by this Agreement, provided the amount of such expense reimbursement does not exceed Twenty Five Thousand Dollars ($25,000) (the "Expense Reimbursement").

**Section 7.2    Competing Transaction**.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "Competing Bid"). From the date hereof (and any prior time) and until the completion of the Auction contemplated hereby or as otherwise directed by the Bankruptcy Court, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets, provided that each Competing Bid submitted subsequent to the execution of this Agreement must include a bid price of at least $1,580,000 (and the Bidding Procedures shall so provide). In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Purchased Assets to prospective buyers.

(b)    Seller will conduct an auction (the "Auction") of the Purchased Assets in accordance with Section 363 of the Bankruptcy Code and the Bidding Procedures as approved and authorized by the Bankruptcy Court pursuant to the Bidding Procedures Order.  Seller shall offer the Purchased Assets for sale in accordance with the procedures set forth in Exhibit F (the "Bidding Procedures").

(c)    Following completion of the Auction contemplated hereby, Seller shall not be permitted to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, unless otherwise directed by the Bankruptcy Court, Seller shall not after completion of the Auction contemplated herein respond to any inquiries or offers to purchase all or any part of the

Purchased Assets or perform any other acts related thereto, including supplying information relating to the Purchased Assets to prospective buyers.

**Section 7.3    Bankruptcy Court Filings**. Seller shall promptly (but in any event not later than November 25, 2015) file with the Bankruptcy Court a motion (the "Sale Motion") under Sections 105 and 363 of the Bankruptcy Code, in form and substance acceptable to Buyer, seeking entry of the Sale Order and expedited entry of the Bidding Procedures Order. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Bidding Procedures Order and the Sale Order.  Buyer and Seller shall cooperate in demonstrating to the Bankruptcy Court and making a record as needed to obtain required findings, determinations and decrees in the Sale Order that Buyer is a purchaser in "good faith" under Section 363(m) of the Bankruptcy Code, that the Sale Order shall take effect immediately upon issuance and shall not be stayed pending appeal pursuant to Bankruptcy Rules 6004(g), 6006(d) and 7062 or otherwise, and that the reversal or modification on appeal of the authorization provided to consummate the sale and assignment to Buyer of all of the Purchased Assets pursuant to this Agreement shall not affect the validity of such sale and assignment.

## ARTICLE VIII

## COVENANTS

**Section 8.1    Access to Information**. Seller agrees that, prior to the Closing Date, Buyer shall be entitled, through its officers, employees and representatives (including its legal advisors and accountants), to make such investigation of the Purchased Assets as it reasonably requests and to make extracts and copies of the records relating thereto. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Seller shall cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination.  Buyer shall indemnify Seller for any damage caused by Buyer's representatives during such investigations and examinations.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller or any of its Affiliates to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller or any of its Affiliates is bound.

**Section 8.2    Further Assurances**. Each of Seller and Buyer shall use reasonable efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement

**Section 8.3    Confidentiality**. Buyer acknowledges that the confidential information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms and conditions of that certain letter agreement, by and among Buyer and Seller, dated as of July 7, 2015.

## ARTICLE IX

## CONDEMNATION

**Section 9.1**    **Condemnation**.  In the event that notice of any action, suit or proceeding shall be given prior to the Closing for the purpose of condemning any part of the Purchased Assets (including, without limitation, any parking areas, driveways, access or other common areas), Seller shall notify Buyer in writing within three (3) Business Days of receipt of such notice (whether Seller shall have received such notice orally or in writing) and shall provide Buyer with copies of all documentation relating thereto. Buyer shall have the right to terminate its obligations hereunder within twenty (20) Business Days after receiving notice of such condemnation proceeding and copies of all documentation relating thereto, and upon such termination, the proceeds resulting from such condemnation shall be paid to Seller.  If Buyer terminates this Agreement, then the Earnest Money shall be paid to Buyer by Escrow Agent and neither Buyer nor Seller shall have any further obligations under this Agreement, except to the extent of any obligations that expressly survive such termination.  In the event Buyer shall not elect to terminate its obligations hereunder, if Buyer purchases the Purchased Assets, all of such condemnation proceeds (or proceeds from any sale or transfer in lieu thereof) shall be assigned and belong to Buyer.

## ARTICLE X

## [RESERVED]

## ARTICLE XI

## CONDITIONS TO CLOSING

**Section 11.1**    **Conditions Precedent to Obligations of Buyer**. The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Seller set forth in this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Buyer shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate);

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Buyer shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate);

(c)    Seller shall have delivered, or caused to be delivered, to Buyer all of the items set forth in <u>Section 4.2</u>;

(d)    Buyer shall have received, at Buyer's sole cost and expense, a policy of title insurance in the amount of the Purchase Price from a title insurance company reasonably selected by Buyer, insuring Buyer's fee simple ("*pleno dominio*") title to the Real Property subject only to the Permitted Exceptions and survey exceptions to the Real Property that do not have a material impact on the value, use or operation of the Real Property;

(e)    Buyer's purchase of the Adjacent Assets under the Adjacent Assets Purchase Agreement shall have closed;

(f)    Seller shall have filed the Sale Motion by not later than November 25, 2015; and

(g)    The Bidding Procedures Order shall have been entered, in form and substance acceptable to Buyer, and granting approval of the Break-Up Fee and Expense Reimbursement, on or before December 4, 2015.

**Section 11.2    <u>Conditions Precedent to Obligations of Seller</u>**. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Buyer set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materially shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Seller shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate);

(b)    Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect in his or her

corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate);

(c)    Buyer shall have delivered, or caused to be delivered, to Seller the Purchase Price in accordance with Section 3.1.

**Section 11.3    Conditions Precedent to Obligations of Buyer and Seller.** The respective obligations of Buyer and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)    the Sale Order shall be a Final Order.

**Section 11.4    Frustration of Closing Conditions.** Neither Seller nor Buyer may rely on the failure of any condition set forth in Section 11.1, Section 11.2 or Section 11.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE XII

### SURVIVAL

**Section 12.1    Survival of Post-Closing Covenants.** The Parties hereto agree that the covenants contained in Sections 2.6, 8.3, 13.1, 13.2, 14.1 and 14.9 of this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

## ARTICLE XIII

### TRANSFER COSTS AND PRORATIONS

**Section 13.1    Transfer Costs.** Buyer and Seller shall be responsible for all Transfer Costs as follows:

| Transfer Cost | Responsible Party |
| --- | --- |
| Documentary stamps required for the original of the Deed | Seller |
| Documentary stamps required for the first certified copy of the Deed | Buyer |

| | |
|---|---|
| Recording fees required for the Deed | Buyer |
| All costs and expenses, if any, required to be incurred for the cancellation of Liens affecting the Purchased Assets (other than Permitted Exceptions) | Seller |

**Section 13.2   Prorations**. All operating expenses, utilities, general and special real estate taxes, ad valorem taxes (if any), special assessments (if any), and utility costs, and any other matters customarily prorated upon the sale of similar properties in Puerto Rico shall be prorated between Seller and Buyer as of Closing (with Seller responsible for amounts accruing prior to the Closing Date and Buyer responsible for amounts accruing on or after the Closing Date).  All real estate tax prorations shall be based on the last available known real estate tax bill, and shall be subject to post-Closing adjustment in accordance with the terms of this Section 13.2. If the Closing shall occur before a new real estate tax rate is fixed, the apportionment of real estate taxes at the Closing shall be upon the basis of the old tax rate for the preceding fiscal year applied to the latest assessed valuation.  Promptly after the new tax rate is fixed, the apportionment of real estate taxes shall be recomputed and any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected and the proper party reimbursed, which obligations shall survive the Closing for the period of time specified in this Section 13.2. No insurance premiums shall be prorated and no insurance coverage shall be assigned by Seller to Buyer at Closing.  Any adjustment, error or correction to the amounts prorated at Closing under this Section 13.2 shall be made within six (6) months after the Closing Date and, after such date, no further adjustments shall be made.

**ARTICLE XIV**

**MISCELLANEOUS**

**Section 14.1   Expenses**. Except for the Expense Reimbursement owed by Seller to Buyer and except as provided in Section 13.2, each of Seller and Buyer shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby; provided that Seller shall be responsible for payment of the statutory notarial tariff corresponding to the Deed, which shall not exceed $7,500.

**Section 14.2   Submission to Jurisdiction; Consent to Service of Process**.

(a)   Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby,

and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 14.6</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state and federal courts sitting in San Juan, Puerto Rico and any appellate court thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 14.6</u>.

**Section 14.3    <u>Waiver of Right to Trial by Jury</u>**. Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

**Section 14.4    <u>Entire Agreement; Amendments and Waivers</u>**. This Agreement (including the Schedules and Exhibits hereto) represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought or, if such amendment, supplement, modification or waiver can be so construed, by both Parties. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

**Section 14.5    <u>Governing Law</u>**. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico applicable to contracts made and performed in Puerto Rico, and, to the extent applicable, the Bankruptcy Code.

**Section 14.6    <u>Notices</u>**. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail (and no notice of failure of delivery was received within a reasonable time

after such message was sent) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e-mail addresses (or to such other address, facsimile number or e-mail address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller, to:

> Doral Financial Corporation
> 999 Ponce de León Blvd.
> Suite 730
> Coral Gables, FL 33134
> Attention: Enrique R. Ubarri
> E-mail: enrique.ubarri@dfcmain.com

With a copy to:

> Zolfo Cooper
> Grace Building
> 1114 Avenue of the Americas
> 41st Floor
> New York, NY 10036
> Attention: Carol Flaton
> Telecopier: (212) 213-1749
> E-mail: cflaton@zolfocooper.com

With an additional copy (which shall not constitute notice) to:

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036-8704
> Attention: Mark I. Bane
> Telecopier: (646) 728-1662
> E-mail: mark.bane@ropesgray.com

If to Buyer, to:

> Banco Popular de Puerto Rico
> Popular Center, 3rd Floor
> 208 Ponce de León Avenue
> San Juan, PR 00918
> Attention: Javier D. Ferrer
> Telecopier: (787) 751-8645
> E-mail: javier.ferrer@popular.com

With a copy (which shall not constitute notice) to:

Pietrantoni Méndez & Alvarez LLC
Popular Center, 19th Floor
208 Ponce de León Avenue
San Juan, PR 00918
Attention: Donald E. Hull
Telecopier: (787) 274-1470
E-mail: dhull@pmalaw.com

With an additional copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square, 7th Floor
Wilmington, DE  19801
Attention: Mark S. Chehi
Telecopier: (302) 651-3001
E-mail: mark.chehi@skadden.com

Each Party entitled to notice may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

**Section 14.7    Severability**. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**Section 14.8    Binding Effect; Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller, on the one hand, or Buyer, on the other hand, (by operation of law or otherwise) without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Buyer may assign any or all of its rights, interests, and obligations hereunder to one or more of its Affiliates, provided, further, however, no such assignment shall relieve Buyer of its obligations hereunder. No assignment of any obligations hereunder shall relieve the Parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Buyer shall also apply to any such assignee unless the context otherwise requires.

**Section 14.9    Publicity**. Neither Seller, on the one hand, nor Buyer, on the other hand, shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Buyer or Seller, disclosure is otherwise required by applicable Law or with respect to filings to be made with the Bankruptcy Court in connection with this Agreement.

**Section 14.10 Counterparts**. This Agreement may be executed in one or more counterparts (including by facsimile or electronic mail), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLER:**

**DORAL FINANCIAL CORPORATION**

By: _____
Name: CAROL FLATON
Title: CRO

**BUYER:**

**BANCO POPULAR DE PUERTO RICO**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLER:**

**DORAL FINANCIAL CORPORATION**

By: _____
Name:
Title:

**BUYER:**

**BANCO POPULAR DE PUERTO RICO**

By: _____
Name:  Néstor Obie Rivera
Title:   Executive Vice President

54141422_1

## **Schedule 5.1(k)**

### **Parties in Possession**

Triple-S Salud, Inc., as tenant under a purported lease with a third party (not Doral Financial Corporation)

## Exhibit A

## **PARKING PARCEL**

"RÚSTICA: Predio de terreno radicado en el Barrio San Patricio (antes Monacillos) del término Municipal de San Juan, Puerto Rico, marcado en el plano de segregación e inscripción preparado por el Ingeniero Adolfo Hernández Cruz con el No. 1 con una cabida superficial de 3016.1104 metros cuadrados, equivalentes a 0.76738 cuerdas, en lindes por el Norte en varias alineaciones, que corren desde el punto 40 al punto 41 en una distancia en forma de arco de 9.4248 metros; del punto 41 al punto 42 en una distancia de 45.1362 metros; y del punto 45 al punto 43 en una distancia en forma de arco de 9.9029 metros con la Calle B que aparece en el plano de inscripción y que divide esta parcela del remanente del cual se segrega; por el Sur, en varias alineaciones que corren desde el punto 150 al punto 148 en una distancia de 7.4221 metros; del punto 148 al punto 140 en una distancia de 10.9854 metros; del punto 140 al punto 139 en una distancia de 11.9487 metros; del punto 139 al punto 138 en una distancia de 18.0363 metros del punto 138 al punto 186 en una distancia de 9.2559 metros con la Calle Marginal de la Avenida Franklin Roosevelt; por el Este en una alineación que corre desde el punto 186 al punto 40 en una distancia de 50.4130 metros con First Financial Caribbean Corporation; y por el Oeste en una alineación que corre desde el punto 43 al punto 150 en una distancia de 39.9831 metros con la Calle Resolución."

Recorded in the Registry of Property, Third Section of San Juan, at volume ("tomo móvil") 25 of Monacillos, property number 26,086.

**<u>Exhibit B</u>**

## ESCROW DEPOSIT AGREEMENT

This **ESCROW DEPOSIT AGREEMENT** (this "**Agreement**") dated as of this 25 day of November 2015 by and among **DORAL FINANCIAL CORPORATION** ("**Doral Financial**" or "**Seller**"), a Puerto Rico corporation having an address at 999 Ponce de Leon Blvd., Suite 730, Coral Gables, FL 33134, **BANCO POPULAR DE PUERTO RICO** ("**Popular**" or "**Buyer**"), a Puerto Rico Banking Corporation and **SIGNATURE BANK** (the "**Escrow Agent**"), a New York state-chartered commercial bank, having an office at 565 Fifth Avenue, 12th Floor, New York, New York, 10017.

This Agreement is entered into in connection with Buyer's purchase of certain real estate assets (the "**Assets**") in accordance with the Bidding Procedures (the "**Bidding Procedures**") approved by the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") pursuant to the *Order (I) Approving Bidding Procedures for the Sale of Certain Real Estate Assets (II) Approving the Breakup Fee and Expense Reimbursements, (III) Approving the Form and Manner of Notice, and (IV) Scheduling an Auction and a Sale Hearing*, entered on [ ] in the chapter 11 bankruptcy case of Doral Financial Corporation, Case No. 15-10573 (the "**Chapter 11 Case**") [Dkt. No. [ ]].  Buyer is acting as the stalking horse bidder for the Assets in accordance with the Bidding Procedures, which bid includes a proposed purchase agreement (the "**Purchase Agreement**").  In connection with the Purchase Agreement, Buyer will deposit $100,000 with the Escrow Agent on account of the Assets (the "**Escrow Assets**").

## W I T N E S S E T H:

**WHEREAS**, Seller and Buyer have agreed that a certain sum of money shall be held in escrow upon certain terms and conditions; and

**WHEREAS**, Seller and Buyer appoint the Escrow Agent as escrow agent of such escrow subject to the terms and conditions set forth in this Agreement; and

**WHEREAS**, the Escrow Agent accepts such appointment as escrow agent subject to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE, IT IS AGREED** as follows:

1.    Delivery of Escrow Funds.

(a)    Buyer will deliver, or shall cause to be delivered, to the Escrow Agent a wire transfer in the amount of $100,000 to "Doral Financial Corporation, Signature Bank as Escrow Agent" to be held in an account at Signature Bank entitled "Doral Financial Corporation, Signature Bank, as Escrow Agent" having ABA No. 026013576, Account No. 1502641448 (the "**Escrow Account**").

(b)    The collected funds deposited into the Escrow Account are referred to as the "**Escrow Funds**".

(c)    The Escrow Agent shall have no duty or responsibility to enforce the collection or demand payment of funds delivered to Escrow Agent for deposit into the Escrow Account.

2.    <u>Release of Escrow Funds</u>.  The Escrow Funds shall be paid by the Escrow Agent in accordance with the joint written instructions, in form and substance satisfactory to the Escrow Agent, received from Seller and Buyer or in the absence of such instructions in accordance with the order of the Bankruptcy Court or another court of competent jurisdiction.  As between Buyer and Seller, instructions to release Escrow Funds shall be in accordance with the terms and conditions of this Agreement.  The Seller and Buyer shall timely deliver any and all forms reasonably requested by Escrow Agent in order to establish and maintain the Escrow Funds as hereby provided for, including, without limitation, joint written investment instructions pursuant to Section 7.

3.    <u>Termination of Escrow Agreement</u>.  This Agreement shall terminate upon the joint instructions, in form and substance satisfactory to the Escrow Agent, received from Seller and Buyer or, in the absence of such instructions, in accordance with an order of the Bankruptcy Court or another court of competent jurisdiction.  The Escrow Agent shall not be required to pay any uncollected funds or any funds that are not available for withdrawal.  The Escrow Agent may act in reliance upon any instructions, court orders, notices, certifications, demands, consents, authorizations, receipts, powers of attorney or other writings delivered to it without being required to determine the authenticity or validity thereof or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgment or order.  The Escrow Agent may act in reliance upon any signature believed by it to be genuine, and may assume that such person has been properly authorized to do so.  The Escrow Agent shall be entitled to close the Escrow Account once all Escrow Funds have been disbursed pursuant to Section 2 and the Escrow Agent reasonably believes no further activity is expected in the Escrow Account or under this Agreement.

4.    <u>Acceptance by Escrow Agent</u>.  The Escrow Agent hereby accepts and agrees to perform its obligations under the Purchase Agreement, provided that:

(a)    The names and true signatures of each individual authorized to act singly on behalf of Seller and Buyer are stated in <u>Schedule A</u>. The Escrow Agent may act in reliance upon any signature believed by it to be genuine, and may assume that any person who has been designated in Schedule A to give any written instructions, notice or receipt, or make any statements in connection with the provisions hereof has been duly authorized to do so.  The Escrow Agent shall have no duty to make inquiry as to the genuineness, accuracy or validity of any statements or instructions or any signatures on statements or instructions. The names and true signatures of each individual authorized to act singly on behalf of Seller and Buyer are stated in <u>Schedule A</u>, which is attached hereto and made a part hereof.  The Buyer and Seller may each remove or add one or more of its authorized signers stated on <u>Schedule A</u> by notifying the Escrow Agent of such change in accordance with this Agreement, which notice shall include the true signature for any new authorized signatories.

(b)    The Escrow Agent's duties under this Escrow Agreement as escrow agent under this Escrow Agreement and pursuant to the Purchase Agreement, shall be limited to (i) the

2

safekeeping of the money, instruments, documents and other property received by it as Escrow Agent, (ii) the reasonable accommodation of requests of Seller and/or Buyer regarding review and confirmation of the money, instruments, documents and other property held by Escrow Agent in regard to this Escrow Agreement, and (iii) the discharge of its other obligations as Escrow Agent specified in this Escrow Agreement.

(c)    The Escrow Agent may act relative hereto in reliance upon advice of counsel in reference to any matter connected herewith.  The Escrow Agent shall not be liable for any mistake of fact or error of judgment or law, or for any acts or omissions of any kind, unless caused by its willful misconduct or gross negligence.

(d)    (i)  The Seller agrees to indemnify, release, and hold the Escrow Agent harmless from and against any and all claims, losses, costs, liabilities, damages, suits, demands, judgments or expenses, including, but not limited to, reasonable attorney's fees, costs and disbursements, (collectively "**Claims**") claimed against or incurred by Escrow Agent arising out of or related, directly or indirectly, to the Escrow Agreement and the Escrow Agent's performance hereunder or in connection herewith, except to the extent such Claims arise from Escrow Agent's willful misconduct or gross negligence as adjudicated by a court of competent jurisdiction.  Anything herein to the contrary notwithstanding, the Seller shall not be liable for any Claims arising as a result of or related, directly or indirectly, to any act or failure to act on the part of the Buyer or to any other circumstance attributable to the Buyer.

(ii) The Buyer agrees to indemnify, release, and hold the Escrow Agent harmless from and against any and all Claims claimed against or incurred by Escrow Agent arising out of or related, directly or indirectly, to the Escrow Agreement and the Escrow Agent's performance hereunder or in connection herewith, except to the extent such Claims arise from Escrow Agent's willful misconduct or gross negligence as adjudicated by a court of competent jurisdiction. Anything herein to the contrary notwithstanding, the Buyer shall not be liable for any Claims arising as a result of or related, directly or indirectly, to any act or failure to act on the part of the Seller or to any other circumstance attributable to the Seller.

(e)    In the event of any disagreement between or among Seller and Buyer, or between any of them and any other person, resulting in adverse claims or demands being made to Escrow Agent in connection with the Escrow Account, or in the event that the Escrow Agent, in good faith, is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not become liable in any way or to any person for its failure or refusal to act, and the Escrow Agent shall be entitled to continue so to refrain from acting until (i) the rights of all parties shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjusted and all doubt resolved by agreement among all of the interested persons, and the Escrow Agent shall have been notified thereof in writing signed by all such persons. The Escrow Agent shall have the option, after thirty (30) days' notice to Seller and Buyer of its intention to do so, to file an action in interpleader requiring the parties to answer and litigate any claims and rights among themselves. The rights of the Escrow Agent under this section are cumulative of all other rights which it may have by law or otherwise.

3

(f)    In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder, the Escrow Agent shall be entitled to (i) refrain from taking any action other than to keep safe the Escrow Funds until the Escrow Agent shall be directed otherwise by a court of competent jurisdiction, or (ii) deliver the Escrow Funds to a court of competent jurisdiction.

(g)    The Escrow Agent shall have no duty, responsibility or obligation to interpret or enforce the terms of any agreement other than Escrow Agent's obligations hereunder, and the Escrow Agent shall not be required to make a request that any monies be delivered to the Escrow Account, it being agreed that the sole duties and responsibilities of the Escrow Agent shall be to the extent not prohibited by applicable law (i) to accept checks or other instruments for the payment of money delivered to the Escrow Agent for the Escrow Account and deposit said checks or instruments into the Escrow Account, and (ii) disburse or refrain from disbursing the Escrow Funds as stated herein, provided that the checks or instruments received by the Escrow Agent have been collected and are available for withdrawal.

4.    <u>Escrow Account Statements and Information.</u> The Escrow Agent agrees to send to the Buyer and/or the Seller a copy of the Escrow Account periodic statement, upon request in accordance with the Escrow Agent's regular practices for providing account statements to its non-escrow clients and to also provide the Buyer and/or Seller, or their designee, upon request other deposit account information, including Account balances, by telephone or by computer communication, to the extent practicable. The Buyer and Seller agree to complete and sign all forms or agreements required by the Escrow Agent for that purpose.  The Buyer and Seller each consents to the Escrow Agent's release of such Account information to any of the individuals designated by Buyer or Seller, which designation has been signed in accordance with Section 3(a) by any of the persons in <u>Schedule A</u>.  Further, the Buyer and Seller have an option to receive e-mail notification of incoming and outgoing wire transfers.  If this e-mail notification service is requested and subsequently approved by the Escrow Agent, both Buyer and Seller agree to provide a valid e-mail address and other information necessary to set-up this service and sign all forms and agreements required for such service.  The Buyer and Seller each consent to the Escrow Agent's release of wire transfer information to the designated e-mail address(es). The Escrow Agent's liability for failure to comply with this section shall not exceed the cost of providing such information.

5.    <u>Resignation and Termination of the Escrow Agent</u>.  The Escrow Agent may resign at any time by giving thirty (30) days' prior written notice of such resignation to Seller and Buyer. Upon providing such notice, the Escrow Agent shall have no further obligation hereunder except to hold the Escrow Funds that it has received as of the date on which it provided the notice of resignation as depository.  In such event, the Escrow Agent shall not take any action until Seller and Buyer jointly designates a banking corporation, trust company, attorney or other person as successor escrow agent.  Upon receipt of such written instructions signed by Seller and Buyer, the Escrow Agent shall promptly deliver the Escrow Funds, net of any outstanding charges, to such successor escrow agent and shall thereafter have no further obligations hereunder.  If such instructions are not received within thirty (30) days following the effective date of such resignation, then the Escrow Agent may deposit the Escrow Funds and any other amounts held by it pursuant to this Agreement with a clerk of a court of competent jurisdiction pending the

4

appointment of a successor escrow agent. In either case provided for in this section, the Escrow Agent shall be relieved of all further obligations and released from all liability thereafter arising with respect to the Escrow Funds.

6.    <u>Termination</u>. Seller and Buyer may terminate the appointment of the Escrow Agent hereunder upon a joint written notice to Escrow Agent specifying the date upon which such termination shall take effect. In the event of such termination, Seller and Buyer shall, within thirty (30) days of such notice, jointly appoint a successor escrow agent and the Escrow Agent shall, upon receipt of written instructions signed by both Seller and Buyer, turn over to such successor escrow agent all of the Escrow Funds; provided, however, that if Seller and Buyer fail to appoint a successor escrow agent within such thirty (30)-day period, such termination notice shall be null and void and the Escrow Agent shall continue to be bound by all of the provisions hereof. Upon receipt of the Escrow Funds, the successor escrow agent shall become the Escrow Agent hereunder and shall be bound by all of the provisions hereof and the Escrow Agent shall be relieved of all further obligations and released from all liability thereafter arising with respect to the Escrow Funds.

7.    <u>Investment</u>. The Escrowed Funds shall be invested by Escrow Agent in an insured interest bearing or money market account with an FDIC insured national or state bank or in another form of available investment(s) from time to time reasonably acceptable to Buyer and Seller. All interest and/or other income earned on the Escrow Funds from time to time shall be reported to the Puerto Rico Department of the Treasury, the United States Internal Revenue Service and other relevant taxing authorities as income of Buyer.

8.    <u>Compensation</u>. The Escrow Agent shall be entitled, for the duties to be performed by it hereunder, to a fee of Two Thousand Dollars ($2,000.00), which fee shall be paid one-half by Seller and one-half by Buyer upon the signing of this Agreement. In addition, Seller and Buyer shall be obligated to reimburse Escrow Agent for all fees, costs, and expenses incurred or that become due in connection with this Agreement or the Escrow Account, including reasonable attorney's fees as a result of any dispute between Seller and Buyer, and such fees, expenses or costs will be reimbursed one-half by Seller and one-half by Buyer, unless and until Seller or Buyer is the prevailing party by unappealable judicial decree in such dispute, at which time the nonprevailing party in such dispute shall be fully responsible for such fees, costs and expenses of Escrow Agent and for all prior payments thereunder by the prevailing party. Neither the modification, cancellation, termination or rescission of this Agreement nor the resignation or termination of the Escrow Agent shall affect the right of the Escrow Agent to retain the amount of any fee which has been paid, or to be reimbursed or paid any amount which has been incurred or becomes due, prior to the effective date of any such modification, cancellation, termination, resignation, or rescission.

9.    <u>Notices</u>. All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if sent by hand-delivery, by facsimile followed by first-class mail, by nationally recognized overnight courier service or by prepaid registered or certified mail, return receipt requested, to the addresses set forth below.

If to Seller:

    Doral Financial Corporation
    999 Ponce de Leon Blvd.
    Suite 730
    Coral Gables, FL 33134
    Attention: Enrique Ubarri, General Counsel
    enrique.ubarri@dfcmain.com

    With a copy to:

    Ropes & Gray LLP
    Prudential Tower
    800 Boylston Street
    Boston, MA 02199-3600
    Attention: James A. Wright III
    james.wright@ropesgray.com

If to Buyer:

    Banco Popular de Puerto Rico
    Popular Center, 3rd Floor
    208 Ponce de León Avenue
    San Juan, PR 00918
    Attention: Javier D. Ferrer
    Telecopier: (787) 751-8645
    E-mail: javier.ferrer@popular.com

With a copy to:

    Pietrantoni Méndez & Alvarez LLC
    Popular Center, 19th Floor
    208 Ponce de León Avenue
    San Juan, PR 00918
    Attention: Donald E. Hull
    Telecopier: (787) 274-1470
    E-mail: dhull@pmalaw.com

With an additional copy to:

    Skadden, Arps, Slate, Meagher & Flom LLP
    One Rodney Square, 7th Floor
    Wilmington, DE 19801
    Attention: Mark S. Chehi
    Telecopier: (302) 651-3001
    E-mail: mark.chehi@skadden.com

6

      If to Escrow Agent:

          Signature Bank
          565 Fifth Avenue, 12th Floor
          New York, New York 10017
          <u>Attention</u>: Thomas Kasulka, Group Director and Senior Vice President
          Fax No.: (646) 822-1833
          E-mail:  TKasulka@signatureny.com

      With an additional copy to:

          Signature Bank
          565 Fifth Avenue, 8th Floor
          New York, New York 10017
          <u>Attention</u>: Legal Department
          Fax No.: (646) 758-8188

10.    <u>General</u>.

    (a)    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be entirely performed within such State, without regard to choice of law principles, and any action brought hereunder shall be brought in the courts of the State of New York, located in the County of New York.  Each party hereto irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any manner permitted by applicable law and consents to the jurisdiction of said courts.  EACH OF THE PARTIES HERETO HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  Each party hereto consents to the jurisdiction of the Bankruptcy Court with respect to this Agreement.

    (b)    This Escrow Agreement (and to the extent applicable, the Purchase Agreement) embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein and all prior or contemporaneous agreements, understandings, representations and statements (either oral or written) are merged into this Escrow Agreement. Neither this Escrow Agreement nor any provision hereof may be waived, discharged or terminated except by an instrument in writing signed by the party against whom the enforcement of such waiver, discharge or termination is sought, and then only to the extent set forth in such instrument.  This Escrow Agreement may only be amended by a written agreement executed by Seller, Buyer and Escrow Agent.

    (c)    All of the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by, the parties hereto, as well as their respective successors and assigns.

7

(d)      If any provision included in this Agreement proves to be invalid or unenforceable, it shall not affect the validity of the remaining provisions.

(e)      This Agreement and any modification or amendment of this Agreement may be executed in several counterparts or by separate instruments and all of such counterparts and instruments shall constitute one agreement, binding on all of the parties hereto.

11.      <u>Form of Signature.</u> The parties hereto agree to accept a facsimile transmission copy of their respective actual signatures as evidence of their actual signatures to this Agreement and any modification or amendment of this Agreement; *provided*, *however*, that each party who produces a facsimile signature agrees, by the express terms hereof, to place, promptly after transmission of his or her signature by fax, a true and correct original copy of his or her signature in overnight mail to the address of the other party.

12.      <u>No Third-Party Beneficiaries</u>.  This Agreement is solely for the benefit of the parties and their respective successors and permitted assigns, and no other person has any right, benefit, priority or interest under or because of the existence of this Agreement.

13.      <u>No Joint and Several Liability</u>.  The liability and obligations of Buyer and Seller under this Agreement shall be several, not joint and several.

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the date first set forth above.

**BANCO POPULAR DE PUERTO RICO**

By: _____
      Name: Néstor Obie Rivera
      Title:   Executive Vice President

**DORAL FINANCIAL CORPORATION**

By: _____
      Name:
      Title:

**SIGNATURE BANK**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the date first
set forth above.

**BANCO POPULAR DE PUERTO RICO**

By: _____
  Name:
  Title:

**DORAL FINANCIAL CORPORATION**

By: _____
  Name: CAROL FLATON
  Title: CRO

**SIGNATURE BANK**

By: _____
  Name:
  Title:

By: _____
  Name:
  Title:

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the date first set forth above.

**BANCO POPULAR DE PUERTO RICO**

By: _____
    Name:
    Title:

**DORAL FINANCIAL CORPORATION**

By: _____
    Name:
    Title:

**SIGNATURE BANK**

By: _____
    Name:  Robert Bloch
    Title: Group Director

By: _____
    Name: Craig Stolow
    Title:  Associate Group Director

9

The Escrow Agent is authorized to accept instructions signed or believed by the Escrow
Agent to be signed by any one of the following on behalf of Buyer and Seller.

BANCO POPULAR DE PUERTO RICO

<u>Name</u>                                                          <u>True Signature</u>

Héctor Santiago Gómez

Consuelo M. Sifre

DORAL FINANCIAL CORPORATION

<u>Name</u>                                                          <u>True Signature</u>

Enrique R. Ubarri                                         _____

Carol Flaton                                               _____

54141425_1

The Escrow Agent is authorized to accept instructions signed or believed by the Escrow Agent to be signed by any one of the following on behalf of Buyer and Seller.

BANCO POPULAR DE PUERTO RICO

Name                                              True Signature

_____          _____

_____          _____

DORAL FINANCIAL CORPORATION

Name                                              True Signature

Enrique R. Ubarri                              _____

Carol Flaton                                     _____

The Escrow Agent is authorized to accept instructions signed or believed by the Escrow Agent to be signed by any one of the following on behalf of Buyer and Seller.

BANCO POPULAR DE PUERTO RICO

Name                                                    True Signature

_____                    _____


_____                    _____


DORAL FINANCIAL CORPORATION

Name                                                    True Signature

Enrique R. Ubarri                              _____


Carol Flaton                                    _____

**Exhibit C**

-------------NUMBER _____ (___)----------------

------------ DEED OF PURCHASE AND SALE --------------

---In the Municipality of San Juan, Commonwealth of Puerto Rico, this _____ (___) day of _____, two thousand fifteen (2015).------------------------

-------------------- **BEFORE ME** ----------------------

---_____, Attorney-at-Law and Notary Public in and for the Commonwealth of Puerto Rico with an office on the Nineteenth (19th) Floor of Popular Center, two hundred eight (208) Ponce de León Avenue, Hato Rey, San Juan, Puerto Rico and residence in _____, Puerto Rico.-----

----------------------**APPEAR**------------------------

---**AS PARTY OF THE FIRST PART: DORAL FINANCIAL CORPORATION,** a corporation duly organized and existing under the laws of the Commonwealth of Puerto Rico (hereinafter, the "<u>Seller</u>"), herein represented by its _____, _____, of legal age, [single/married], executive and a resident of _____, Puerto Rico, who has been duly authorized to appear herein on behalf of the Seller pursuant to a Certificate of Resolutions executed by _____, as _____ of the Seller, on _____ (___), two thousand _____ (20___), before Notary Public _____.---

---**AS PARTY OF THE SECOND PART: BANCO POPULAR DE PUERTO RICO**, a banking corporation duly organized and existing under the laws of the Commonwealth of Puerto Rico (hereinafter, the "<u>Buyer</u>"), herein represented by its Authorized Representative, _____, of legal age, _____,

1

_____ and a resident of _____, Puerto Rico, who has been duly authorized to appear herein on behalf of the Buyer pursuant to a Certificate of Resolutions executed by _____, as _____ of the Buyer, on _____ (\_\_), two thousand fifteen (2015), before Notary Public _____.-------------------------I, the undersigned Notary Public, do hereby certify that I am personally acquainted with the natural persons appearing on behalf of the appearing parties, and, from their statements, I also attest as to their age, civil status, occupation and place of residence. They assure me that they have, and in my judgment they do have, the legal capacity and knowledge of the English language necessary to execute this instrument, and, therefore, they freely and of their own will and accord:---------------------------------------------------------------- **STATE** ----------------------
---**FIRST:** Background. -----------------------------
-----(a) On _____, \_\_\_\_ (\_\_\_), the Seller filed a voluntary petition for reorganization relief in the case of _____, Case Number _____ (the "Bankruptcy Case") pursuant to Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). --------------------
-----(b) On _____, \_\_\_\_, the Buyer and the Seller entered into that certain Asset Purchase Agreement (the "Purchase Agreement") pursuant to which, subject to approval of the Bankruptcy Court, the Seller agreed to sell to the Buyer, and the

2

Buyer agreed to purchase from the Seller, free and clear of liens and encumbrances other than Permitted Exceptions (as such term is defined in the Purchase Agreement), certain assets (the "Purchased Assets") of the Seller more particularly described in the Purchase Agreement including, but not limited to, the real property described in Schedule I attached hereto (the "Property"). All of the representations, warranties and agreements of the Seller and the Buyer in the Purchase Agreement are incorporated herein by reference and shall survive the execution of this Deed to the extent provided in the Purchase Agreement. References herein to the Purchase Agreement shall not affect the rights of third parties. Defined terms used in this Deed and not otherwise defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.------

-----(c) Pursuant to an order of the Bankruptcy Court in the Bankruptcy Case, on _____ (____), two thousand fifteen (2015) an auction was held in _____, _____, pursuant to which the Buyer, as the favored bidder, agreed to purchase the Purchased Assets, including, but not limited to, the Property, subject to the approval of the Bankruptcy Court and the terms and conditions set forth in the Purchase Agreement.-----

-----(d) On _____, two thousand fifteen (2015), the Bankruptcy Court entered an order in the Bankruptcy Case (the "Sale Order") approving the sale to the Buyer of the Purchased Assets, including, but not limited to, the Property, free

3

and clear of all liens and encumbrances other than Permitted Exceptions (as such term is defined in the Purchase Agreement). A simple copy of the Sale Order (to which a copy of the Purchase Agreement is attached) is attached to and made a part of this Deed. A certified copy of the Sale Order has been filed in the Registry concurrently with the first certified copy of this Deed.-----------------------

---**SECOND**: <u>The Property</u>. The Seller represents that it is the owner in fee simple (*pleno dominio*) of the Property. The Property is subject to the liens and encumbrances of record that are described in <u>Schedule I</u>. As a condition precedent to the execution of this Deed, pursuant to the Sale Order all of the liens and encumbrances that encumber the Property are being canceled by the Seller concurrently with the execution of this Deed.-------

---**THIRD**: <u>Sale and Purchase of the Property</u>. The Seller has agreed with the Buyer on the sale to the Buyer of the Property in accordance with the following terms and conditions:---------------------

-----(a) <u>Purchase-Sale</u>. The Seller hereby sells to the Buyer, and the Buyer hereby purchases from the Seller, the Property, together with all its rights, easements, servitudes, appurtenances and improvements (including the Improvements, as such term is defined in the Purchase Agreement), without any limitation whatsoever, free of all mortgages, liens and encumbrances described in <u>Schedule I</u> hereto, subject to Permitted Exceptions.------------

-----(b) <u>The Purchase Price</u>. The purchase price (hereinafter, the "<u>Purchase Price</u>") of the Property

54168652_1

is the sum of _____ Dollars
($_____), which is paid by the Buyer to the
Seller in this act and the receipt and sufficiency
of which are hereby acknowledged by the Seller. The
Buyer and the Seller hereby acknowledge and agree
that, notwithstanding that the aggregate amount of
the monetary liens previously encumbering the
Property exceeds the Purchase Price, due to the
general contraction of the real estate market in
Puerto Rico, the Purchase Price represents the best
price obtainable for the Property, and thus the
current market value of the Property. Therefore,
the Buyer and the Seller herein state that it is
not their intention that the sale of the Property
effectuated hereby be construed as a gift or
donation by the Seller to the Buyer.----------------
-----(c) <u>Property Taxes</u>. Property taxes paid or
payable with respect to the Property shall be
apportioned as provided in the Purchase Agreement.--
-----(d) <u>As-Is</u>. The Buyer acknowledges and agrees
that the Seller is not making any representations
or warranties whatsoever, express or implied,
beyond those expressly given by Seller in Article V
of the Purchase Agreement, and the Buyer
acknowledges and agrees that, except for the
representations and warranties contained therein,
the Property is being transferred on a "WHERE IS"
and, as to condition, "AS IS" basis and "WITH ALL
FAULTS." Without in any way limiting the foregoing,
the Seller hereby disclaims any warranty (express
or implied) of merchantability or fitness for any
particular purpose as to any portion of the

5

54168652_1

Property; provided, however, that the Seller shall undertake and accept with respect to the Property the warranty of title ("*saneamiento por evicción*") imposed upon sellers of real property by the Civil Code of Puerto Rico.------------------------------(e) <u>Possession</u>. This Deed shall entitle the Buyer to enter into immediate possession of the Property without any additional formality or request.----------------------------------(f) <u>Expenses</u>. All costs and expenses of this Deed shall be apportioned as provided in the Purchase Agreement.------------------------------(g) <u>Successors and Assignees</u>. This Deed shall not confer any rights or remedies upon any Person other than the Seller and the Buyer, and their respective successors and permitted assigns.-----------**FOURTH**: <u>Additional Documents and Expenses</u>. The Seller and the Buyer hereby agree to execute and deliver such other public and private documents, as may be required by the undersigned Notary Public to formalize and record the foregoing transaction in the corresponding Section of the Registry.-------------**FIFTH**: <u>Request to the Registrar</u>. The Honorable Registrar of the Property is respectfully requested to record the transfer of title to the Property in fee simple (*pleno dominio*) in the name of the Buyer.---------------------------------------------**ACCEPTANCE, WARNINGS AND EXECUTION**------------The appearing parties to this Deed hereby accept the same as drafted, since it has been drawn up in accordance with their stipulations, terms and conditions.---------------------------------------

54168652_1

---I, the undersigned Notary Public, made to the appearing parties the necessary legal warnings concerning the execution of this Deed and they were fully advised by me thereon. I advised the appearing parties as to their right to read this Deed by themselves, which they did, and to have witnesses present at the execution thereof, which right they waived.---------------------------------

---Specifically, I advised the appearing parties with respect to: (a) the meaning and legal effects of the acts consummated pursuant to this Deed, having asked each of the persons appearing herein whether they had any further questions and allowing each of them ample time and opportunity to understand and comprehend the meaning and legal nature and effects of their acts; (b) that any liens or encumbrances, or any other matter affecting the title to the Property, that may be filed for recordation in the Registry prior to the filing of this Deed may be legally binding and could take precedence over this Deed; (c) the responsibility of the Seller regarding the obligations imposed by the Civil Code of Puerto Rico to a seller of real property; (d) that if the Property subject of this transaction is located in a flood prone area, any present or future titleholder or occupant thereof may be compelled by law to observe and comply with the requirements and provisions of the Flood Zone Regulations, and the appearing parties are hereby warned that failure to comply therewith may result in an unlawful act pursuant to the provisions of Section thirty (30)

7

of Act Number Eleven (11) of March eight (8),
nineteen eighty eight (1988), regarding flood
zones; (e) the advisability of the appearing
parties having a person with appropriate expertise
conduct an investigation to determine the
environmental condition of the Property; (f) the
need to file an Informative Return with the Puerto
Rico Department of Treasury and Change of Ownership
Petitions with the Municipal Revenues Collection
Center (hereinafter, the "CRIM") in connection with
the execution of this Deed; (g) that real property
taxes, including, without limitation, taxes
assessed pursuant to Act Number Seven (7) of March
nine (9), two thousand nine (2009), as amended
(hereinafter, "Act Seven"), corresponding to the
preceding five (5) tax years and the current tax
year constitute a senior, preferred statutory lien
encumbering the Property; and (h) of the
advisability of verifying the payment status of
such real property taxes and Act Seven taxes in the
records of the CRIM and the Puerto Rico Department
of Treasury.----------------------------------------
---I also advised the appearing parties that a
title search report in relation to the Property was
prepared by an independent third party and not by
the undersigned Notary Public, and that a certified
copy of this Deed will be filed for recordation in
the Registry by an independent third party and not
by the undersigned Notary Public.-------------------
---After having read the contents of this Deed, as
stated in all preceding paragraphs, the appearing
parties fully ratified and confirmed the statements

54168652_1

contained herein as the true and exact embodiment of their stipulations, terms and conditions, whereupon the appearing parties signed this Deed before me, the undersigned Notary Public, and placed their initials on each and every page of this Deed.------------------------------------------I, the undersigned Notary Public, do hereby certify as to everything stated or contained in this instrument.-------------------------------------TO ALL OF WHICH, under my signature, seal, mark and flourish, I, the undersigned Notary Public, do hereby ATTEST.------------------------------------

408134.1

9

**SCHEDULE I**

---The Property is described in the Registry of Property of Puerto Rico, Third Section of San Juan (the "Registry"), as follows:----------------------
-----"_____
_____.--------------------
---The Property is recorded in the Registry at page (*folio*) _____ (___), of volume (*tomo*) _____ (___) of Monacillos, property number _____ (_____).----------------
---The Seller acquired the Property pursuant to Deed Number _____ (__), dated _____,
_____, before Notary Public _____,
recorded at page (*folio*) _____ (___), of volume (*tomo*) _____ (____) of Monacillos, property number _____ (_____).---------------------------------------------
---The Seller states that the cadastre number assigned to the Property by the CRIM is "_____".-------------------------------------
---The Property is subject to the following liens and encumbrances of record: ---------------
-----(a) By its origin, to:----------------------
--------(i) _____.-
--------(ii) _____.
-----(b) By itself, to: ------------------------
--------(i) _____.--
--------(ii) _____.-
---The above described **[mortgages and the restrictive covenants]** have been canceled pursuant to the Sale Order. --------------------
 ---------------------- ------------------------

10

**EXHIBIT A**

-------------COPY OF THE SALE ORDER------------------

54168652_1

**<u>Exhibit D</u>**

<u>BILL OF SALE</u>

WHEREAS, on the date hereof, DORAL FINANCIAL CORPORATION, a Puerto Rico corporation ("<u>Seller</u>"), is conveying to BANCO POPULAR DE PUERTO RICO, a Puerto Rico banking corporation ("<u>Buyer</u>") certain Purchased Assets as more particularly described and defined in that certain Asset Purchase Agreement (Parking Parcel) (the "<u>Purchase Agreement</u>"), dated as of _____, 2015, between Seller and Buyer.  Terms not expressly defined herein shall have the meanings given thereto in the Purchase Agreement.

WHEREAS, in connection with the above-described conveyance, Seller desires to grant, convey, sell, transfer, set over and deliver to Buyer certain items of personal property as hereinafter described.

NOW, THEREFORE, in consideration of the receipt of good and valuable consideration paid in hand by Buyer to Seller, the receipt and sufficiency of which are hereby acknowledged, Seller has GRANTED, CONVEYED, SOLD, TRANSFERRED, SET OVER and DELIVERED and by these presents does hereby GRANT, CONVEY, SELL, TRANSFER, SET OVER and DELIVER to Buyer, its successors and assigns, any and all of Seller's right, title and interest in and to any and all Personal Property, including specifically, without limitation, appliances, furniture, furnishings, equipment and machines (including, without limitation, office, telephone and other telecommunication, cable and satellite television and computer equipment and machines, devices, tools, carpeting, draperies, curtains and other floor, window and wall coverings, lighting fixtures, decorations, artwork, signs and signage, and other items of personal property located at the Real Property, to have and to hold, all and singular, the Personal Property unto Buyer forever.

Buyer acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V of the Purchase Agreement, and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Personal Property is being transferred on a "WHERE IS" and, as to condition, "AS IS" basis and "WITH ALL FAULTS." Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Personal Property.

This Bill of Sale has been executed pursuant to the Purchase Agreement. All of the representations, warranties, agreements and indemnities of Seller and Buyer in the Purchase Agreement are incorporated herein by reference and shall survive the execution of this Bill of Sale to the extent provided in the Purchase Agreement.

(SIGNATURES APPEAR ON NEXT PAGE)

1

IN WITNESS WHEREOF, Seller and Buyer have caused their duly authorized officers to execute and deliver this Bill of Sale as of the date written above.

<u>SELLER</u>

**DORAL FINANCIAL CORPORATION**

By_____
Name:
Title:


<u>BUYER</u>

**BANCO POPULAR DE PUERTO RICO**


By: _____
Name:
Title:



Affidavit Num. _____:

Acknowledged and subscribed before me in San Juan, Puerto Rico on this __ day of _____, _____ by the following persons who are personally known to me: _____.



_____
Notary Public




2

## **Exhibit E**

## ASSIGNMENT OF INTANGIBLE PROPERTY

THIS ASSIGNMENT OF INTANGIBLE PROPERTY (this "Assignment"), dated as of _____, ____, is made by and between DORAL FINANCIAL CORPORATION, a Puerto Rico corporation ("Assignor"), and BANCO POPULAR DE PUERTO RICO, a Puerto Rico banking corporation ("Assignee").

### RECITALS

A.      Reference is made to that certain Asset Purchase Agreement (Parking Parcel) (the "Purchase Agreement"), dated as of _____, 2015, between Assignor and Assignee, pursuant to which Assignor agreed to sell to Assignee certain Purchased Assets as described and defined in the Purchase Agreement.  Terms not expressly defined herein shall have the meanings given thereto in the Purchase Agreement.

B.      The Purchase Agreement provides, *inter alia*, that Assignor shall assign to Assignee the Intangible Property as described and defined in the Purchase Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as set forth in this Assignment.

1.      Assignment of Intangible Property.  Assignor hereby assigns, sets over and transfers to Assignee any and all of its right, title and interest in, to and under the following: to the extent in Seller's actual possession and control and assignable or transferable without cost to Seller, (i) all existing warranties and guaranties (expressed or implied) issued or assigned to Seller in connection with the Real Property and the Personal Property, if any, (ii) all Permits, licenses, franchises and any other approvals and authorizations granted by any public body (or by any private party), and all applications therefor, used in or relating to the development, ownership, possession, occupancy, use or operation of the Real Property and the Personal Property or any part thereof, (iii) all architectural, engineering or other plans (including, without limitation, "as-built" plans), drawings and specifications, operating and maintenance manuals and records, ledgers, budgets and other accounting and business records and books, correspondence, mailing lists, and other records and documents used in or relating to the development, ownership, possession, occupancy, use or operation of the Real Property and the Personal Property or any part thereof, (iv) all telephone and other telecommunication numbers, if any, used in or relating to the ownership, possession, occupancy, use or operation of the Real Property and the Personal Property or any part thereof, and (v) all security and other deposits relating to the ownership, possession, occupancy, use or operation of the Real Property and the Personal Property or any part thereof including, without limitation, deposits with any utility provider.

2.      AS IS.  Assignee acknowledges and agrees that Assignor is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V of the Purchase Agreement, and Assignee acknowledges and agrees that, except for the representations and warranties contained therein, the Intangible Property is being assigned on a "WHERE IS" and, as to condition, "AS IS" basis and "WITH ALL FAULTS." Without in any way limiting the foregoing, Assignor hereby disclaims any warranty (express or

1

implied) of merchantability or fitness for any particular purpose as to any portion of the Intangible Property.

3.    <u>Purchase Agreement</u>.    This Assignment has been executed pursuant to the Purchase Agreement. All of the representations, warranties, agreements and indemnities of Assignor and Assignee in the Purchase Agreement are incorporated herein by reference and shall survive the execution of this Assignment to the extent provided in the Purchase Agreement.

4.    <u>Counterparts</u>.    This Assignment may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

(SIGNATURES APPEAR ON NEXT PAGE)

2

IN WITNESS WHEREOF, each party hereto has caused this Assignment to be duly executed as of the date written above.

ASSIGNOR

**DORAL FINANCIAL CORPORATION**

By_____
Name:
Title:

ASSIGNEE

**BANCO POPULAR DE PUERTO RICO**

By_____
Name:
Title:

Affidavit Num. ____:

Acknowledged and subscribed before me in San Juan, Puerto Rico on this __ day of _____, ____by the following persons who are personally known to me: _____.

_____
Notary Public

3

**<u>Exhibit F</u>**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Doral Financial Corporation, et al.[1] | : | Case No. 15-10573 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-----------------------------------------------------x

## BIDDING PROCEDURES

The following bidding procedures shall apply in connection with any initial overbids or counteroffers for the Buildings and the OA Parking Lot:[2]

1.  Any initial counteroffer or overbid for the Buildings (a "Building Counteroffer") or the OA Parking Lot (a "Parking Lot Counteroffer" and together with a Building Counteroffer, each a "Counteroffer") shall comply with the following requirements:

    1.1.  Any Building Counteroffer shall provide for a purchase price with a minimum cash or cash equivalent component payable at closing equal to the sum of (i) $20,300,000 plus (ii) $850,000.00, on account of the Breakup Fee and Expense Reimbursement, plus (iii) $450,000,000;

    1.2.  Any Parking Lot Counteroffer shall provide for a purchase price with a minimum cash or cash equivalent component payable at closing equal to the sum of (i) $1,500,000 plus (ii) $80,000;

    1.3.  Counteroffers may not include a requirement for a breakup fee, topping fee, expense reimbursement, or similar bid protection; and

    1.4.  A Parking Lot Counteroffer may be conditioned upon the bidder winning the auction for the Building and being approved by the Court as the successful purchaser of the Building. A Building Counteroffer, however, may not be conditioned upon the bidder winning the auction for the OA Parking Lot.

    1.5.  Any Counteroffer shall be accompanied by a deposit in the amount of five percent of the initial bid, delivered to the Debtors, by certified or cashier's check or wire transfer, so as to be received on or before January 11, 2016, the last business day prior to the first scheduled date of the Auction (as defined below).

---

[1] The last four digits of the taxpayer identification number of the Debtors are: Doral Financial Corporation (2162); Doral Properties, Inc. (2283).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the order approving these bidding procedures.

    1.6.  Any Building Counteroffer shall include agreement by the proposed buyer to, upon and continuing after Closing, accept the assignment of (and the proposed buyer's assumption of Doral Properties, Inc.'s obligations under) the Lease Agreement, dated July 31, 2015, between Doral Properties, Inc., and Banco Popular de Puerto Rico (as amended, the "Lease"), which lease agreement provides for the lease of the bank branch and certain related space at the Building through April 30, 2016. A copy of the Lease is available upon request.

2.  Any Counteroffer shall further comply with all of the following requirements; provided, that the Debtors may, in their discretion exercised in good faith and in consultation with counsel to the official committee of unsecured creditors (the "UCC") and in the case of the Building, counsel to UMB Bank, N.A., the trustee for the 1999 AFICA Bonds (the "Indenture Trustee") and without further order of the Court, waive any such requirements:

    2.1.  Any Counteroffer shall:

        2.1.1.  be in writing and be served on counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Mark I. Bane; Ropes & Gray LLP, so as to be received on or before 12:00 noon (Prevailing Eastern Time) on January 8, 2016 (the "Bid Deadline"), two business days prior to the first scheduled date of the Auction; and

        2.1.2.  be accompanied by (ii) executed asset purchase agreement(s) (the "Counteroffer Asset Purchase Agreement") and executed copies of all other transaction documents necessary to effect the proposed transaction (including all schedules) and a copy of the relevant Stalking Horse Agreements marked to show all changes requested by the bidder (including those related to purchase price); (ii) an executed confidentiality agreement; and (iii) written evidence of a commitment for financing or other evidence of the party's ability to consummate the transaction and payment of the purchase price at the Closing.

    2.2.  The terms and conditions of any Counteroffer must be, in aggregate, not materially more burdensome to Seller than provisions contained in the relevant Stalking Horse Agreement.

    2.3.  Any entity submitting a Counteroffer shall demonstrate, to the Debtors' satisfaction and in the Debtors' sole discretion exercised in good faith, that such entity is able to consummate the transaction(s) on the date and on the terms contemplated by the Counteroffer Asset Purchase Agreement(s).

    2.4.  Any entity submitting a Counteroffer shall agree to serve as a back-up bidder (the "Back-up Bidder") if such entity is designated as the second highest bidder at the Auction (as defined below). The Back-up Bidder's deposit shall be held until the earlier of (x) the closing of a transaction with the winning bidder and (y) twenty (20) days from the date of the Auction. Notwithstanding the foregoing, the Stalking Horse shall not be required to serve as the Back-up Bidder, and in the event that the

2

Stalking Horse is designated as the second highest bidder at auction, then the third highest bidder, if any, will serve as the Back-up Bidder.

3. Auctions (the "Auctions") for the Buildings and the OA Parking Lot will be conducted in order as described in the Motion by the Debtors at the offices of their counsel, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY, on January 12, 2016 at 10:00 a.m. (Prevailing Eastern Time), or at such other date and time as determined by the Debtors in their sole discretion, exercised in good faith and after consultation with the UCC. The Debtors will send notice by electronic mail to the Notice Parties and counsel to any entity that has submitted a Counteroffer if the date, time, or place of the Auctions changes.

    3.1.  The Debtors and their professionals will direct and preside over the Auctions.

    3.2.  If the Debtors select a Counteroffer as the highest and best bid at the commencement of either Auction, the Debtors must disclose such bid (including a copy of the Counteroffer Asset Purchase Agreement) to the Stalking Horse and its counsel no later than two (2) business days before the Auctions.

    3.3.  Each Stalking Horse Agreement and Stalking Horse bid at the Auction shall be deemed to be a qualified bid at the relevant Auction.

    3.4.  At the Auctions, the Debtors, after consultation with counsel to the UCC, may announce additional procedural or bidding rules for an Auction so long as the rules are not inconsistent with these Bid Procedures. The Debtors shall maintain a transcript of all bids made and announced at the Auctions. Bidding at the Auctions shall be conducted on an open basis with all bidders entitled to be present.

    3.5.  Each bidder participating at the Auctions must attend in person through a duly authorized representative and certify on record at the commencement of the Auctions that it has not and will not engage in any collusion with respect to the bidding or the sale.

    3.6.  The Debtors will continue the Auctions until there is one bid, or a collection of bids, for the Buildings or OA Parking Lot, as the case may be, that the Debtors determine in their sole discretion, exercised in good faith and after consultation with counsel to the UCC, and (in the case of the Building) with the Indenture Trustee, to be the highest or otherwise best bid for the subject Asset.

    3.7.  The applicable Breakup Fees and Expense Reimbursements will be credited to the Stalking Horse's bid(s) at the Auction for the Building.

    3.8.  Each subsequent bid at an Auction must comply with the requirements for a Counteroffer set forth herein.

4. A hearing to consider approval of the sales of the Buildings and the OA Parking Lot pursuant to the Stalking Horse Agreements or to other bidders submitting higher and better offers at the Auctions, and any objections to such sales, will be held on [January 14, 2016],

at [--]:00 p.m. (Prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10002.

53842743_10